In re: FRIEDMAN'S INC., et. al.

      Debtors.

ALAN COHEN, as Trustee of the Friedman's Creditor Trust

      Plaintiff,

vs.         407CV041

MORGAN SCHIFF & CO., INC., PHILLIP
E. COHEN, STERLING BRINKLEY,
BRADLEY J. STINN, VICTOR M.
SUGLIA, and ALSTON & BIRD LLP,

      Defendants.

## ORDER

## I. INTRODUCTION

### A. Overview

Friedman's Inc., a large jewelry store chain, financially collapsed and entered Chapter 11 Bankruptcy in 2005. *In re Friedman's, Inc.*, Case No. 05-40129 (Bankr.S.D.Ga. filed 1/14/05). The "Friedman's Creditor Trust" arose from that. Its Trustee filed an Adversary Complaint, Case No. 07-04042 (Bankr.S.D.Ga. 1/12/07), since withdrawn to this Court, *In re Friedman's Inc.*, 2007 WL 1541962 (S.D.Ga. 5/23/07) (unpublished), alleging 15 counts of wrongdoing on the part of Friedman's directors, officers, a controlling shareholder, and its attorneys. A-doc. # 1.[1] All defendants now move to dismiss the Complaint against them. Doc. ## 31, 35, 36, 38, 41.

---

[1] The Court will use "A-doc." to refer to docket filings in the Bankruptcy Court's Adversary No. 07-04042 -- the case withdrawn to this Court. *See* doc. # 27. The Court will simply use "Doc." or "doc." to refer to filings in this Court under case number 407CV041.

### B. FED.R.CIV.P. 12(b)(6) Standard

A Rule 12(b)(6) motion generally requires a Court to accept alleged facts as true. There are *a lot* of facts -- many of them damning -- alleged here. So it is worth pausing to review the 12(b)(6) standard, which itself pivots on F.R.Civ.P. 8(a)(2).

Under Rule 8(a)(2), one need only present a short and plain statement of one's claims, showing entitlement to relief. A plaintiff must show enough to "give the defendant[s] fair notice of what the ... claim is and the grounds upon which it rests...." *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S.Ct. 1955, 1964 (2007). Pre-*Twombly*, pleaded claims could only be dismissed when the plaintiff could prove "no set of facts" that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

*Twombly* "retired" the "no set of facts" standard. *Twombly*, 127 S.Ct. at 1969. Now, a complaint need not bear "detailed factual allegations," but must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 127 S.Ct. at 1964-65 (citation omitted); *Association of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007).

Thus, "[f]actual allegations must be enough to raise the right to relief *above* the speculative level, on the assumption that all the allegations in the complaint are true ...." *Twombly*, 127 S.Ct. at 1965 (citations omitted; emphasis added). *See also Weissman v. NASD*, 500 F.3d 1293, 1303 (11th Cir. 2007) (Pryor, J., concurring in part and dissenting in part) (advising the district court to revisit the pleadings because the *Twombly* decision rejected the notion that pleadings may rely on "the possibility that a plaintiff might later establish some set of undisclosed facts to

support recovery") (quotes, cites and alterations omitted). The bottom line here, then, is that

> while notice pleading may not require that the pleader allege a specific fact to cover every element or allege with precision each element of a claim, it is still necessary that a complaint contain either direct or inferential allegations respecting *all* the material elements necessary to sustain a recovery under some viable legal theory.

*Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282-83 (11th Cir. 2007) (quotes and cites omitted; emphasis added).

Too, it has long been the rule that "conclusory allegations and unwarranted deductions of fact are not admitted as true in a motion to dismiss." *South Fla. Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 408 n.10 (11th Cir. 1996). A plain statement of the facts must "possess enough heft to show" entitlement to relief. *Twombly*, 127 S. Ct. at 1966 (quotes, cite and alterations omitted). This includes a sufficient factual allegation to justify the requested relief. *Id.* at 1965.

Finally, the parties have referenced a considerable number of materials in the Complaint and dismissal-motion briefs. Ordinarily, courts

> do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir.1997). [The Eleventh Circuit] recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its

motion to dismiss. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999); *Brooks*, 116 F.3d at 1368-69.

*Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007).

## II. BACKGROUND

### A. The Defendants

Defendant Morgan Schiff (MS) was an investment banking firm with whom Friedman's contracted to provide investment banking and financial advisory services. *Id.* ¶ 2. MS ceased active operations in 2004. *Id.*

Defendant Phillip Cohen was the chairman, controlling shareholder and sole owner of MS. *Id.* ¶ 4. Additionally, Cohen held all of Friedman's Class B voting stock, thus giving him the right to elect 75% of Friedman's directors.[2] *Id.* ¶ 5. Friedman's 10-K[3] for fiscal year 2002 revealed that Cohen had "significant control over [Friedman's] business, policies and affairs, including the power to appoint new

_____

[2] Actually, MS Jewelers Corporation holds all of the Class B voting stock of Friedman's. But Cohen is the sole owner of MS Jewelers Corporation. *Id.* ¶ 5.

[3] A 10-K is

> [a] comprehensive summary report of a company's performance that must be submitted annually to the [SEC]. Typically, the 10-K contains much more detail than [a company's] annual report. It includes information such as company history, organizational structure, equity, holdings, earnings per share, subsidiaries, etc.

http://www.investopedia.com/terms/1/10-k.asp (site as of 1/8/08).

management, prevent or cause a change of control and approve any action requiring the approval of the holders of [Friedman's] common stock, including adopting amendments to [Friedman's] certificate of incorporation and approving mergers or sales of all or substantially all of [Friedman's] assets." *Id.*

Cohen also controlled Crescent Jewelers, Inc., another jewelry retailer to whom Friedman's provided significant financial assistance from 1996 until Crescent's bankruptcy in 2004. *Id.* ¶¶ 24, 36.

Defendant Sterling Brinkley was a Friedman's director from 1993 until 12/23/03. *Id.* ¶ 8. He also served as Executive Chairman of Friedman's Board of Directors at different times, but most importantly from 1998 until his resignation in 2003. *Id.* During his Friedman's tenure, Brinkley also was a director at Crescent and a paid consultant to MS. *Id.* ¶¶ 9, 10. As of 2003, he and his wife held approximately a 6% ownership interest in Crescent's common stock. *Id.* ¶ 9. Brinkley similarly occupied several other positions at Cohen-controlled entities during this time. *Id.* ¶ 11.

Defendant Bradley Stinn served as a Friedman's director and CEO from 1993 until his resignation on 12/2/03. *Id.* ¶ 14. Stinn, like Brinkley, also acted as a Crescent director and CEO while serving in those positions at Friedman's too. *Id.* ¶ 15. By 9/03, he held almost 3% of the total ownership of Crescent and served in various other positions at Cohen-controlled entities. *Id.* ¶¶ 15-17.

Defendant Victor Suglia, who has not made an appearance in this case, acted as Friedman's Senior Vice President and CFO, as well as its corporate treasurer and secretary, from 6/97 to 11/03. *Id.* ¶ 19. Suglia also was Crescent's

CFO during this time. *Id.* ¶ 37.

Finally, defendant Alston & Bird (A&B) is a law firm that acted as Friedman's outside general counsel from the 1990s until Friedman's, then run by a new board of directors, terminated A&B's representation in 2004. *Id.* ¶¶ 21, 187. Prior to its termination, A&B had advised special committees Friedman's appointed to approve transactions with Crescent. One special committee was Friedman's Audit Committee. A&B acted as its lead investigator after the Government alleged wrongdoing at Friedman's. *Id.* ¶¶ 21, 22. A&B attorney Mark McElreath, in turn, acted as A&B's main contact with Friedman's, and he became highly involved with the events of this case. *Id.* ¶ 30.

## B. Friedman's and Crescent

Crescent Jewelers, Inc., was a privately held retail jewelry corporation based in California. *Id.* ¶ 24. By late 2002, it operated 156 stores in seven western states. *Id.* As stated previously, Cohen controlled both Crescent and Friedman's through ownership of each company's class B voting stock. *Id.* ¶ 36.

Besides sharing the same controlling shareholder, Friedman's and Crescent had several overlapping directors. *Id.* ¶ 37. Brinkley and Stinn were directors at both simultaneously. *Id.* The two companies also shared CEOs and CFOs, Stinn and Suglia. *Id.*

From at least 1995 until its 2004 bankruptcy, Crescent struggled financially, operating at a loss in each of those fiscal years. *Id.* ¶¶ 39, 40, 41, 49, 76. Beginning in 1996, Cohen used his influence over Brinkley and Stinn to have Friedman's financially support Crescent. *Id.* ¶¶ 38-39.

Thus, in 1996 Friedman's gave Crescent $20 million in exchange for subordinated secured debt plus a "Standby Purchase Agreement" allowing Friedman's to purchase up to $5 million of Crescent's 10% Convertible Senior Subordinated Notes. *Id.* ¶ 39. Crescent also obtained a $50 million senior secured bank line of credit (also referenced by the parties as a "credit facility"[4]) as part of the refinancing. *Id.* MS acted as the investment banker and financial advisor to both Friedman's and Crescent on the transaction. *Id.*

In 1997, Friedman's exercised its option pursuant to the Standby Purchase Agreement and invested another $5 million into Crescent, taking subordinated notes from it for that amount. *Id.* ¶ 40. Despite Friedman's support, Crescent continued to operate at a loss for fiscal years 1997-1999. *Id.* ¶¶ 40-41.

In 9/99, Friedman's and Crescent's relationship dramatically changed. Crescent refinanced and obtained a $112.5 million credit line from Bank of America. *Id.* ¶ 42. In order for Crescent to obtain that, Friedman's had to guarantee it -- *i.e.*, if Crescent defaulted, then Friedman's would be called upon to pay off the debt. *Id.* But, the transaction still provided Friedman's with a secured position, meaning that in the event Crescent defaulted and Friedman's paid off the debt to the bank, Friedman's would then "step into the shoes" of the secured lender and have a priority position over all other creditors of Crescent. *Id.* Furthermore, as part of the transaction, Friedman's gave Crescent "credit enhancements," including access to $60 million of Friedman's eligible receivables and inventories. *Id.* In exchange, Friedman's received a 2% guaranty fee on the outstanding balance of Crescent's debt with a warrant to purchase Class A stock in Crescent equal to a 50% equity interest for an exercise price of $500,000. *Id.* ¶ 43. But exercising this option would not have given Friedman's the power to control Crescent because Cohen monopolized the voting rights through his ownership of Class B Stock. *Id.* Again, MS acted as the investment banker and financial advisor to both companies on the transaction. *Id.* ¶ 44.

During 2000, Brinkley, Stinn, Suglia and A&B created two agreements between Friedman's and Crescent whereby Friedman's would subsidize some of Crescent's overhead. *Id.* ¶ 45. According to the "Services Agreement," Friedman's would provide a "broad range of management services including but not limited to services relating to accounting, cash management, sales, audit, accounts payable, loss prevention planning and miscellaneous management services" to Crescent. *Id.* Friedman's would receive an annual fee from each Crescent store with the fee fluctuating depending upon the number of stores in operation. *Id.*

Under the second, "Information Technology Systems Integration Agreement," Friedman's provided Crescent with "an enhanced information technology system and ...

---

[4] As explained by a "Dictionary of Finance":

> Credit facility is the notion encompassing all types of loans marketed to all sorts of borrowers by lenders. There are four major types of credit facilities: committed facilities; revolving credits; term loans (business loans, syndicated loans); and letters of credit, equipment lines. Also called lending facility.

http://www.vernimmen.com/html/glossaire/definition_cr edit_facility.html (site as of 1/8/08). For convenience, the Court will primarily use the term "credit line" here.

complete[d] the integration of that system with Friedman's operations." *Id.* ¶ 46. Crescent was responsible for all costs and expenses for the work, but no specific price was set in the contract. *Id.* Plaintiff maintains that these agreements were heavily weighted in Crescent's favor to the detriment of Friedman's, just like the other investments. *Id.* ¶ 47.

In 9/01, Crescent defaulted on its $112.5 million line of credit with Bank of America. Its debt balance was then $109 million under that line. *Id.* ¶ 50. At about the same time, Bank of America notified Stinn and Suglia that it did not want to continue financing Crescent. *Id.* Crescent proceeded to contact eleven lending institutions about the possibility of extending a $50 to $60 million credit line. *Id.* ¶ 51. Included in the pitch to the lending institutions was that Friedman's would make a $70 to $75 million subordinated investment in Crescent to ease its debt situation. *Id.* Friedman's would accomplish such a proposed investment through a new $180 million credit line. *Id.* Plaintiff emphasizes, however, that at the time the banks were told this, Friedman's board had never addressed such an investment in Crescent. *Id.*

Crescent's financial situation worsened to the point that it required refinancing. Ernst & Young (E&Y), the auditor for both Friedman's and Crescent, engaged Ernst & Young Corporate Finance LLC (EYCF) to assess Crescent's chances of refinancing its outstanding debt to Bank of America. *Id.* ¶ 52. EYCF spoke with two of the lending institutions, previously contacted by Crescent, who both expressed concerns that Crescent's refinancing would require an investment by Friedman's so large that it could be considered a fraudulent

conveyance[5] by Friedman's creditors and shareholders. *Id.* ¶ 52.

In 12/01, Crescent and Bank of America came to terms on default waivers and an amendment to the existing line of credit. *Id.* ¶ 54. The new terms were so restrictive that A&B's McElreath sent emails to his partners and Stinn and Suglia explaining that the agreement needed to be analyzed by E&Y to determine if Crescent could abide by it and remain solvent. *Id.* ¶¶ 55-56. If they could not, McElreath explained to Stinn and Suglia, E&Y might have to issue an opinion questioning Crescent's ability to continue operating as a going concern -- meaning Crescent's ability to continue operating as a business entity. *Id.* ¶ 56. This could result in a call by Bank of America on Friedman's guaranty of Crescent's line of credit.

---

[5] The Trustee fails to explain why the banks believed this to be a potentially fraudulent conveyance. A treatise provides a generic explanation of fraudulent conveyance in this general context:

> Traditionally, it has been equally clear that transfers made or obligations incurred solely for the benefit of third parties do not constitute "fair consideration" or "reasonably equivalent value" to the transferor or obligor. Accordingly, where the transfer or obligation is made or incurred while the debtor is, or which has the result of rendering the debtor, insolvent or inadequately capitalized, such interests may be avoided in bankruptcy under [11 U.S.C.] section 548(a)(1)(B) [as a fraudulent conveyance] or, through [11 U.S.C.] section 544(b), state fraudulent conveyance law.

L. Ponoroff & S. Snyder, COMMERCIAL BANKRUPTCY LITIGATION § 10:37 (2007).

That, in turn, would require an assessment of Friedman's ability to pay that debt either through financing or its own funds. *Id.* If Friedman's could not make the payment, it too could receive a "going concern" opinion from E&Y. As part of the ongoing chain reaction, that could destroy Friedman's scheduled (1/02) $35 million stock offering. *Id.* ¶ 56-57. Friedman's auditors would not allow the company to file a registration statement with the SEC for a stock offering if there was an outstanding going-concern opinion. *Id.* ¶ 57.

Before the close of 2001, then, E&Y hired EYCF to perform two tasks: (1) assess Crescent's ability to comply with the new covenants under the line of credit; and (2) provide a valuation of Crescent. *Id.* ¶ 58. A valuation for Crescent was necessary because, if Friedman's guaranty was called, it would have to record a $109 million liability on its financial statements; but Friedman's, in turn, would be able to record the value of Crescent as an offsetting asset due to its secured position. *Id.*

E&Y notified A&B's McElreath that it was having difficulty with the valuation of Crescent using a fair market value basis as required by generally accepted accounting principles (GAAP). Doc. # 56 at 32.[6] Instead, E&Y came up with a value of Crescent in excess of $109 million, using a non-GAAP basis for valuation called "investment value." *Id.* This was defined as the "value to a particular investor [in this case, Friedman's] based on individual investment requirements and expectations." *Id.*

Friedman's then recorded, in its financial statements attached to its 10-K (a regulatory filing document submitted to the Securities and Exchange Commission (SEC) for fiscal year 2001, a $109 million value for Crescent. A-doc. # 1 ¶ 62. Friedman's ultimately received an SEC comment letter in 2002, questioning how it determined *under GAAP* the value of Crescent to offset the liability. *Id.* ¶¶ 90-91. As it turned out, that was only the start of its communications with the SEC. *Id.*

Friedman's at that time had three independent directors: John E. Cay III, Robert Cruickshank and David Parshall (the "independent directors"). *Id.* ¶ 28. These directors were "independent" because they neither served on Crescent's board nor had other conflicts of interests that would question their loyalty to Friedman's. The plaintiff alleges that the independent directors were never informed of the severity of Crescent's financial condition, including the valuation issues, potential going-concern opinions, fraudulent conveyance issues, Bank of America's unwillingness to continue the credit line, or the significance of the new terms and amendments to Crescent's credit facility. *Id.* ¶¶ 62-63.

During 2002, Crescent continued to decline and Friedman's continued to lend support. In 2/02, Bank of America gave Friedman's a confidential offering memorandum that would establish a $125 million Friedman's-only senior secured credit line. *Id.* ¶ 65. Friedman's, in turn, would terminate its guarantee of Crescent's credit line by making an $80 million investment in Crescent -- to be used to pay off the remainder of Crescent's debt to Bank of America. *Id.* But such a transaction between Friedman's and Crescent implicated conflicts of interests, given the overlapping directors and officers between the two companies. *Id.* ¶ 66.

---

[6] The Court's "CM/EFC" docketing software numbers this page as 32 while the printed document numbers this page as 18. The Court will use the docketing-software pagination, however, since that is what the public likely sees first when accessing the docket.

To deal with that conflict, A&B's McElreath suggested the creation of a Special Committee of Friedman's independent directors to either approve or disapprove of the transaction. *Id.* That committee was created at the 2/27/02 Friedman's Board Meeting, and it was composed of Friedman's independent directors. *Id.* ¶ 67. It was "charged with the power and duty to review any proposal by management regarding the strategic investment in Crescent, and after such review to approve or disapprove such investment in their sole discretion." *Id.* Initially, McElreath had said independent counsel from a Delaware law firm would be hired to represent the Special Committee, but when the committee began to meet A&B and McElreath acted as its counsel. *Id.* ¶ 66.

At the 2/27/02 board meeting, management told the independent directors that Friedman's $80 million investment would be a "junior *secured* investment" in Crescent. *Id.* ¶ 67 (emphasis added). Plaintiff claims that A&B's McElreath, who was present at that meeting, either knew or should have known, based on his knowledge of Crescent's financial situation, that

> any projection or representation to Friedman's board that the Company could make a significant "secured" investment (junior or otherwise) in Crescent at this time was fraught with the risk that that investment would be deemed a fraudulent conveyance (as well as the risk that the investment would be deemed or recharacterized as equity or subordinated to the level of unsecured debt) in the entirely plausible event that Crescent continued its nine year streak of operating losses and went into bankruptcy.

*Id.* ¶ 68. But A&B's McElreath never disclosed

such risks to the Special Committee to whom he acted as counsel during this time. *Id.* In fact, the Special Committee was never informed by anyone for that matter of these risks. *Id.* ¶ 72.

In 3/02, Crescent again defaulted on its credit line and Bank of America agreed to a fifth amendment of their credit agreement -- this time providing for even more restrictive terms. *Id.* ¶ 71. As part of the agreement, Friedman's expanded the amount of borrowing base reserve accessible to Crescent to $80 million from $60 million. Friedman's also had to advance $6 million to Crescent. *Id.* The independent board members were never told of any of these amendments, including the $6 million advance or the increase in borrowing base reserve support for Crescent. *Id.* ¶ 72.

The Special Committee met for the first time on 6/5/02. *Id.* ¶ 74. McElreath was present for that meeting and provided proposals to the members for an $85 million investment in Crescent -- $50 million in preferred stock and $35 million in subordinated notes (hence, a $35 million loan). *Id.* ¶ 74. Friedman's would establish a new $150 million credit line with Bank of America, from which it would draw $85 million to invest in Crescent. *Id.* Crescent would then immediately take that $85 million and pay off most of the $109 million debt that it already owed to Bank of America. *Id.* At the same time, Crescent would open a new $50 million credit line with Bank of America and immediately draw $24 million from that to pay off the difference owed on its previous line ($85 million + $24 million = $109 million). This is what ultimately occurred, when the Special Committee voted to approve the transaction two months later. *Id.* ¶ 81.

The Trustee, however, insists that the Special Committee lacked knowledge of certain key

facts and circumstances surrounding this transaction: First, the written proposals provided to the Special Committee on 6/5/02 said Crescent would grant Friedman's a "valid and perfected security interest in all of Crescent's present and future real and personal property and assets," subject only to Bank of America's priority position under the $50 million credit facility. *Id.* ¶ 74. But apparently after 5/17/02, all language on "A&B-prepared draft term sheets" about *perfected* security interests with respect to the $35 million loan was deleted and the loan, from that point forward, was identified as a "*subordinate* loan" instead of a "secured loan." *Id.* It is not apparent from the complaint whether McElreath pointed out these changes or not, but the Court will assume, based on the rest of plaintiff's arguments, that this is alleged.

Second, the Special Committee sought a fairness opinion regarding the transaction. *Id.* ¶ 75. A&B's McElreath recommended using Wedbush Morgan, a financial services and investment firm, and the Committee agreed. *Id.* But the plaintiff argues this fairness opinion was unreliable because Wedbush Morgan was not sufficiently independent from the transaction due to its position as an underwriter of Friedman's 1/02, $35 million stock offering. *Id.* Wedbush Morgan could not review the transaction objectively because as an underwriter it had "already accepted the collectibility of the $109 million Crescent obligation and Friedman's intention ... to provide further financial support for Crescent." *Id.* If Wedbush Morgan, says the plaintiff, determined the $85 million investment was not fair, "it would directly contradict the position it previously took as co-underwriter of Friedman's January 2002 offering." *Id.* Consequently, the independent directors, unbeknownst to them, made an enormous decision partly based on an unreliable fairness opinion by a biased Wedbush Morgan.

The Special Committee also sought a "downside analysis" from E&Y asking what happens if Crescent defaults on its new $50 million Bank of America credit line with a $44 million debt. *Id.* ¶ 76. E&Y, in preparing this downside analysis, consulted with McElreath regarding "security, priority of claims and what alternatives Friedman's would have in a default scenario." *Id.* ¶ 78. The downside analysis was prepared and delivered to the Committee on 8/26/02, the day before the Committee would vote on the transaction. *Id.* ¶ 76. It declared that, in the event Crescent defaulted on the credit facility with $44 million owed, Friedman's could pay that $44 million debt off to the bank and then "step into the shoes" of the bank -- giving Friedman's the ability to "foreclose on substantially all assets of Crescent and the stock of Crescent operating co. (held by Crescent parent co.) which are pledged as security under the bank credit facility." *Id.* ¶ 78.

As it turned out, this conclusion was wrong, and in the subsequent Crescent bankruptcy Friedman's lost its $85 million investment. *Id.* ¶ 79. Crescent and its creditors subordinated the debt owed to Friedman's to that of all other creditors because Friedman's was a "control person and a holder of equity." *Id.* According to the Trustee, McElreath knew, or should have known, that this would be the outcome because there were no provisions in the transaction giving Friedman's special rights to step into the shoes of the lenders. *Id.* The 1999 transaction between Friedman's and Crescent had such provisions, but this one did not. *Id.*

In the end, Friedman's exchanged its secured position (obtained as a result of the 1999 transaction) for an $85 million investment as a subordinated unsecured creditor of Crescent at a time when Crescent was in dire financial straits. *Id.* ¶ 87. The plaintiff essentially alleges

that Cohen, Brinkley, Stinn and Suglia, who owed loyalties to Friedman's, orchestrated this transaction to keep Crescent afloat at the expense of Friedman's. These non-independent directors intentionally failed to disclose material information to the independent directors about Crescent's financial condition so that they would approve the transaction. Nor did they mention that two directors, Stinn and Brinkley, received undisclosed payments of $600,000 each from Crescent for pushing the deal through. *Id.* ¶ 94. Plaintiff further alleges that A&B committed malpractice while acting as counsel to the Special Committee, and this also caused them to wrongly approve the fatal, $85 million investment.

## C. Friedman's and MS

Friedman's first entered into a relationship with MS in 1994 in an agreement to provide financial advice in the areas of capital structure, business strategy, budgeting and financial controls, mergers, and related areas. *Id.* ¶ 96. Initially, the contract called for Friedman's to pay a $400,000 annual retainer in monthly installments to MS. *Id.* In addition, Friedman's paid "fees" for any other services that the two parties agreed MS would provide in connection to transactions, the "expenses" incurred by MS in relation to its services, and out-of-pocket expenses for Friedman's Chairman Sterling Brinkley[7] "incurred in connection with the financial advice and assistance provided" to Friedman's. *Id.* ¶ 96-97. This contract by its terms only lasted one year but was automatically renewed unless either party gave thirty days written notice of cancellation. Friedman's continued the agreement every year until it

terminated the contract in 2004. Doc. # 44 at 9.

Starting in 10/01, the parties altered their fee agreement such that Friedman's would pay MS a flat fee of $1.44 million per year ($120,000 monthly), which included the retainer for advisory services, expenses related to advisory services, and Brinkley's out-of-pocket expenses. A-doc. # 1 ¶ 98. This represented over a $500,000 increase from the amounts paid in fiscal years 2000 and 2001, but presumably Friedman's board agreed to it.[8] *Id.* ¶ 97. The flat fee breaks down as follows: $400,000 retainer for advisory service fees ($33,333.33 per month), $320,000 for MS's expenses ($26,667 per month), $720,000 for Brinkley's expenses ($60,000 per month). *Id.* ¶ 98. In addition to the flat fees, Friedman's also paid MS, as agreed upon by Friedman's board, an extra $1 million fee in 2002 for services performed in relation to the $85 million investment and refinancing of Crescent. *Id.* ¶¶ 93, 103.

The gist of the plaintiff's grievances against the defendants, as they relate to the contract with MS, is that Friedman's was paying an exorbitant amount of fees to MS, and MS was not performing the work to earn them. Accordingly, payments to MS were simply an attempt to loot Friedman's by Cohen, MS, Brinkley and Stinn. *Id.* ¶ 93.

As evidence for this charge, plaintiff points to the size of the payments ($1.44 million a year) and the fact that minimal if any back up was provided to substantiate the expenses. *Id.* ¶ 111.

---

[7] Brinkley's expenses were submitted through MS because he worked out of MS's office as a paid consultant for MS. Doc. # 56 at 56.

[8] The Complaint states that the agreements were changed. It does not specifically say that Friedman's board agreed to the change, but the Court will presume that it did because the plaintiff fails to point to anyone else who made the change without board approval. *Id.* ¶ 98.

Also, MS submitted a revised fee allocation summary in 2002 that substantially recharacterized its fees for that year. *Id.* ¶ 102. This occurred after E&Y expressed concerns over how the fee summary was allocated previously and the fact that Friedman's capitalized all of these expenses. *Id.* ¶¶ 99-102. The first fee summary allocation split the fees up as stated above: $400,000 retainer for advisory services, $320,000 for MS expenses, and $720,000 for Brinkley expenses.[9] *Id.* ¶ 100.

Apparently, Friedman's Audit Committee questioned the $720,000 in expenses attributable to Brinkley. *Id.* ¶ 101. The revised allocation, then, left the retainer the same, reduced MS's out-of-pocket expenses by $20,000 and reduced Brinkley's out-of-pocket expenses from $720,000 to only $40,000. However, new fees were included to reach the same total, including: $600,000 for an "[i]ncremental allocation related to capital markets transactions" and $100,000 for "[p]rofessional fees related to transactions." *Id.* ¶ 102. A note on the revised allocation explained that the $600,000 constituted "investment banking service fees" for work performed on the 2002 transaction with Crescent -- work for which MS had already requested $1 million as payment from Friedman's. *Id.* ¶¶ 102-103. This recharacterization is alleged to have prevented a fuller review, by E&Y or the independent directors, of what Friedman's was actually being billed for. *Id.* ¶ 104.

Further changes to the allocation of fees in 6/03, according to the plaintiff, should raise greater speculation about the legitimacy of MS's

fees. *Id.* ¶ 110. Suglia, along with other defendants, attempted to raise MS's retainer to $1,000,000 from $400,000 so that there would only be a balance of $440,000 of variable expenses to substantiate. *Id.* ¶ 111. The total payment stayed the same but the allocation for accounting purposes changed. *Id.* Plaintiff questions how legitimate these expenses and fees could be if they can be recharacterized on both occasions with such ease.

In that regard, the Trustee points to Friedman's own executive, Suglia, who complained about the size of the fees and did not know why Friedman's was paying them. *Id.* ¶ 105. He "considered the amounts of money that were paid to [MS] to be arbitrary and just a way to get MS money...." *Id.*

The revised invoice, increased retainer and Suglia's statements constitute the basis for the majority of the plaintiff's claims regarding this relationship. Essentially, MS did not really perform any work, yet received large fees just to give itself, Cohen and Brinkley more money to Friedman's detriment, and many of the defendants acted to achieve that end.

## D. Friedman's and A&B

As already discussed above, A&B, chiefly through its representative McElreath, acted as Friedman's outside general counsel. A&B was intimately involved with the financial dealings between Friedman's and Crescent, orchestrating the 2000 Services Agreements and the 2002 investment. During its representation, A&B, due to its contact with Stinn and Suglia, was privy to all of the inside information on the financial condition of Crescent, much of which it is alleged was never disclosed to the independent directors. When Friedman's board approved the establishment of the Special

---

[9] Also included were two unpaid invoices from the previous year totaling $182,000, an amount that carried over into 2002. *Id.* ¶ 99. The Court does not address these fees because there is no argument made about them in the Complaint.

Committee charged with the duty to approve or disapprove of the 2002 transaction, A&B acted as counsel to that committee. Plaintiff brings legal malpractice and breach of fiduciary duty claims against A&B. These claims arise from A&B's failure to disclose known material information to the Committee, and for providing it with erroneous legal advice.

Moreover, A&B prepared a proposed revised Financial Services Agreement between Friedman's and MS to reallocate the fees paid to include a $1 million retainer at Suglia's request. *Id.* ¶¶ 110, 114. Plaintiff alleges that A&B's involvement put it on notice that the allocation between fees and expenses under the agreement was "arbitrary and phony" and that MS, Cohen and Brinkley were defrauding Friedman's through illegitimate expenses. *Id.* ¶¶ 112-114. Yet, A&B never reported this to any of the independent directors; rather, it acquiesced in drafting the agreements that furthered the activity. *Id.* ¶ 114.

A&B's representation expanded when it took on a new role in 9/03. Friedman's was named as a defendant in a complaint filed by Capital Factors for misrepresentation of balances Friedman's owed to another jewelry company, Cosmopolitan. *Id.* ¶ 126. A&B's John Latham was contacted by an assistant U.S. attorney for the Eastern District of New York and informed that the Government was investigating Friedman's based on that complaint. *Id.* ¶ 136. After Latham told Friedman's Audit Committee of the investigation, the Audit Committee decided to conduct its own independent investigation of the matter. *Id.* ¶ 137.

Stressing the importance of maintaining the independence of the investigation, the Audit Committee resolved to exclude certain people from participation, including McElreath and

certain individuals from E&Y. *Id.* Then it retained Latham of A&B to conduct the investigation. *Id.* Of course, A&B was not independent considering it was Friedman's general counsel, but this was disclosed, along with other conflicts of interest, to the Audit Committee in a letter from Latham to the Chairman of the committee and Friedman's in-house counsel. *Id.* ¶ 140.

The scope of this investigation quickly ballooned as the SEC and Department of Justice (DOJ) began a formal inquiry into accounting and credit issues at Friedman's, as well as many of the financial transactions between Friedman's and Crescent that A&B had directly worked on. *Id.* ¶¶ 147-169. Plaintiff alleges that A&B should have never accepted the representation due to its conflicts, and that any attempted disclosure of conflicts was inadequate.

Furthermore, the Trustee contends, even if A&B properly accepted the representation and disclosed its conflicts, it nevertheless failed to obtain, as its conflicts became more severe when the investigation expanded, a new waiver of its conflicts of interest from Friedman's. Due to such conflicts, says the plaintiff, A&B performed an inadequate investigation, and this forced Friedman's to hire new counsel to substantially redo the same work that A&B had been retained to perform.

To potentially add to its conflicts, A&B in 2004 attempted to represent the individual Audit Committee members in relation to both the SEC/DOJ investigations and the derivative and class actions that had been filed against Friedman's beginning in late 2003. *Id.* ¶ 184. True, A&B did send a proposed conflict waiver letter to the individuals, but such a waiver must be obtained by an official of the corporation other than the individual to be represented. *Id.*

¶ 188. Since that was not done, A&B never obtained a proper waiver for this representation.

Plaintiff combines these conflicted representations and inadequate consent waivers to bring further malpractice and breach of fiduciary duty claims against A&B.

### E. Friedman's Downfall

Despite the refinancing and huge investment by Friedman's, Crescent's decline continued until it went bankrupt in 2004 and Friedman's completely lost its $85 million investment. *Id.* ¶ 87. Unsurprisingly, Friedman's met its doom shortly thereafter in 2005 when it filed for bankruptcy. *Id.* ¶ 203. But between the investment and the bankruptcy of both companies, several notable events unfolded.

In 2003, Crescent was on the verge of defaulting on its required dividend payments to Friedman's (on Friedman's investments in Crescent). *Id.* ¶¶ 131-132. Such a default would violate Crescent's credit line with the bank, so A&B advised Crescent to pay the dividend, but Friedman's would immediately reinvest it in Crescent as subordinated debt or preferred stock. *Id.* ¶ 132. In effect, Friedman's never received any payments from Crescent on Friedman's investment, then later lost its entire investment in Crescent's bankruptcy.

Meanwhile, the SEC and DOJ investigations picked up steam and began to unearth a variety of accounting and credit issues at Friedman's. *Id.* ¶ 156. By 11/03/03, Friedman's received an SEC subpoena for all documents related to: payments made to Friedman's directors and officers, payments to MS, minutes of board meetings and Audit Committee meetings, and the transactions between Friedman's and Crescent. *Id.* ¶ 168. The subpoena also sought documents relating to Friedman's various accounting practices. *Id.* ¶ 169. On 11/11/03, the SEC announced that it was conducting a formal investigation of Friedman's.

That precipitated the first in a series of lawsuits filed against Friedman's. *Id.* ¶ 174. Soon thereafter, Friedman's announced it would be restating its financial results for fiscal years 2000, 2001, 2002 and the first three quarters of 2003. *Id.* ¶ 175. By the end of 12/03, Friedman's had either placed on leave or terminated Suglia, Stinn and Brinkley (CEO, CFO and Chairman of Board).

In 5/04, control of Friedman's board completely changed; all former board members were replaced with newly elected members. *Id.* ¶ 187. The new board appointed a Special Litigation Committee, which fired A&B and replaced it with "conflicts-free" counsel. *Id.*

Friedman's new board also hired restructuring advisors, Kroll Zolfo Cooper LLC (Kroll), to assist in the restatement of its financials. *Id.* ¶ 194. Kroll apparently found significant accounting fraud at Friedman's and identified around $201 million of necessary adjustments in Friedman's financial statements affecting fiscal year 2000-04 net income. *Id.* ¶ 195. The Trustee alleges various forms of manipulation attributed to Friedman's former management and directors, chiefly Brinkley, Stinn and Suglia.

Friedman's financial performance and financial condition suffered immensely as a result of the need to restate its historical financials and its $85 million lost investment in Crescent. *Id.* ¶ 203. The financial strain was too much, so Friedman's filed for bankruptcy. *Id.* The Court will now turn to the Friedman's Creditor Trust Trustee's various claims.

## III. ANALYSIS[10]

### A. Count I -- Breach of Contract Against MS and Cohen

#### 1. *MS*

The plaintiff alleges that MS breached its contract with Friedman's by:

(1) billing Friedman's for unreasonable and illegitimate expenses, and performing services under the agreement not on behalf of Friedman's but rather for other parties -- to Friedman's detriment; and

(2) billing Friedman's $600,000 more than agreed upon for MS's services related to the 2002 refinancing transaction.

*Id.* ¶¶ 212-215 (paraphrased).

Pursuant to the contract's choice of law provision, New York law applies here. *See* doc. # 41, exh. A ¶ 7. Nothing about the application of New York law in this case contravenes the public policy or interests of the state of Georgia. *See Convergys Corp. v. Keener*, 276 Ga. 808, 810 (2003) (Georgia courts refuse to effectuate choice of law provisions "where application of the chosen law would contravene the policy of, or would be prejudicial to the interests of, this state"). Considering New York (headquarters of MS) was most likely the situs of the majority of services performed, Georgia's adherence to *lex*

*loci contractus*[11] also calls for New York law to govern the contract. *Id.* at 811.

MS first argues that plaintiff's allegations fail *Twombly*'s pleading requirements. Again, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." *Twombly*, 127 S.Ct. at 1965 (quotes and cites omitted). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. But "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of these facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 1965 (quotes and cites omitted).

With respect to expenses billed, the plaintiff claims that MS billed Friedman's for illegitimate expenses not related to services provided under the contract. This includes MS's overhead and "personal expenses of Cohen and Brinkley such as expensive car leases, the costs of a driver for Brinkley, tax preparation services and life insurance payments, unauthorized additional compensation for [MS], Brinkley and/or Cohen, and other unauthorized or fabricated expenses." *Id.* ¶ 213.

In all contracts, New York law implies a "covenant of good faith and fair dealing in the course of performance." *511 West 232nd*

---

[10]  Unless otherwise indicated, the Court will apply Georgia law here. Both the Trustee (doc. ## 56, 56-2) and all of the defendants (doc. ## 31, 35, 37, 39, 44) cite to Georgia law in their briefs and make no arguments, except as discussed *infra*, that any other state's law should apply.

[11]  "Under this approach, [contracts] are to be governed as to their nature, validity, and interpretation by the law of the place where they were made, except where it appears from the contract itself that it is to be performed in a State other than that in which it was made, in which case ... the laws of that sister State will be applied...." *General Telephone Co. of Southeast v. Trimm*, 252 Ga. 95, 95 (1984) (quotes and cites omitted).

*Owners Corp. v. Jennifer Realty Co.*, 773
N.E.2d 496, 500 (N.Y. 2002) (cites omitted).
"This covenant embraces a pledge that neither
party shall do anything which will have the
effect of destroying or injuring the right of the
other party to receive the fruits of the contract."
*Id.* (quotes and cites omitted).

MS's retort that the covenant only applies to
"conduct that impedes the performance of the
contract" misses the target. Doc. # 62 at 12.
Rather, it encompasses "any promises which a
reasonable person in the position of the promisee
would be justified in understanding were
included." *Jennifer Realty Co.*, 773 N.E.2d at
501. Certainly an implied promise to charge
only legitimate fees constitutes a justifiable
expectation on the part of Friedman's under this
agreement. Thus, plaintiff asserts, MS violated
the implied covenant of good faith and fair
dealing by billing Friedman's for illegitimate
and arbitrary expenses.

To support his claims, the Trustee points to
statements made by Friedman's CFO, Suglia,
that he

> considered the amounts of money that
> were paid to [MS] to be arbitrary and just
> a way to get [MS] money and [he] stated
> that he did not know why Friedman's was
> paying the fees and that [MS] was not
> doing work to warrant the fees....

A-doc. # 1 ¶ 105. The Complaint includes
emails which show Friedman's conflicted
directors and executives recharacterizing the fees
that were paid to MS to appear to be more
legitimate. *Id.* ¶¶ 100, 102, 110, 111. The Audit
Committee of Friedman's Board in 2002 raised
issue with the billing of $720,000 in billed
expenses for Friedman's chairman, Brinkley. *Id.*
¶ 101. The invoice was then adjusted to show

only $40,000 in expenses attributable to
Brinkley, but it then added $600,000 in
expenses titled as "Incremental allocation
related to capital markets transactions." *Id.* ¶
102. Suddenly, then, this $600,000 was for
additional investment banking service fees
related to MS's work on the 2002 refinancing
transaction. *Id.*

Additionally, in 2003 emails and memos
from Friedman's, CFO Suglia express a desire
to change the annual retainer paid by
Friedman's to MS from $400,000 to $1,000,000
in order to "shift a large % of the variable
expenses to the retainer and provide the
appearance of being more in line...." *Id.* ¶¶ 110,
111. The retainer had to be changed also
because MS, due to issues raised in an audit by
Ernst & Young, had to "account for and
substantiate their expenses" with appropriate
documentation. *Id.* These emails support the
claim that MS was simply billing Friedman's for
illegitimate expenses because MS had obviously
not been furnishing documentation for these
expenses, and thus the parties recharacterized
out-of-pocket expenses to a "retainer" to avoid
questioning of amounts billed.

If, as plaintiff claims and supports with the
statements and emails of its CFO, MS was
simply billing Friedman's substantial fees for
non-performed services, that would constitute
breach of the covenant of good faith and fair
dealing in the contract. The facts, as pled by the
plaintiff, are sufficient to meet the plausibility
standard of *Twombly*.

And since plaintiff's allegations all sound in
wilful and wanton misconduct, the exculpatory
provision contained in the contract between the
two parties is not applicable. See Doc. # 44 at
12 n. 4. New York enforces exculpatory clauses
where a party relieves himself from his own

negligence, except for that negligence which amounts to wilful misconduct or gross negligence. *Dubovsky & Sons, Inc. v. Honeywell, Inc.*, 89 A.D.2d 993, 994-995 (N.Y.A.D. 1982). The Court only finds allegations of *wilful* (not negligent) misconduct on the part of MS -- by wilfully charging Friedman's for expenses it did not earn. Therefore, the exculpatory provision is inapplicable to this breach of contract claim.

MS next argues that Friedman's Board ratified the payments to MS -- first when it approved the amounts payable, and second when it renewed the agreement with MS annually for approximately ten years. Doc. # 62 at 9.

Failure to repudiate an agreement or object to invoices coupled with payment of those invoices constitutes ratification. *Mulitex USA, Inc. v. Marvin Knitting Mills, Inc.*, 12 A.D.3d 169, 170 (N.Y.A.D. 2004). MS points out that, not only did Friedman's pay the invoices and repeatedly renew the agreement, but Friedman's also agreed to the new flat fee arrangement in 2001. A-doc. # 1 ¶ 98. MS further states that the Friedman's Board and Audit Committee met in 2002 to discuss fees payable to MS for that year. The independent board members were aware of MS's invoices because two of them were on the Audit Committee that reviewed the payments made. *Id.* ¶¶ 28, 101. Therefore, Friedman's knew of these fees and continued to approve their payment. The Company also, with Board endorsement, publicly disclosed a detailed breakdown of the fees it authorized in 2002 to be paid to MS including the fee for the refinancing transaction. *Id.* ¶ 108. MS urges that Friedman's ratified these payments to it through its continued business dealings with and payments to MS.

An effective ratification requires that the principal possessed full knowledge of all material facts relevant to the act ratified. *Cologne Life Reinsurance Co. v. Zurich Reinsurance (North America), Inc.*, 286 A.D.2d 118, 128 (N.Y.A.D. 2001). The plaintiff states that Friedman's did not ratify the payments because they were made without "the informed consent of Friedman's Independent Directors, who were unaware that [MS]'s fees and expenses (though represented as appropriate and legitimate) were in fact 'arbitrary' and unearned." Doc. # 56-2 at 21.

However, the independent directors in fact knew about the change to a flat fee arrangement and agreed to it. A-doc. # 1 ¶ 98. The independent members on the Audit Committee also reviewed and approved payments made to MS. *Id.* ¶ 101. This sufficiently constitutes ratification by Friedman's.

In an attempt to void that ratification, the plaintiff makes a conclusory allegation sounding in fraud that MS's expenses were presented as legitimate but were actually "arbitrary and unearned." Doc. # 56-2 at 21. Fraud has five elements: (1) a false representation by a defendant; (2) scienter; (3) intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *Johnson v. Rodier*, 242 Ga.App. 496, 498 (2000).

Due to the inclusion of a fraud claim, plaintiff must satisfy F.R.Civ.P. 9(b), which requires, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The rule is satisfied if

the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions

were made; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud.

*U.S. ex rel. Clausen v. Laboratory Corp. of Am., Inc.,* 290 F.3d 1301, 1310 (11th Cir. 2002).

But the plaintiff fails to support his claim with any particular pleadings required by Rule (9)(b) for pleading fraud. The Complaint points to zero misrepresentations that induced Friedman's to make the payments. Identification of specific misrepresentations is an essential element to a fraud claim. *Johnson,* 242 Ga. App. at 498. Accordingly, plaintiff has failed to sufficiently plead facts to void ratification of these payments by Friedman's board and independent directors.

Plaintiff's second claim against MS is that MS billed Friedman's for $600,000 more than agreed upon for work related to the 2002 refinancing transaction. This satisfies the *Twombly* standard. The Trustee asserts that Friedman's Audit Committee and Board agreed to pay MS $1,000,000 for its work on the refinancing transaction. *Id.* ¶ 103. There is no dispute from MS that this was the agreement. Yet, plaintiff cites a revised MS invoice billing Friedman's another $600,000 in 2002, for an "Incremental allocation related to capital markets transactions." This was attributed to "investment banking services fees" related to the work on the 2002 refinancing transaction. *Id.* ¶ 102. But this $600,000 was originally characterized as part of Brinkley's out-of-pocket expenses, then recharacterized as fees for the 2002 refinancing transaction. *Id.* Due to the recharacterization, Friedman's wound up paying MS $1,600,000 for its work on the 2002 refinancing transaction, when it had only agreed to pay $1,000,000. These facts, as pled, support plaintiff's breach-of-contract theory.

MS claims that the contract's "plain language confirms, that it was authorized by contract to receive a fee in relation to any separate transactional matters to which Friedman's Board assigned it and agreed to pay a fee." Doc. # 62 at 8 n. 2. There is no argument from the plaintiff that Friedman's agreed to pay $1,000,000 in addition to the flat fee annual payment of $1.44 million. However, what the plaintiff alleges and supports is that Friedman's only agreed to pay MS $1,000,000 *total* for its services on the separate transactional matter of the 2002 refinancing transaction. So as a separate transactional matter, no fees for it should have been included in the flat fee payment. As the plaintiff shows, $600,000 dollars of the flat fee payment were attributed to services on the separate transactional matter, creating a total of a $1,600,000 fee for the 2002 refinancing transaction to which MS was not entitled under the separate-transaction agreement. Therefore, plaintiff has sufficiently pled breach of contract, and MS's motion to dismiss this claim is denied.

### 2. *Cohen*

The plaintiff next asserts a claim against Cohen individually for breach of contract. This stems from the agreement between Friedman's and MS. A-doc. # 1 ¶ 216. The plaintiff concedes that Cohen is not a party to this contract and thus, the only way in which Cohen can be found liable is if he and MS are found to be alter egos -- thus justifying a disregard of the corporate entity. Doc. # 56-2 at 14.

"Under the alter ego doctrine in Georgia, the corporate entity may be disregarded for liability purposes when it is shown that the corporate form has been abused." *Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 290 (2005). "The corporate entity may be disregarded only in exceptional circumstances." *McKesson Corp. v. Green*, 266 Ga. App. 157, 166 (2004).

"In Georgia, these exceptional circumstances include evidence of shareholder control of the corporation, such disregard for the corporate form as to make the corporation a mere sham or a business conduit for the shareholder personally, or manipulation of the corporation by the shareholder in order to commit fraud or evade statutory, contractual, or tort liability." *Id.* "Plaintiff must show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." *Baillie Lumber*, 279 Ga. at 290.

To support this claim, plaintiff makes several allegations purporting to show that Cohen abused MS's corporate form, including:

(1) Cohen clearly dominated MS, as he was its chairman and 100% owner;

(2) Cohen abused MS's corporate form by, *inter alia*, treating his own personal "out-of-pocket" expenses as those of the corporation and billing Friedman's and Crescent for his own personal expenses related to luxury car leases, personal drivers, tax preparation and life insurance;

(3) Cohen used MS to defraud Friedman's by billing it vast sums for little or no work, and by billing it for his personal expenses and MS operating expenses (which were not reimbursable under MS's contract with Friedman's);

(4) Cohen allowed Brinkley to use MS to improperly bill Friedman's; and

(5) To the extent that MS provided any "financial advice" at all, it was for the benefit of Cohen's personal financial interests (*i.e.*, to keep Crescent alive as a separate entity) rather than for the benefit of Friedman's.[12]

Doc. # 56-2 at 15-16 (paraphrased); A-doc. # 1 ¶¶ 4, 204-216.

Cohen responds that, even assuming all of these allegations are true, plaintiff's claim must be dismissed because it fails to allege that MS was insolvent. Doc. # 37 at 12. Georgia law requires, "as a precondition to a plaintiff's piercing the corporate veil and holding individual shareholders liable on a corporate claim, that there be insolvency on the part of the corporation in the sense that there are insufficient corporate assets to satisfy the plaintiff's claim." *Johnson v. Lipton*, 254 Ga. 326, 328 (1985); *see also Perry v. Unum Life Ins. Co. of America*, 353 F.Supp.2d 1237, 1240 (N.D.Ga. 2005) (citing to *Johnson*); *Omega Patents, LLC v. Fortin Auto Radio, Inc.*, 2006 WL 3544823, at * 2 (M.D.Fla. 12/8/2006) (unpublished) (also citing to *Johnson*).

---

[12] Plaintiff further alleges in his brief that certain bank records show funds wired into MS's operating account were routinely transferred the next day to Cohen and his wife's personal accounts. Doc. # 56. These funds were used to pay their personal bills. However, as the plaintiff acknowledges, this information was not included in the complaint, so they will not be considered for these motions. Plaintiff, for that matter, has not attempted to amend the complaint to include such information.

Plaintiff asks the Court to interpret *Johnson*, and the cases citing to it, as holding that insolvency is only one factor to consider when deciding to pierce the corporate veil. Doc. # 56-2 at 16. To support such a reading, plaintiff points to several Georgia appellate court decisions that do not specifically mention that insolvency is a prerequisite to pierce the corporate veil and instead focus on a totality of the factors previously mentioned above. *Id.* at 16-17.[13]

However, out of the five cases that the plaintiff cites for his proposition, three make an express finding that the corporation involved is insolvent. *See Baillie Lumber Co.*, 279 Ga. at 288 (corporation had filed for bankruptcy); *Scott Bros.*, 261 Ga. App. at 288 (corporation loaned money to owner and owner drew salary after it was insolvent); *J-Mart Jewelry Outlets, Inc.*, 218 Ga. App. at 460-61 (corporation made personal payments for shareholder knowing it would soon cease operations due to financial difficulties).

Plaintiff is correct that two of the cases make no mention of the insolvency of the corporation, but only one of these actually pierces the corporate veil. *McKesson Corp.*, 266 Ga. App. at 166 (refusing to pierce corporate veil); *Soerries*, 248 Ga. App. at 376 (piercing the corporate veil without making express finding on issue of insolvency). The Court thus rejects plaintiff's argument. The Georgia Supreme Court's statement of law in *Johnson*, 254 Ga. at 328, is unequivocal. It requires that the plaintiff show insolvency on the part of the corporation as a prerequisite to piercing the corporate veil.

---

[13] Specifically, plaintiff cites to *Baillie Lumber Co.*, 279 Ga. at 289-90; *McKesson Corp.*, 266 Ga. App. at 166; *Scott Bros. v. Warren*, 261 Ga. App. 285, 287-88 (2003); *Soerries v. Dancause*, 248 Ga. App. 374, 375 (2001); *J-Mart Jewelry Outlets, Inc. v. Standard Design*, 218 Ga. App. 459, 460 (1995).

*Id.*

Furthermore, there is no indication that this holding has been rejected or overturned. For that matter, two district courts in the Eleventh Circuit have cited to *Johnson* on this exact issue in the past two years. *See Perry*, 353 F.Supp.2d at 1240 (N.D.Ga. 2005); *Omega Patents, LLC*, 2006 WL 3544823, at * 2. And *Baillie Lumber Co.* bolsters the holding in *Johnson*. That case states: "In general, equitable principles govern the alter ego doctrine. As a consequence, [a claim for piercing the corporate veil] is appropriately granted only in the absence of adequate remedies at law." 279 Ga. at 290 (brackets original; cites omitted).

Thus, if the plaintiff fails to allege that the corporation is insolvent, then the Court must assume that the plaintiff has an adequate remedy at law. That, in turn, renders unavailable the equitable remedy of piercing the corporate veil. *See Concrete Coring Contractors, Inc. v. Mechanical Contractors & Engineers, Inc.*, 220 Ga. 714, 719 (1965) ("Insolvency of the defendant and inability to respond to such damages as the plaintiff might recover for breach of the contract is ground for equitable intervention"). Therefore, the Court finds that the plaintiff must allege that the corporation is insolvent or unable to respond to damages as a threshold requisite for considering other facts pertinent to piercing the corporate veil. The Trustee has failed to do that here.

He alternatively claims that the Complaint contains sufficient allegations "strongly suggestive of insolvency or an attempt to shield assets from creditors." It states that MS "ceased active operations" in 2004 after the government and class action plaintiffs had begun investigations, and lawsuits aimed at the companies involved in this action included MS.

Doc. # 56-2 at 17. Plaintiff does mention briefly in the Complaint that MS stopped all business activity in 2004 in ¶ 2 of the Complaint. A-doc. # 1. Then plaintiff cites the filing of lawsuits against MS in ¶ 174. *Id.* But nowhere does he link the two together in an effort to allege insolvency. Failing that, the Court grants Cohen's motion to dismiss the breach of contract claim against him as an alter ego.

### B. Count II -- Unjust Enrichment Against MS, Cohen and Brinkley

#### 1. *MS*

The Trustee next claims that Friedman's conferred substantial benefits upon MS in the form of fees and reimbursement expenses that it did not earn, *see supra* Count I, and therefore is subject to a claim of unjust enrichment. "The theory of unjust enrichment is basically an equitable doctrine that the benefitted party equitably ought to either return or compensate for the conferred benefits when there was no legal contract to pay." *Morris v. Britt*, 275 Ga. App. 293, 294 (2005). Unjust enrichment is "premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received...." *Reidling v. Holcomb*, 225 Ga. App. 229, 232 (1997). "Inherent in unjust enrichment is the requirement that the receiving party knew of the value being bestowed upon them by another and failed to stop the act or to reject the benefit." *Id.*

MS argues correctly that the plaintiff's claim must fail because there was a legal contract between MS and Friedman's in this case and unjust enrichment is only available when there is no legal contract between the parties. "Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal

contract...." *Phillips v. Blankenship*, 251 Ga. App. 235, 236 (2001). Here it is undisputed that there was a legal contract between Friedman's and MS for MS to provide financial advice in exchange for the payment of an annual retainer and fees and expenses. A-doc. # 1 ¶ 96.

What the plaintiff contends, though, is that there was no contract with respect to Friedman's payment of $1,000,000 to MS in relation to the 2002 refinancing transaction. This payment, says plaintiff, was a mistake because Friedman's independent directors would not have authorized such a payment if they had been informed that (1) "[MS] had done little or no work to earn such compensation"; or (2) "[MS] was also being separately paid a large 'bonus' by Crescent for its work on the same transaction." Doc. # 56-2 at 23. However, the original agreement provided for the payment of additional fees that the parties mutually agreed upon when Friedman's assigned MS to specific transactions. A-doc. # 1 ¶ 96. Additionally, the Complaint recognizes that the Friedman's Board, including independent directors, agreed to the $1,000,000 fee. *Id.* ¶ 103. Because there was a legal contract between the parties, the unjust enrichment claim against MS fails. The Court thus grants MS's motion to dismiss plaintiff's unjust enrichment claim against it.

#### 2. *Cohen*

Plaintiff's unjust enrichment claim against Cohen rests on the premise that Cohen and MS are alter egos. Doc. # 56-2 at 23. The Court has already concluded that the plaintiff has failed to sufficiently plead that Cohen and MS are alter egos. *See supra* Part III(A)(2). The Court thus grants Cohen's motion to dismiss the Trustee's unjust enrichment claim against him.

19

### 3. *Brinkley*

The plaintiff next asserts that Brinkley was unjustly enriched by payments made to Brinkley through MS to cover the "bogus expenses" that Brinkley was charging to Friedman's. Doc. # 56-2 at 6. Essentially, the Trustee claims Brinkley received payments indirectly from Friedman's for expenses that he was not entitled to receive. The right to recovery here rests upon a fraud claim -- that Brinkley submitted fraudulent invoices. In fact, the fraud claim is made *infra* Part III(E)(4) against Brinkley.

But unjust enrichment is an equitable doctrine. And "equitable relief is improper if the complainant has a remedy at law which is adequate, *i.e.*, as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity." *McArthur Elec., Inc. v. Cobb County School Dist.*, 281 Ga. 773, 774 (2007) (quotes and cite omitted). Because the Trustee must first prove the fraud claim to recover for unjust enrichment, he has an adequate remedy at law (recovery for fraud) such that equity should not intervene. Therefore, this claim is dismissed.

### C. Count III -- Unjust Enrichment of Brinkley, Stinn, and Suglia[14]

Plaintiff next claims that Brinkley, Stinn and Suglia were unjustly enriched in three ways. First, all three received performance bonuses as compensation that was based on inflated statements of Friedman's earnings from 2000-03. Had those earning been accurately reported, the bonuses would have been less. A-doc. # 1 ¶

224.

Second, Brinkley and Stinn received $600,000 in compensation from Crescent in relation to the 2002 refinancing that was not disclosed to Friedman's. *Id.* ¶ 225. Friedman's paid Brinkley and Stinn based on the total compensation that they received from both Friedman's and Crescent; had Friedman's known about Crescent's $600,000 payment to each, their respective compensations from Friedman's would have been $600,000 less. *Id.*

Last, in 1/03 Friedman's paid Brinkley's, Stinn's, and Suglia's taxes associated with grants of restricted Friedman's stock made to them by Friedman's pursuant to an "83B election."[15] *Id.* ¶ 226. These payments, says plaintiff, were not authorized by Friedman's Board; nor did any of the three earn or have any entitlement to payment of these taxes by Friedman's. *Id.* The Trustee claims all three had knowledge of the benefits that were bestowed upon them, and they accepted such benefits, but it would be inequitable to allow them to retain them. *Id.* ¶¶ 227, 228.

### 1. *Brinkley*

Brinkley argues that none of the unjust enrichment claims can go forward because there are no mistaken transfers, no facts suggesting Brinkley induced or encouraged Friedman's to furnish these payments to him, or that Brinkley

---

[14] Suglia has made no appearance in this case and hence has not filed a motion to dismiss. The Court therefore will not consider the sufficiency of the plaintiff's allegations with respect to him.

[15] Restricted stock is stock that has not vested. Because it is not vested at the time of receipt, the new owner does not pay taxes on the stock at that time. But pursuant to an 83b election, restricted stock is treated as though it already vested and taxes are paid on that stock at the time of receipt. This ultimately can save a large amount in taxes paid when the stock actually vests later. http://www.fairmark.com/execcomp/grants.htm (site as of 1/8/08).

avoided paying for the value he received. Doc. # 31 at 34. Overall, he argues that the factual allegations in the Complaint fail to meet the *Twombly* standard requiring the pleading of sufficient facts such that a claim is "plausible on its face." 127 S.Ct. at 1974.

*Reidling* states that unjust enrichment is "premised upon the principle that a party cannot induce, *accept*, or encourage another to furnish or render something of value to such party and avoid payment for the value received...." 225 Ga. App. at 232 (emphasis added). A successful claim also requires that "the receiving party knew of the value being bestowed upon them by another and failed to stop the act or to reject the benefit." *Id.* Here it is telling that Brinkley quotes the terms "induce" or "encourage" from the *Reidling* case, but ignores "accepts." Doc. # 34 at 31.

Plaintiff alleges that these payments were made to Brinkley and there is no argument that Brinkley did not accept any of them -- nor that he did not know of the value being bestowed upon him. The question really is whether or not the Trustee has sufficiently pled the allegations that Brinkley knew that he was not entitled to these payments. Brinkley, after all, cannot be expected to "fail to stop the act or reject the benefit" if he did not know he was not entitled to such a benefit.

Plaintiff has sufficiently pled facts showing that Brinkley knew that Friedman's was allegedly improperly capitalizing all of its fees paid to MS, including Brinkley's expenses, which would result in inflated financial statements for Friedman's. *See* A-doc. # 1 ¶ 111 (Suglia memo to Brinkley).

Therefore plaintiff's unjust enrichment claim regarding unearned bonus compensation based on inflated financial statements is plausible as pled. However, the Complaint fails to plead any facts showing that Brinkley had knowledge that Friedman's financial statements were inflated by any other means. Therefore, the Court will only consider the amounts of the bonuses Brinkley received due to the capitalization of the fees paid to MS that were alleged to be improper.

Subject to that limitation, the plaintiff has sufficiently pled a claim for unjust enrichment with respect to the $600,000 payment Brinkley received from Crescent as compensation. The Complaint states that Friedman's Compensation Committee paid Brinkley according to the combined amount that Friedman's and Crescent paid him. *Id.* ¶ 165. It is fair to infer that Brinkley knew his compensation was determined in this manner because any reasonable person knows how he or she is compensated for the work he or she performs. Therefore, the Trustee has sufficiently pled that Brinkley was unjustly enriched by Friedman's $600,000 overpayment to him.

With respect to the tax payments on stock received by Brinkley from Friedman's, the Complaint fails to plead this matter sufficiently. The Complaint simply states that the Board did not authorize or approve these payments, and Brinkley did not earn nor was he entitled to them. *Id.* ¶ 226. This is the type of conclusory legal allegation that *Twombly* prohibits. It is only made once in the entire 290 paragraph Complaint, and there is absolutely no factual support for it. Therefore, Brinkley's motion to dismiss is granted as to this portion of the Trustee's unjust enrichment claim.

### 2. *Stinn*

Stinn argues that the Complaint does not allege there were any mistaken transfers and

therefore the claim for unjust enrichment must fail. *See Guyana Tel. & Tel. Co. v. Melbourne Int'l Comms., Ltd.*, 329 F.3d 1241, 1245 n. 3 (11th Cir. 2003). Stinn, also citing *Guyana*, contends that if the plaintiff is relying on a wrong for the "unjust" component of unjust enrichment, then the claim does not arise from unjust enrichment but from that wrong instead. Doc. # 39 at 9. But the Trustee's claims rest on Stinn's knowledge that Friedman's mistakenly overpaid him, not the malfeasance that caused the overpayment. Consequently, unjust enrichment is a proper theory of recovery.

The Complaint alleges that Stinn was overpaid in performance bonus compensation as a result of Friedman's inflated financial statements. In other words, Friedman's relied on these inflated financial statements and mistakenly paid Stinn more than he was actually entitled to receive. A-doc. # 1 ¶ 224. Stinn says he's not responsible for the inflated financial statements, and did not know that he was being paid more than he should have been based on these financial statements, so he could not have rejected same. Doc. # 61 at 8. In other words, he did nothing "unjust" to now suffer an unjust-enrichment claim against him.

The Trustee has alleged, however, that Stinn directed employees to employ accounting practices that resulted in misstating Friedman's financial statements, specifically Friedman's "allowance for doubtful accounts." A-doc. # 1 ¶ 196. More specfic ally, the Complaint states that Stinn directed employees to:

(1) put[] accounts in earlier aging buckets[16]

that they should have been in to lower the percentage reserved against the accounts; and (2) manipulat[e] the percentages applied to different aging buckets, and justifying the lower percentages by using unreasonable or doubtful subjective factors to support it.

*Id.* (footnote added). Also Stinn, as Friedman's CEO, "mandated that the fiscal year-end allowance be 10% [on Friedman's fiscal year 2002 financial statements] even though Suglia repeatedly told him that number was in his view incorrect and that an appropriate allowance number was substantially higher." *Id.* Stinn later conceded, at a Board Meeting, that the "allowance was on the 'low end' of the range, and that an increase should be bled in over time." *Id.* ¶ 197. This had been the practice for years past as well. *Id.*

Therefore, the Complaint sufficiently alleges that Stinn had knowledge of the accounting practices that inflated Friedman's financial statements. Consequently, the Trustee has stated a claim for unjust enrichment based on performance-based bonus compensation calculated by wrongfully inflated financial statements.

Stinn's main argument with respect to the $600,000 undisclosed payment from Crescent is that there was no mistaken transfer, so the Complaint fails to explain why he had an obligation to tell Friedman's about the payment. Doc. # 39 at 10. But, for the same reasons stated above with respect to Brinkley, *see supra* Part III(C)(1), this claim has been pled sufficiently. Again, it is alleged that Friedman's based its compensation paid to Stinn on the total compensation he received from both Friedman's and Crescent. A-doc. # 1 ¶ 165. If Friedman's had known of the $600,000 payment from

---

[16] This is an accounting term that denotes the age and payment history of an account receivable. *See* http://download-uk.oracle.com/docs/cd/A60725_05/html/comnls/us/ar/system08.htm (site as of 1/8/08).

Crescent to Stinn, the Compensation Committee allegedly would have taken this into account and reduced Stinn's annual compensation accordingly. *Id.*

Stinn knew of the payment from Crescent and the annual compensation payment from Friedman's. He accepted both and, as stated above, it can be inferred that Stinn, like Brinkley, knew the manner in which his compensation was calculated. He knew he was being overpaid based on a mistake by Friedman's (it did not know of the earlier, $600,000 payment from Crescent). He failed to reject this overpayment. That supports the claim for unjust enrichment.

The Trustee's tax-payment claim for unjust enrichment, for the same reasons stated above with respect to Brinkley, is dismissed for failing to plead sufficient facts. *See supra* Part III(C)(1).

In sum, plaintiff's claims for unjust enrichment against Stinn are sufficiently pled for the overpaid bonus compensation and annual compensation. Stinn's motion to dismiss therefore is denied on that score. But his motion to dismiss the unjust enrichment claim based on the tax payments is granted.

### D. Count IV -- Violation of Sarbanes-Oxley Against Stinn and Suglia

Plaintiff has voluntarily dismissed this count under F.R.Civ.P. 41(a) without prejudice.[17] Doc.

---

[17] Stinn argues that these claims must be dismissed with prejudice. Under Rule 41(a), a plaintiff may dismiss an action without order of the court by "filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs...." No answer or motion for summary judgment has been filed by an adverse party in

# 56-2 at 8 n. 23.

### E. Count V -- Common Law Fraud Against MS, Cohen, Brinkley, Stinn and Suglia

The Trustee next asserts several allegations of fraud against MS, Cohen, Brinkley, Stinn and Suglia based on various activities. Again, fraud has five elements: (1) a false representation by a defendant; (2) scienter; (3) intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *Johnson v. Rodier*, 242 Ga.App. 496, 498 (2000).

Plaintiff's first fraud theory states that Brinkley, Stinn and Suglia "knowingly or recklessly made or disseminated materially false and misleading financial statements and other financial information and projections concerning Crescent to Friedman's independent directors and its Special Committee ... and knowingly or recklessly made other materially false and misleading statements or omissions of material fact" about Crescent during deliberations concerning the $85 million unsecured investment in Crescent in 8/02. A-doc. # 1 ¶ 233.

Next, plaintiff alleges that MS, Cohen, Brinkley, Stinn and Suglia "knowingly or recklessly made materially false o[r] misleading statements to Friedman's and/or its independent directors to induce and cause Friedman's

(a) to enter into the Services Agreement as a vehicle for improperly shifting significant portions of Crescent's overhead for grossly inadequate consideration, without disclosing the same

---

this case. Thus, the Court rejects Stinn's argument.

to the independent members of the Friedman's Board of Directors and instead falsely characterizing the transaction as a fair and arms-length transaction;

(b) to authorize and pay false invoices submitted by MS for "fees" and "services" which they knew that MS was not entitled to payment or reimbursement for;

(c) to authorize and pay false invoices submitted by MS on behalf of expenses allegedly incurred by Sterling Brinkley in his capacity as Chairman of Friedman's, which they knew were not bona fide expenses and were being improperly billed to Friedman's;

(d) to pay Brinkley and Stinn substantial bonus compensation based on false financial statements and falsely inflated statements of Friedman's earnings.

*Id.* ¶ 234.

The defendants contend that the four year statute of limitations for fraud claims has run on any allegations of fraud relating to events prior to 1/14/01, since the bankruptcy petition was filed on 1/14/05. Doc. # 44 at 17 n. 6; # 39 at 11; # 37 at 15 n. 9; # 31 at 17-18; *see also* O.C.G.A. § 9-3-31; *Majeed v. Randall*, 279 Ga.App. 679, 681 (2006). Plaintiff responds that the claims for fraud were tolled until they were discovered in late 2003, and therefore are not barred by the statute of limitations. Doc. # 56-2 at 3.

"When, as here, the underlying cause of action is one alleging actual fraud, the statute of limitation is tolled until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." *Nash v. Ohio Nat'l*

*Life Ins. Co.*, 266 Ga.App. 416, 418 (2004). The plaintiff claims that "[n]o defendant asserts that [he] failed to act with reasonable diligence to uncover their fraud" so the plaintiff's claims are not time-barred. Doc. # 56-2 at 3.

However, "it is the plaintiff's burden to show the existence of facts that would toll the statute of limitation." *Nash*, 266 Ga.App. at 418. Therefore, the Trustee must show that he was diligent in discovering the fraud once the defendant raises the statute of limitations defense. Plaintiff merely asserts that the statute of limitations is tolled by fraud and that no one challenges his diligence in discovering the fraud. He otherwise provides no support to toll the statute of limitations. Furthermore, defendants are challenging diligence by raising the statute of limitations defense. Therefore, the statute of limitations will not be tolled and any fraud claims involving activity prior to 1/15/01[18] are time-barred.

With respect to activity on 1/15/01 and beyond, all defendants assert that the plaintiff's fraud claims must be dismissed for failure to plead with sufficient particularity as required by F.R.Civ.P. 9(b). Rule 9(b) states, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The rule is satisfied if

the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made; (2) the time and place of each such statement and the person responsible

---

[18] The defendants mistakenly assert 1/14/01 as the cutoff date for the statute of limitations, but the bankruptcy petition was filed on 1/14/05, and going back four years from that date is 1/15/01.

for making (or, in the case of omissions, not making) same; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud.

*U.S. ex rel. Clausen v. Laboratory Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002). Whether or not the plaintiff has satisfied this particularity requirement will be analyzed separately for each defendant.

### 1. *Fraud Relating to the $85 Million Investment in Crescent*

The Court will first address the misrepresentations and omissions alleged to have been made with regards to Friedman's $85 million investment in Crescent. Plaintiff essentially claims that Brinkley, Stinn and Suglia made material misstatements about the financial condition of Crescent to Friedman's independent directors, or failed to inform them of the severity of Crescent's financial condition. A-doc. # 1 ¶ 233. Plaintiff claims that this meets Rule 9(b)'s particularity requirement.

Alternatively, the Trustee relies on the "group pleading" doctrine. Doc. # 56 at 52. "In cases such as this of corporate fraud where misrepresentations are conveyed in prospectuses, press releases, or other group published information, plaintiffs may rely upon the group pleading doctrine." *In re AFC Enter., Inc. Sec. Litig.*, 348 F.Supp.2d 1363, 1370 (N.D.Ga. 2004). "The group pleading doctrine permits a plaintiff to presume, for the purpose of pleadings, that these statements are the collective actions of the officers or directors of a corporation." *Id.*

The Court will assume that Brinkley and Stinn belong under the umbrella of the group pleading doctrine for this particular claim.[19] However, the Trustee fails to identify any particular fraudulent misrepresentations in Crescent's financial statements. Plaintiff simply states that the misstatements that flowed from Crescent were worse than the misstatements that came from Friedman's. A-doc. # 1 ¶ 201. This conclusory statement is not sufficient to satisfy Rule 9(b)'s particularized pleading requirement.

True, plaintiff has pled with greater particularity about the misrepresentations contained in Friedman's financial statements. But that does not help his case. The argument here is that Friedman's independent directors relied on false financial statements of *Crescent's* provided by the defendants. Whether or not *Friedman's* financial statements were fraudulently misstated is not an issue for this claim. Therefore, even if the group pleading doctrine is applicable, plaintiff has failed to plead with sufficient particularity any published *Crescent* financial statement that is fraudulent.

The Court will consider, however, whether Brinkley or Stinn communicated to the independent directors any materially false or misleading financial statements about Crescent's financial condition.

### a. **Brinkley**

---

[19] Yet, it is highly unlikely that Brinkley would be considered a director with inside knowledge of and involvement in the day to day affairs of the company. He was only a director, which means he would not have been involved in the daily operations like an officer, and there is no indication that he was involved in the preparation of either company's financial statements. Therefore, the Court would be hard-pressed to find that Brinkley was a director who should expect to be held accountable for the company's public statements.

The Trustee has failed to identify a single Brinkley statement or omission that would constitute fraud. Furthermore, nothing in the Complaint links Brinkley with any of the communications from banks or A&B attorneys about Crescent's financial condition. All of those communications went to Stinn and Suglia, the CEO and the CFO of both Friedman's and Crescent. Without connecting Brinkley to these communications, it is impossible to say that Brinkley fraudulently omitted information about Crescent's dire financial situation.

### b. Stinn

The Complaint also fails to allege that Stinn made any affirmative misrepresentation about Crescent's financial condition, except in the Crescent financial statements (and as to them, the Court already determined that the Complaint fails to plead fraud with sufficient particularity, *see supra* Part III(E)(1)). But the plaintiff also alleges that Stinn, along with Suglia, fraudulently failed to inform the independent directors of information concerning the severity of Crescent's financial condition. A-doc. # 1 ¶ 233. More specifically, the Trustee claims that the independent directors, when considering Friedman's investment in Crescent, were never informed that

> (1) Bank of America told the companies it was unwilling to continue Crescent's $112.5 million credit line, nor participate in a refinancing of Crescent; (2) two bank lenders had raised concerns that a $75 million unsecured investment by Friedman's in Crescent could be a fraudulent conveyance; (3) E&Y had problems valuing Crescent at $109 million to offset Friedman's liability on its guaranty, and used an undefined investment value methodology for

reaching that value; (4) Crescent had narrowly avoided a going-concern opinion from its auditors; and (5) the tightening of Crescent's availability under the 12/01 amendments to its credit line made it very unlikely that Crescent could abide by the terms, and this would result in a call on Friedman's guaranty of that credit line.

*Id.* ¶¶ 62, 63 (paraphrased). The plaintiff states that Stinn, due to his fiduciary duty to Friedman's as CEO and a director, had a duty to disclose these material facts, and his failure to do so constituted a fraud on the company. Doc. # 56 at 53 n. 18.

"Georgia courts have consistently held that the concealment of a material fact when one is under a duty to speak constitutes fraud, as does suppressing material facts when a party is under obligation to communicate them." *R.W. Holdco, Inc. v. Johnson,* 267 Ga.App. 859, 865 (2004) (quotes omitted). There can be no doubt that a fiduciary relationship creates a duty to disclose material facts. *Ledford v. Smith,* 274 Ga.App. 714, 721 (2005). Stinn certainly had a fiduciary relationship with Friedman's as a director and CEO.

The Complaint points to several facts Stinn knew of, which if not disclosed to the independent board members, would constitute fraud. First, Stinn and Suglia were contacted by Bank of America, which stated that it did not want to continue financing Crescent. A-doc. # 1 ¶ 50. At this time, Crescent had defaulted under its $112.5 million credit line, and had a debt balance of approximately $109 million. *Id.*

Next, A&B's McElreath contacted Stinn and Suglia about the financial situation at Crescent and the danger of Crescent's auditors issuing an opinion expressing doubts about Crescent's

ability to operate as a going concern. *Id.* ¶ 56. McElreath emphasized to Stinn that if Crescent received a going-concern opinion from its auditors, then Friedman's auditors would have to assume that Friedman's guaranty has been called by Bank of America on Crescent's $112.5 million credit line. *Id.* The auditors would then look to see if Friedman's had the funding to pay off that guaranty ($109 million). *Id.* If Friedman's did not, then it could also receive a going concern opinion from its auditors. *Id.*

A going-concern opinion, in turn, would have dropped the value of Friedman's Class A common stock significantly and destroyed any chance Friedman's had of gaining the SEC's consent for an already planned January $35 million stock offering. *Id.* ¶¶ 56, 57.

Additionally, the Complaint claims that Stinn knew E&Y used an undefined investment value methodology to value Crescent at $109 million to offset Friedman's $109 million liability on the guaranty in its 10-K issued 12/28/01. *Id.* ¶ 62 n. 1. This methodology was used after E&Y used other methodologies such as business enterprise value, income approach, market approach and asset-based approach -- all of which came up with varying figures between $120 million and $98 million. *Id.* ¶ 60. The Complaint alleges that the independent board members were not apprised of the difficulties E&Y had in valuing Crescent to reach a number that would cover Friedman's liability. Stinn, as an insider, knew about these difficulties yet said nothing.

These all are material facts that a board member would want to know in determining whether or not to make an $85 million unsecured investment in another company. Having notice of the solvency of a company and hence the ability to realize a return on such an investment seem to be extremely important in that decision-making process. Had the independent board members known of these facts, perhaps they would have realized that Crescent was worse off financially than they were aware, and thus would not have found it prudent to invest $85 million in that company. As the plaintiff alleges, Stinn had personal equity in Crescent (*id.* ¶15) that would have been worth nothing if the company went bankrupt. Stinn also received $600,000 from Crescent just after the deal went through. This shows that he had a motivation, other than Friedman's best interests, to push the investment for his own and others' purposes.

Meanwhile the independent board members, due to these fraudulent omissions, relied on the fact that this was a sound investment. And Friedman's was damaged when it lost its investment and subsequently fell into bankruptcy. The plaintiff, therefore, has pled this fraud claim with sufficient particularity, so it may proceed.

### 2. *The Services Agreement of 2000*

Plaintiff alleges that MS, Cohen, Brinkley, Stinn and Suglia made materially false o[r] misleading statements to Friedman's or its independent directors to induce Friedman's to enter into a Services Agreement on 5/1/00 "as a vehicle for improperly shifting significant portions of Crescent's overhead for grossly inadequate consideration...." *Id.* ¶ 234. As stated earlier in Part III(E) *supra*, this Services Agreement was entered into on 5/1/00, so all fraud claims related to it are time-barred. Therefore, this claim is dismissed.

### 3. *False Invoices Submitted by MS*

The Trustee next claims that MS fraudulently submitted false invoices to Friedman's for fees

not earned and for expenses to which Friedman's never agreed. A-doc. # 1 ¶ 234. Along with that claim, plaintiff alleges that Cohen, Brinkley, Stinn and Suglia committed fraud by making materially false or misleading statements to Friedman's and/or its independent directors to induce it to make these payments. *Id.*

To begin, the Complaint makes no mention of any material misrepresentation, attributable to Brinkley or Stinn, which caused Friedman's to make such payments to MS. It states only that Brinkley was consulted by Suglia about recharacterizing MS's fees so that Friedman's could capitalize a greater portion of them without raising any questions. *Id.* ¶ 111.

It also states that Suglia approached Stinn and complained to him about the size of MS's fees, and that Suglia did not believe MS was doing the work to warrant such fees. *Id.* ¶ 105. Supposedly Stinn did nothing with Suglia's complaint. *Id.* These allegations do not make out a fraud claim against Brinkley and Stinn, as the plaintiff simply fails to point to any *misrepresentations* made by either defendant. Additionally, the Trustee fails to point to what Brinkley or Stinn would have received for making any misrepresentations. *U.S. ex rel. Clausen*, 290 F.3d 1301, 1310 (11th Cir. 2002) (to satisfy Rule 9(b) particularity must plead "what the defendants obtained as a consequence of the fraud"). Therefore, this claim must be dismissed as to these defendants.

The fraud allegation against MS for submitting false invoices to Friedman's relies on three separate facts referenced in the Complaint. As mentioned above, Suglia, Friedman's CFO, stated that MS was not performing work to justify the fees it received. *Id.* ¶ 105. Next, MS submitted a second altered invoice for the allocation of fees for fiscal year 2002. That revision changed the previously invoiced $720,000 of fees for Brinkley to $40,000 and reallocated the remaining $680,000 into other areas, including a $600,000 charge for investment banking services fees in connection with MS's work on the 2002 transaction. *Id.* ¶ 102. Last, a memo from Suglia to Brinkley states that "Expenses going to the payment of MS's general operating expenses ... cannot be capitalized...." *Id.* ¶ 111. This statement, plaintiff asserts, shows that MS was fraudulently billing Friedman's for its general operating expenses -- something that was simply not allowed under the Friedman's-Crescent contract. Doc. # 56-2 at 12.

But again, the plaintiff fails to point to particular MS invoice amounts that constitute fraudulent billings for operating expenses. The fact that Suglia states that he did not believe that MS was earning its fees sounds in contract (failure of consideration), not fraud. And the only specific amount to which the Trustee points here is the change in the fee allocation for fiscal year 2002. However, it was Friedman's Audit Committee that raised issues with the original allocation of $720,000 to Brinkley's expenses. A-doc. # 1 ¶ 101. There is no question that MS then changed the allocation of fees and expenses to lower that number. But there is no way that the independent members of Friedman's board could have relied on this change, since two of the independent members served on the Audit Committee that saw the original allocation. *See Id.* ¶ 28 (two of the independent directors served on Friedman's Audit Committee at all times).

Justifiable reliance by the plaintiff is an element of fraud that must be met, and it is not possible that the independent board members could have justifiably relied on the altered fee summary. Therefore, the fraud claims against

MS for billing bogus expenses must be dismissed for (a) failing to plead with particularity the fraudulent billings; and (b) lack of justifiable reliance by the plaintiffs on MS's recharacterization of fees.

The Trustee also argues that Cohen committed fraud by personally approving the revised fee allocation summary (A-doc. # 1 ¶ 102) and approving the change to MS's fees to include a $1 million retainer plus $440,000 in fees, rather than a $400,000 retainer plus $1.04 million in fees (*id.* ¶ 110). But as discussed above, the plaintiffs could not have justifiably relied on the revised fee allocation summary because independent members of Friedman's board possessed knowledge of and raised issues with the original fee allocation summary. With respect to changing MS's fees to include a $1 million retainer, that change was orchestrated by members of *Friedman's* board to allow the company to capitalize more of its fees paid to MS. *Id.* ¶ 111. This does not show that MS was billing Friedman's for bogus expenses and it does not show that Cohen committed fraud against Friedman's.

What it does show is that Friedman's directors and officers orchestrated a situation to characterize MS's expenses so that they could be capitalized and thus inflate Friedman's financial statements. That does not constitute *fraudulent* billing by MS, or fraud by Cohen. Therefore this claim against Cohen must also be dismissed.

### 4. *False Invoices Submitted by Brinkley*

The plaintiff next alleges that Brinkley invoiced Friedman's every month prior to 8/01 for bogus expenses, yet provided no backup for these expenses. *Id.* ¶ 97; doc. # 56 at 57. This certainly does not meet any particularity requirement of Rule 9(b). Post-8/01, Brinkley

was set to be paid $60,000 in out-of-pocket expenses each month that would be invoiced through MS. A-doc. #1 ¶ 98. Plaintiff argues that these invoices were actually for personal expenses and not properly billable to Friedman's. *Id.* ¶ 104. But no greater specificity is provided -- *i.e.*, no fraudulent dollar amounts invoiced. It appears the Trustee simply relies on the large amount of the expenses to claim they must have been fraudulent. That runs into the same problem -- Friedman's agreed to change the payments to $60,000 per month -- and plaintiff fails to show any misrepresentations that induced Friedman's to agree to enter into such an arrangement. Plaintiff attempts to save this part of the complaint by explaining, in a footnote:

> The gravamen of the claim is that Friedman's independent directors were deceived into authorizing such payments because they believed they were legitimate, when in fact they were not - and paid them in reliance on senior management's [*i.e.* Brinkley's, Stinn's and/or Suglia's] implicit or explicit representations that they had no reason to believe that they were not legitimate and appropriate.

Doc. # 56-2 at 2 n. 22. This explanation essentially claims that Brinkley, Stinn and Suglia made fraudulent statements to the independent board members to induce them to approve such payments. Yet, there are no fraudulent statements referenced. The fact that the footnote references "implicit" representations destroys any chance of meeting the particularity requirement for fraud claims. In other words, simply pointing to the size of the fees (previously agreed to by the company) and claiming they were for personal expenses -- without any greater specificity -- is simply not

sufficient to satisfy Rule 9(b).

The most particularized claim the plaintiff makes is that Brinkley's invoices must have been fraudulent because MS was able to change Brinkley's $720,000 of expenses to $40,000 when the Audit Committee questioned the original figure.[20] But what plaintiff fails to specify is what Brinkley received because of this change. The Court cannot tell whether Brinkley received $720,000 in fees or $40,000 in fees. Pleading what a defendant received as a result of the fraud is required to satisfy Rule 9(b) particularity. *U.S. ex rel. Clausen,* 290 F.3d at 1310. Therefore, plaintiff has again failed to plead with sufficient particularity this fraud claim against Brinkley.

If the Court assumed Brinkley received $720,000 in fees as agreed upon by Friedman's, the Trustee's claim would still fail. Because Friedman's *agreed* to pay such an amount, the plaintiff must show specific payments for expenses *not* within the agreement to satisfy Rule 9(b). Due to the dearth of particularity, this claim must be dismissed.

As for the remaining defendants, the plaintiff has failed to point to any fraudulent statements that were made by Stinn or Suglia with respect to Brinkley's invoices. Plaintiff, again, has failed to show justifiable reliance by the independent board members on the change in the fee allocation summary by MS and Cohen. Therefore, plaintiff's fraud claims against Stinn (Suglia has not appeared in this case) are dismissed with respect to the Brinkley expenses.

**5. *Payment of Bonus Compensation Based on Friedman's False Financial Statements***

Plaintiff's final fraud claim alleges that MS, Cohen, Brinkley, Stinn and Suglia all made fraudulent misrepresentations to induce Friedman's to pay Brinkley and Stinn bonus compensation based on Friedman's false financial statements. A-doc. # 1 ¶ 234. To begin, plaintiff fails to point to any fraudulent misrepresentations by MS or Cohen to inflate Friedman's financial statements. Even if he did, the Complaint still fails to allege what MS or Cohen received as a result of such activity. *U.S. ex rel. Clausen,* 290 F.3d 1301, 1310 (11th Cir. 2002) (to satisfy Rule 9(b) particularity, one must plead "what the defendants obtained as a consequence of the fraud"). Thus, the particularity requirement remains unsatisfied here.

As to Brinkley and Stinn, the plaintiff has already argued that the group pleading doctrine should apply to them. *See supra* Part III(E)(1). Once again, "where misrepresentations are conveyed in prospectuses, press releases, or other group published information, plaintiffs may rely upon the group pleading doctrine." *AFC Enter.,* 348 F.Supp.2d at 1370. "The group pleading doctrine permits a plaintiff to presume, for the purpose of pleadings, that these statements are the collective actions of the officers or directors of a corporation." *Id.*

But there are limits to that. The group published information is only "attributable to officers and directors with inside knowledge of and involvement in the day to day affairs of a company." *In re JDN Realty Corp. Sec. Litig.,* 182 F.Supp.2d 1230, 1251 (N.D.Ga. 2002); *see also AFC Enters.,* 348 F.Supp.2d at 1371

---

[20] What the Audit Committee appears to have been questioning actually is the fact that Friedman's capitalized all of the $720,000 for Brinkley's expenses, which was improper. But for the sake of the plaintiff's argument the Court will assume that the Committee was questioning the large amount of the expenses.

(limited to people "who should expect to be held accountable for the company's public statements"). Based on this limitation, the Complaint here must show that the directors participated in the day-to-day affairs of the company and should expect to be held accountable for the company's public statements.

The plaintiff has failed to make any such showing with respect to Brinkley. Brinkley was only a director, not an officer of the company. A-doc. # 1 ¶ 8. In the normal corporate structure, "day-to-day management operations are delegated to the corporation's officers and other agents." CHARLES O'KELLEY & ROBERT THOMPSON, CORPORATIONS AND OTHER BUSINESS ASSOCIATIONS 141-142 (5th ed. 2006). The plaintiff has failed to show that the corporate structure of Friedman's was any different, or that Brinkley was involved in the day-to-day affairs of the corporation or the preparation of Friedman's financial statements. Therefore, Brinkley does not fall under the umbrella of the group pleading doctrine, so any fraudulent statements in Friedman's group published information cannot be attributable to him.

Stinn, on the other hand, was more than just a director at Friedman's -- he was also the CEO. A-doc. # 1 ¶ 14. As the CEO, the Complaint sets forth sufficient allegations to show Stinn's involvement in the day-to-day affairs of the company, including his repeated communications with the A&B attorneys and various banks concerning the 2002 transaction. *Id.* ¶¶ 50, 56, 62 n. 1. Plus, the Complaint also references some involvement by Stinn with the accounting and financial statements of Friedman's. This includes, *inter alia*, setting the percentage on the fiscal year end allowance for accounts receivable and directing certain

accounting practices by company personnel. *Id.* ¶ 196. Accordingly, Stinn is properly within the coverage of the group pleading doctrine.

But Stinn argues that use of the group pleading doctrine should not be allowed in this case because the Eleventh Circuit explicitly declined to rule on its viability, and no court in the Southern District of Georgia has permitted it. In *Phillips v. Scientific-Atlanta, Inc.* the court did not rule on the viability of the group pleading doctrine because the plaintiffs had alleged particular fraudulent statements and omissions to specific defendants. 374 F.3d 1015, 1019 (11th Cir. 2004). The Trustee, meanwhile, points to two Northern District of Georgia cases that have permitted use of the group pleading doctrine. Because those cases are persuasive, this Court will follow their lead. *See AFC Enters.*, 348 F.Supp.2d at 1370-71; *JDN Realty,* 182 F.Supp.2d at 1250.

Next, Stinn incorporates by reference Brinkley's argument[21] that, even if the group pleading doctrine is viable, it should not be applied in this case because the plaintiff has had ample opportunity to conduct discovery -- given the plaintiff's access to products of prior investigations conducted during the bankruptcy proceedings, and his right to conduct an extensive investigation pursuant to Fed.R.Bankr.P. 2004. Doc. # 63 at 11, 12.

Rule 2004 is "a powerful tool, allowing an attorney investigating a claim to perform almost all of the necessary discovery before filing an action." *Solomon v. Riverview Finance Co.*, 70 B.R. 501, 504 (Bankr.E.D.Mich. 1987). Stinn further points out that the Complaint's allegations "are based upon, among other things [the Trustee's] counsel's investigation, which

---

[21] *See* doc. # 61 at 7 n. 1.

has included review of voluminous documents produced to date by various persons and entities in prior proceedings in this matter, and upon consultation with various experts." A-doc. # 1 at 1. Plaintiff's counsel in this case includes two firms that were counsel to the investigation conducted in the bankruptcy proceeding. Doc. # 63 at 14. Plaintiff was also permitted to obtain any documents relating to a joint review investigation conducted in the bankruptcy proceedings and all documents produced in the Rule 2004 investigation. *Id.* at 12-13 n. 6. Brinkley's brief states the investigation to which the plaintiff had access included reviewing 1.3 million pages of documents, more than 50 witness interviews, and the issuance of subpoenas to 19 individuals. Doc. # 31 at 21.

Based on these opportunities for discovery and access, Stinn argues that the Trustee should be held to the particularity requirements of Rule 9(b). That means that, instead of using the group pleading doctrine, the Trustee must allege specific misstatements made by Stinn in Friedman's financial reports.[22] *See SEC v. Yuen*, 221 F.R.D. 631, 637 (C.D.Ca. 2004) (rejecting SEC's reliance on group pleading doctrine because significant discovery had already taken place and SEC has broad pre-filing investigative powers).

Plaintiff disputes such extensive discovery by him and his counsel. He first states that a great deal of the investigation referred to in Brinkley's brief (doc. # 31 at 21) was conducted by A&B, a defendant in this case, whose investigation was inadequate and conflicted. Doc. # 56 at 48 n. 14. The Trustee declares that he has never

represented that he or counsel has had the opportunity to review all relevant documents or interview key witnesses. *Id.* He also claims that key defendants such as Brinkley and Cohen refused to be interviewed, and those such as Suglia who were interviewed denied any involvement in fraudulent conduct -- even though he has since pleaded guilty to criminal fraud. *Id.*

Furthermore, the Trustee points out, the U.S. Attorney's office has intervened and discouraged or prevented interviews with key witnesses because it would interfere with the Government's criminal investigations. *Id.* Therefore, a substantial dispute exists between the plaintiff and Stinn as to the extent of discovery performed by the plaintiff prior to filing the Complaint.

The Court will allow the use of the group pleading doctrine in this case. While it is stated that the debtor and creditors committee conducted extensive investigations and the plaintiff is the successor in interest to them, the Court finds it significant that it was not the plaintiff who was actually performing this investigation. In both the *Adams* and *Yuen* cases that Stinn cites, the plaintiffs there had performed all of the discovery before filing their Complaint. That is not alleged in this case.

What is alleged is that the plaintiff has been given the products of others' investigation, over 1.3 million pages of documents for that matter. But simply asserting that the plaintiff is the successor in interest to the debtor and creditors' committee does not mean that both groups approached the investigation with the same litigation focus -- *i.e.*, a broad sweeping investigation into all potential claims is not the same as a fact intensive investigation into individually identified claims. Additionally, the

---

[22]   Again, because Stinn incorporates Brinkley's arguments, most of the statements and arguments above come from Brinkley's briefs. For the sake of brevity, the Court is simply referring to them as Stinn's arguments.

Trustee states that the investigation was obstructed by inadequate and conflicted work by A&B, intervention by the U.S. Government preventing interviews with key witnesses, and the lack of cooperation by witnesses -- as evidenced by Suglia's denials of fraudulent conduct and later guilty plea to criminal fraud.

Applying the group pleading doctrine, the Court concludes that the plaintiff has sufficiently pleaded fraudulent misstatements in Friedman's financial statements to satisfy Rule 9(b). The Complaint states that Friedman's was required to restate its financial statements for fiscal year 2001 and 2002. A-doc. # 1 ¶ 193. More specifically, adjustments were necessary in four main areas: (1) allowance for doubtful accounts receivable; (2) Friedman's investment in Crescent; (3) inventory obsolescence; and (4) the impairment of select stores. *Id.* ¶ 195. Friedman's accounts receivable was understated by $71 million due to "intentional manipulation of aged accounts." The Complaint states that, according to company personnel, Stinn and/or Suglia directed them to

> (1) put[] accounts in earlier aging buckets than they should have been in to lower the percentage reserved against the accounts; and (2) manipulat[e] the percentages applied to different aging buckets, and justify[] the lower percentages by using unreasonable or doubtful subjective factors to support it.

*Id.* ¶ 196. Stinn also ordered the fiscal year-end allowance set at 10% despite repeated objections from Suglia that the number was wrong and should be higher. *Id.* Stinn later admitted at a 2/03 Board Meeting that the number was on the "low end of the range, and that an increase should be bled in over time."[23] *Id.* ¶ 197.

Additionally, it was found that Friedman's should have recorded a $50.3 million loss contingency reserve against the $85 million investment it made in Crescent based on the restated operating results of Crescent and its enterprise value. This was not done in Friedman's first reporting period subsequent to the transaction. *Id.* ¶ 198.

The Complaint also states that Friedman's inventory levels were artificially inflated by $19 million, a manipulation known to both Stinn and Suglia. *Id.* ¶ 199. These allegations are sufficiently particular and scienter is established through Stinn's status as CEO, participation in the day to day affairs of the company, and involvement as alleged in the preparation of these fraudulent financial statements. Therefore this claim shall proceed against Stinn.

While Brinkley is not covered by the group pleading doctrine, the Complaint makes a showing that Brinkley knew that all of MS's fees, including Brinkley's own expenses, were being capitalized improperly, and would have inflated Friedman's financial statements. *Id.* ¶ 111 and ¶ 107. Additionally, the plaintiff shows that Brinkley agreed to a change that would recharacterize MS's fees to give the appearance

---

[23] Stinn argues that these allegations do not amount to fraud because the projection was still within an acceptable range, and was made in an open discussion with both other board members and Friedman's auditors. Doc. # 39 at 13. If there is simply a difference of opinion regarding what the allowance percentage should have been, then that supplies no grounds for fraud. However, as the Court reads the Complaint, the plaintiff is alleging that Stinn knew 10% was too low but "mandated" that it be the percentage anyway -- to inflate Friedman's financial statements. A-doc. # 1 ¶¶ 196, 197. By that interpretation, this constitutes a sufficient pleading of fraud.

that they could be properly capitalized. *Id.* ¶ 110.

Friedman's relied on these financial statements to its detriment by paying Brinkley more than he was actually entitled to had the statements not been altered. Therefore, the plaintiff makes out a fraud claim against Brinkley on those grounds (*i.e.*, as to the capitalization of all of MS's invoices improperly resulting in inflated financial statements and increased bonus compensation to him).

## F. Count VI -- Aiding and Abetting Common Law Fraud

Plaintiff pleads alternatively that MS, Cohen, Brinkley, Stinn and Suglia aided and abetted the frauds committed in the previous count by providing substantial assistance to each other in committing them. A-doc. # 1 ¶ 238. But first the Court must determine if Georgia has even recognized a claim for aiding and abetting fraud. The defendants claim that Georgia has not because no case in Georgia has recognized such a cause of action. *See Hays v. Paul, Hastings, Janofsky & Walker LLP*, 2006 WL 4448809 at * 8 (N.D.Ga. 2006) (finding no case in Georgia has explicitly recognized claim for aiding and abetting fraud); *BMC-The Benchmark Management Co. v. Ceebraid-Signal Corp.*, 2007 WL 2126272 at * 11 (N.D.Ga. 2007) (also finding no case in Georgia has recognized a claim for aiding and abetting fraud).

The Trustee concedes that no Georgia state court has recognized explicitly a claim for aiding and abetting fraud. But he points to *Insight Technology, Inc. v. Freightcheck, LLC*, 280 Ga.App. 19, 23 (2006), which held one may bring a claim for aiding and abetting breach of fiduciary duty. He also cites to O.C.G.A. § 51-12-30 which provides:

In all cases, a person who maliciously procures an injury to be done to another, whether an actionable wrong or a breach of contract, is a joint wrongdoer and may be subject to an action either alone or jointly with the person who actually committed the injury.

Plaintiff argues that this statute plus *Insight's* holding creates a cognizable claim in Georgia for aiding and abetting fraud. Doc. # 56-2 at 18.

That construction was rejected by *Hays*, 2006 WL 4448809 at * 8, and *BMC*, 2007 WL 2126272 at * 11. Both state that, "Because no Georgia court has explicitly recognized a tort of aiding and abetting fraud, the Court will not do so now." *BMC*, 2007 WL 2126272 at * 11; *Hays*, 2006 WL 4448809 at * 8.

The Court disagrees with those two cases and holds that the tort of aiding and abetting fraud is a cognizable claim in Georgia. "Georgia courts have acknowledged a cause of action for procuring an injury or aiding and abetting in a wide array of civil cases...."[24] *Insight*, 280 Ga.App. at 24. Most importantly, *Insight* recognized a cause of action in Georgia for aiding and abetting a breach of fiduciary duty. *Id.* at 25-26. Since committing fraud can form the basis of a breach of fiduciary duty claim, it is no great step to conclude that Georgia

_____

[24] Those include: "an employee's breach of an employment contract's requirement that he give a certain notice before terminating the contract, a former employee's breach of a restrictive covenant in an employment contract, an employer's breach of an employment contract, such as by wrongfully terminating an employee, a client's discharge of his attorney and false repudiation of the attorney's authority to file a suit, a partner's wrongful dissolution of a partnership, a breach of a contract to exchange real property, battery, and trespass to land." *Insight Technology*, 280 Ga.App. at 24.

recognizes a claim for aiding and abetting fraud. As *Insight* states, "there is no magic in mere nomenclature in the designation of causes of action." *Id.* at 23 (quotes and cite omitted). Fraud is certainly an "actionable wrong" within the language of O.C.G.A. § 51-12-30, and therefore the Court will apply the tort of aiding and abetting fraud here.

However, the plaintiff's Complaint is wholly deficient in its attempt to bring this cause of action. He simply repeats all 210 paragraphs of facts and then provides conclusory statements of law. *See* A-doc. # 1 ¶¶ 237-39. This is a shotgun complaint which has been expressly disapproved of by the Eleventh Circuit. *See U.S. ex. rel. Atkins v. McInteer*, 470 F.3d 1150, 1154 n. 6 (11th Cir. 2006) ("Pleading claims in this fashion imposes a heavy burden on the trial court, for it must sift each count for the allegations that pertain to the cause of action purportedly stated and, in the process, disregard the allegations that only pertain to the incorporated counts. We have condemned this sort of pleading on several occasions"). Because the plaintiff simply provides conclusory allegations of law without pointing to facts supporting the allegations, the claim is dismissed.

### G. Count VII -- Breach of Fiduciary Duty

Plaintiff essentially reiterates his fraud claims from Count VI into a claim for breach of fiduciary duty against Brinkley, Stinn and Suglia.[25] More specifically, it is Brinkley's,

---

[25] Again, Suglia has not made an appearance in this case and consequently is not seeking dismissal of any claims. Nevertheless, the Court will consider the adequacy of these breach of fiduciary duty claims against him because it is necessary (given the need to identify an aider and abettor) for the Court to resolve claims for aiding and abetting breaches of fiduciary duty against MS and Cohen.

Stinn's and Suglia's duties of loyalty that are alleged to have been breached in this claim. Plaintiff says that they were acting for their own interests and not the best interests of the company. They breached their duty:

(1) by allowing [MS] to bill Friedman's for, and allowing Friedman's to pay for, "expenses" incurred by [MS] and/or Brinkley that Brinkley, Stinn and Suglia knew were not properly chargeable to Friedman's; (2) by allowing [MS] to bill Friedman's for, and allowing Friedman's to pay for, "fees" charged by [MS] for services that Brinkley, Stinn and Suglia knew [MS] was not entitled to and/or had not earned; (3) by accepting and retaining forgivable loans from Crescent in connection with the August 2002 refinancing of Crescent, without disclosing the receipt of such loans to the independent directors of Friedman's board or otherwise disclosing to them Brinkley and Stinn's personal interest in the Friedman's board vote to approve the $85 million investment in Crescent; (4) by knowing of yet failing to disclose to Friedman's board of directors the true financial condition, value and performance of Crescent, which had [they] disclosed and had the board received the truth would have caused the Board to foreclose on Crescent's assets under its guarantee and otherwise avert the disastrous consequences of the August 2002 Crescent refinancing; (5) by knowing of yet failing to disclose to Friedman's board financial manipulations and improper related-party transactions involving Crescent, Friedman's and MS, causing Friedman's to incur damages to its operations, lost profits, and the substantial costs of a restatement and investigation;

(6) by concealing the extent to which the various contractual, investment and other relationships between Friedman's and Crescent were designed to, and/or did in fact, serve to benefit Crescent, Cohen, Brinkley and Stinn to the detriment of Friedman's; and (7) by knowingly, recklessly or negligently participating in the creation and dissemination of materially false and misleading financial statements of Friedman's.

A-doc. # 1 ¶¶ 243-245.

The Trustee brings an additional duty of loyalty claim solely against Suglia for "knowingly, recklessly or negligently making materially false and misleading statements to Capital Factors concerning Friedman's actual indebtedness to Cosmopolitan." *Id.* ¶ 245.

Because the underlying support for these allegations sounds in fraud, the plaintiff still must meet the Rule 9(b) particularity pleading standards. *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507-08 (7th Cir. 2007) (Rule 9(b) applies to breach of fiduciary duty claims grounded in fraud); *Robison v. Caster*, 356 F.2d 924, 925 (7th Cir. 1966) (same). Therefore much of the analysis from Part III(E) will apply here as well.

Friedman's was a public corporation incorporated in Delaware. Doc. # 31 at 36 (exh. # 1). Georgia requires a foreign corporation to obtain a certificate of authority to transact business in the state under O.C.G.A. § 14-2-1505(a). However, Georgia is not authorized to "regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state." O.C.G.A. § 14-2-1505(c). The internal affairs doctrine as applied by Georgia courts requires that the law of the state of incorporation apply to the claims before this Court alleging breach of fiduciary duties by Brinkley, Stinn and Suglia. *Diedrich v. Miller & Meier & Associates, Architects and Planners, Inc.*, 254 Ga. 734, 735-36 (1985) (holding the wrongful appropriation of a business opportunity by a director, an aspect of the duty of loyalty, is an internal affair and thus the law of the state of incorporation applies). Therefore the law of Delaware will apply to the following claims.

Delaware corporate law allows a corporation to have a provision in its articles of incorporation that essentially eliminates director liability for breach of fiduciary duty. 8 Del.C. § 102(b)(7). Friedman's has such a provision, and it eliminates director liability to the fullest extent allowed by Delaware law. Doc. # 31 at 46 (exh. # 1). But, a corporation may not limit a director's liability for breach of the duty of loyalty to the corporation, for acts or omissions not in good faith or which involve intentional misconduct or knowing violations of law, or for any transaction from which the director derived an improper personal benefit. 8 Del.C. § 102(b)(7)(i), (ii) and (iv).

In fact, Delaware case law stresses the importance of the duty of loyalty in corporate affairs:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only

affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). The Delaware Supreme Court went on to state:

Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally.

*Id.* at 361-62 (cites omitted).

But the business judgment rule must always be kept in mind when resolving director-misconduct claims. That rule "operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." *Id.* at 360. "[I]t creates a presumption that in making a business decision, the directors of a corporation acted on an informed basis [*i.e.*, with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." *Id.* (quotes

and cites omitted). Yet, if there is "any evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment," the presumption detaches. *Id.* (quotes and cites omitted). Because plaintiff's allegations involve fraud and conflicts of interest, the business judgment rule does not attach to the director's decisions.

### 1. *Expenses and Fees Submitted by both MS and Brinkley*

These claims mirror the fraud claims that plaintiff asserted against Brinkley, Stinn and Suglia in Part III(E)(3) and (4). To reiterate, the Trustee alleges that all three defendants knew that invoices for expenses and fees submitted by both Brinkley and MS were false. Yet, they induced Friedman's to pay them through misrepresentations. The Court found in Part III(E)(3) and (4) that the plaintiff had failed to plead with sufficient particularity his claims against the defendants due to a complete lack of any misrepresentation by Brinkley or Stinn, and plaintiff's failure to show what fees and expenses of MS and Brinkley were fraudulent. *See supra* Part III(E)(3), (4).

Because Rule 9(b) applies to fraud-based breach of fiduciary duty claims, the plaintiff's allegations against Brinkley and Stinn here must also be dismissed for failure to plead with sufficient particularity. *Borsellino*, 477 F.3d at 507-08 (Rule 9(b) applies to breach of fiduciary duty claims grounded in fraud), *Robison* 356 F.2d at 925 (same).

Plaintiff raises one additional claim against Suglia. He alleges that Suglia stated he did not know what MS was doing to earn its fees from Friedman's. A-doc. # 1 ¶ 105. This statement of opinion alone, however, will not suffice to plead a breach of the duty of loyalty. The

plaintiff fails to point to any facts showing that MS was not earning its fees. The Trustee must point to at least that much to overcome the fact that Friedman's board had renewed its contract with MS annually for ten years. *Id.* ¶¶ 96-98. It is not sufficient for the plaintiff to rely on the recharacterization of MS's fees either, because the issue raised there was the capitalization of all of those expenses by Friedman's, and not the size of MS's fees. *See id.* ¶¶ 99, 111. Again, the plaintiff has failed to point to any specific expenses or fees that were fraudulently submitted by MS, nor has he pointed to any misrepresentations made by Suglia with respect to these expenses. Had Suglia appeared in this case, this claim would also be dismissed.

### 2. *Forgivable Loans Received by Brinkley and Stinn from Crescent*

The plaintiff has pled that both Brinkley and Stinn received $600,000 in forgivable loans from Crescent shortly after the 2002 refinancing transaction and resulting $85 million investment in Crescent that was approved by Friedman's board. A-doc. # 1 ¶ 94. These payments, according to the Complaint, were never disclosed to the independent board members prior to the vote to approve that transaction.[26] *Id.*

The Trustee characterizes these payments "as additional compensation" from Crescent "as a reward for their work on the 2002 refinancing and for obtaining the $85 million investment from Friedman's." *Id.* These allegations support the plaintiff's claim that Brinkley and

---

[26] The Complaint does indicate that the independent board members were eventually informed of these payments but not until late October or early November of 2003 while the approval of the transaction took place in late August 2002.

Stinn breached their duties of loyalty by failing to disclose to the independent board members their financial interest (the $600,000 payments to them) in the approval of the transaction. The Trustee also attempts to tie Suglia into this claim by alleging that Suglia caused these disbursements to be made to Brinkley and Stinn, then failed to disclose them to Friedman's board. *Id.* ¶ 245.

Brinkley and Stinn were both interested directors under 8 Del.C. § 144(a), as they were directors at Friedman's and Crescent at the time of this transaction between the two companies. A-doc. # 1 ¶¶ 8, 9, 14, 15. Stinn was also the CEO at both Friedman's and Crescent during this time. *Id.* ¶¶ 14, 15. There seems to be no issue that these facts were disclosed to the other members of Friedman's board. But as directors, especially conflicted, interested directors, they had an "unremitting obligation to deal candidly with their fellow directors." *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 119 (Del.Ch. 1999). This obligation required Brinkley and Stinn to take affirmative steps to disclose their interests to the other members of the board, including the $600,000 payments they received from Crescent as a reward for the deal going through. *Id.*

The Court concludes that these payments are material facts that the independent members should have known about -- especially considering the financial difficulties Crescent was experiencing and the fact that these payments most likely came from the $85 million investment Friedman's made in that company.

However, this ruling is dependent upon reading the Complaint as alleging that Brinkley and Stinn had knowledge that this $600,000 payment (or a payment of some kind) would be made *before* the investment was approved by

the independent directors (hence, they failed in their *duty* to disclose this information). This reading is fair based upon the language in ¶¶ 243 and 244 of the Complaint. Those allegations are that these defendants failed to disclose their "personal interest in the Friedman's board vote." A-doc. # 1. The Complaint further claims that the failure to disclose these payments prevented, prior to the Board's vote of approval, a further investigation and greater scrutiny into both the merits of the $85 million investment and the loyalties of Brinkley and Stinn. *Id.* ¶ 165. There is no question that the $85 million investment damaged Friedman's.

Therefore, the plaintiff has alleged with sufficient particularity that Brinkley and Stinn breached their duty of loyalty to Friedman's by fraudulently failing to disclose their personal interest ($600,000 reward payments) in the board's vote to invest $85 million in Crescent.

Brinkley and Stinn's argument -- that the independent members of Friedman's Board voted to approve the investment and that they are entitled to rely on the recommendations of the independent committee under 8 Del.C. § 141(e) -- is unavailing. Doc. # 31 at 29; doc. # 39 at 17. 8 Del.C. § 141(e) requires that Brinkley and Stinn rely in "good faith" on recommendations of independent committees. They could not have done so here because they knew that these independent board members were not fully informed of Brinkley and Stinn's personal interests in the transaction -- despite 8 Del.C. § 144(a)(1)'s disclosure requirement. Brinkley and Stinn's motion to dismiss this claim therefore is denied.

In contrast, this claim would otherwise be dismissed against Suglia (were he to have appeared in this case), because the Trustee has failed to plead any facts showing that he caused

these payments to be made. In fact, the Complaint never mentions Suglia's name in connection with the $600,000 payments. Instead, it only mentions Cohen, Brinkley and Stinn. A-doc. # 1 ¶ 94. Conclusory allegations won't do. *Twombly*, 127 S.Ct. at 1965.

### 3. *Failing to Disclose Crescent's True Financial Condition*

There is no doubt that a director's knowledge of a company's true financial condition -- knowledge not known to the company's other directors -- would be a material fact that should be disclosed to those who would make a large investment in that company. The Complaint alleges that Brinkley, Stinn and Suglia failed to disclose Crescent's dire financial condition prior to the Friedman's board voting on the $85 million investment. A-doc. # 1 ¶¶ 243, 244, 245.

As stated earlier in Part III(E)(1)(b), the plaintiff specifically alleges that Brinkley, Stinn and Suglia failed to inform the independent directors that:

(1) Bank of America told the companies it was unwilling to continue Crescent's $112.5 million credit line nor participate in a refinancing of Crescent; (2) two bank lenders had raised concerns that a $75 million unsecured investment by Friedman's in Crescent could be a fraudulent conveyance; (3) E&Y had problems valuing Crescent at $109 million to offset Friedman's liability on its guaranty, and used an undefined investment value methodology for reaching that value; (4) Crescent had narrowly avoided a going concern opinion from its auditors; and (5) the tightening of Crescent's availability under the 12/01

amendments to its credit line made it very unlikely that Crescent could abide by the terms which would result in a call on Friedman's guaranty of that credit line.

*Id.* ¶¶ 62, 63 (paraphrased).

Again, nothing in the Complaint ties Brinkley to this inside information. He was not involved in the communications with banks and lawyers about Crescent's financial condition. Without tying Brinkley to these communications, the plaintiff fails to particularly plead the facts underlying this fraud-based, breach of duty of loyalty claim. *See supra* Part III(E)(1)(a).

Stinn and Suglia, on the other hand, were directly involved in all of these communications. As the Court concluded earlier, the plaintiff has sufficiently pled with particularity a fraud claim for Stinn's failure to disclose these facts (showing Crescent's true financial condition, facts which were material to Friedman's decision on its $85 million investment in it). *See supra* Part III(E)(1)(b). The Complaint states that Suglia was privy to all the same information as Stinn. A-doc. # 1 ¶¶ 50, 56, 60, 62 n. 1. Due to Stinn's status as a director and CEO of Friedman's, and Suglia's status as its CFO, they had an "unremitting obligation to deal candidly with their fellow directors." This includes an affirmative duty to disclose all material facts related to the transaction, especially considering their status as an interested director and interested officer[27] on both sides of the transaction. *See HMG/Courtland,* 749 A.2d at 119; *see also* 8 Del.C. § 144(a)(1). Crescent's true financial condition was a material fact relevant to the Friedman's Board's decision to

invest a large sum in it. Both Stinn and Suglia had a duty to disclose that fact based on their duty of loyalty. Their failure to do so constitutes a breach of the duty of loyalty.

Again, Stinn's attempt to rely on the approval of the transaction by the independent board members provides him no succor. Doc. # 39 at 17. Those members were not fully informed due to a fraudulent omission by Stinn and Suglia, and therefore they could not have relied in good faith on the independent committee's recommendation as required by 8 Del.C. § 141(e). Stinn's motion to dismiss this claim thus is denied, and the claim would otherwise also be viable against Suglia, who is referenced herein to complete the story line and thus aid reader comprehension, but that ruling will not be made because he has not been served.

### 4. *Financial Manipulations and Improper Related-Party Transactions Involving Friedman's, Crescent and MS*

The Trustee next claims that Brinkley, Stinn and Suglia breached their duty of loyalty to Friedman's by "knowing of yet failing to disclose to Friedman's Board financial manipulations and improper related-party transactions involving Friedman's, Crescent and MS, causing Friedman's to incur damages to its operations, lost profits, and the substantial costs of a restatement and its investigation." A-doc. # 1 ¶¶ 243, 244.

This vague claim fails to meet Rule 9(b)'s particularity requirement for a fraud-based, breach of fiduciary duty claim. It is impossible for the Court or the defendants to wade through 210 paragraphs of factual allegations and *guess* as to what the Trustee references here. Consequently, this claim is dismissed.

---

[27] Suglia was the CFO of both Friedman's and Crescent; this is enough to characterize him as an interested director in the transaction. 8 Del.C. § 144(a).

### 5. *Contractual, Investment and Other Relationships Between Friedman's and Crescent Detrimental to Friedman's*

Plaintiff also alleges that Brinkley, Stinn and Suglia violated their duty of loyalty by "concealing the extent to which the various contractual, investment and other relationships between Friedman's and Crescent were designed to, and/or did in fact, serve to benefit Crescent, Cohen, Brinkley and Stinn to the detriment of Friedman's...." A-doc. # 1 ¶¶ 243, 244.

Once again, plaintiff's claim is too vague and broad to meet Rule 9(b)'s particularity requirements for a fraud-based breach of fiduciary duty claim. Consequently this claim is dismissed, too.

### 6. *Disseminating Fraudulent Financial Statements*

The Complaint shows that Brinkley, Stinn and Suglia possessed knowledge that all of MS's fees were being capitalized improperly in Friedman's financial statements. A-doc. # 1 ¶¶ 107, 110, 111. The Trustee alleges that the three agreed to a recharacterization of MS's fees to provide the appearance that they could be properly capitalized. *Id.* ¶ 110. It is not exactly clear whose interests they were acting for, but it is clear that it could not have been in the company's best interests.

Participating in the fraudulent manipulation of the company's financial statements can only be harmful to the company and not in its best interests. The duty of loyalty requires "refrain[ing] from doing anything that would work injury to the corporation" and "mandates that the best interest of the corporation and its shareholders takes precedence over any interest

possessed by a director...." *Cede,* 634 A.2d at 361-62. Whether these defendants' interest was to inflate the statements in order to receive greater bonus compensation, or to further some interest of controlling shareholder Cohen, it was not in the best interests of the corporation itself, and it was fraudulent. Therefore, plaintiff's breach of duty of loyalty claim against Brinkley, and Stinn (but not Suglia, due only to his non-appearance in this case) may proceed.[28]

With respect to the other accounting manipulations, the Court has already concluded that the group pleading doctrine does not apply to Brinkley. *See supra* Part III(E)(5). But it has concluded that the group pleading doctrine does apply to Stinn and the fraudulent misstatements in Friedman's financial statements are attributable to him. *Id.*

The Court also concludes -- and only to the extent this ruling is necessary to comprehend or support the plaintiff's claims against defendants now before this Court -- Suglia qualifies as an officer "with inside knowledge of and involvement in the day to day affairs of [Friedman's]." *JDN,* 182 F.Supp.2d at 1251. Suglia was the CFO of Friedman's and, *inter alia,* participated in the valuation of Crescent for Friedman's financial statements, prepared pro forma analyses and projections, prepared responses to an SEC Comment Letter, and allegedly ordered Friedman's employees to engage in certain accounting practices. A-doc. # 1 ¶¶ 19, 59, 76, 92, 196. Therefore, fraudulent representations made in Friedman's financial statements are attributable to Suglia as well.

---

[28] Again, Suglia has not been served and thus is not before this Court. But the Court is reaching claims against him solely for the purpose of resolving whether aiding and abetting claims (thus requiring the participation of others, like Suglia) are viable against those who are before this Court.

Again, intentionally participating in and orchestrating the manipulation of Friedman's financial statements could not have been acting in the best interests of the company as required by the duty of loyalty. The plaintiff alleges that Stinn and Suglia acted in the best interests of Stinn, the controlling shareholder Cohen, and Crescent by manipulating the financials to encourage the public to invest in order to raise more money to put into Crescent. Doc. # 56 at 31. As the plaintiff states, the fraudulent financial statements caused great injury to the company, *inter alia*, in the form of costs of internal investigations and attempting to restate its financials. A-doc. # 1 ¶ 246. Consequently, this claim may go forward.

### 7. *False and Misleading Statements to Capital Factors*

Plaintiff's final breach of the duty of loyalty claim runs against only Suglia. It states that Suglia "knowingly, recklessly, or negligently ma[de] materially false and misleading statements to Capital Factors concerning Friedman's actual indebtedness to Cosmopolitan." *Id.* ¶ 245. In that Suglia is not before this Court and this claim is not part of the aiding and abetting claims referenced *supra*, the Court will not reach it.

### H. Count VIII -- Aiding and Abetting Breach of Fiduciary Duties Against MS and Cohen

For this claim, the Trustee simply repeats the breach of fiduciary duty claims against Brinkley, Stinn and Suglia from Count VII, *see supra* Part III(G), and states that MS and Cohen, through "improper actions and wrongful conduct, and without privilege ... encouraged and acted to procure and induce numerous breaches of these

officers' duties to Friedman's...." A-doc. # 1 ¶ 249. Plaintiff again incorporates all 210 paragraphs of the complaint before the Counts and makes a formulaic recitation of the elements of a cause of action for aiding and abetting. *Id.* ¶¶ 247-252.

A claim for aiding and abetting a breach of fiduciary duty was recognized under Georgia law in *Insight,* 280 Ga.App. at 25. A plaintiff may recover by proving the following elements:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Id.* at 25-26.

Because the third element requires an actual breach of fiduciary duty by the primary wrongdoer, the Court only need consider the aiding and abetting claim with respect to the breach of loyalty claims that were sufficiently pled as found in Part III(G). This includes claims relating to the $600,000 forgivable loan payments, the failure to disclose the true financial condition of Crescent, and the recharacterization and capitalization of MS's fees.

Plaintiff alleges that Cohen authorized the $600,000 forgivable loan payments to Stinn and Brinkley. A-doc. # 1 ¶¶ 94, 166. He essentially

argues that Cohen paid off Stinn and Brinkley to push the $85 million investment in Crescent through without informing the independent directors of material facts regarding Crescent's precarious financial condition. Doc. #56-2 at 19. The Court has ruled that Stinn and Brinkley's acceptance of the $600,000 to help push the deal through could constitute a breach of the duty of loyalty. *See supra* Part III(G)(2). The Court also ruled that the withholding of material information regarding Crescent's financial condition prior to Friedman's approval of the $85 million investment could constitute a breach of Stinn and Suglia's duty of loyalty. *See supra* Part III(G)(3).

Plaintiff has sufficiently alleged that Cohen approved the $600,000 payments to Stinn and Brinkley to procure a breach of their fiduciary duty. A-doc. # 1 ¶¶ 94, 166. It is fair to assume that Cohen knew of their duties owed to Friedman's because he appointed them as directors. *Id.* ¶ 5. Additionally, plaintiff has alleged that he procured these breaches with malice by attempting to "keep Crescent afloat as a separate entity" at Friedman's expense and for his own benefit. *Id.* ¶ 94; *see also Insight,* 280 Ga.App. at 25 n. 13 ("Persuading a person to break a contract for the indirect purpose of ... benefitting the defendant at the expense of the plaintiff is a malicious and actionable act if injury arises from it"). Such wrongful conduct was the proximate cause of the plaintiff's damages because it allowed an uninformed group of independent directors to make an $85 million investment which ultimately precipitated Friedman's bankruptcy. This claim against Cohen may proceed.

But no acts are alleged on the part of MS in procuring the breach of duty through the $600,000 payments. Similarly, no acts are alleged on the part of either MS or Cohen to procure the silence of Suglia with respect to the financial condition of Crescent. Therefore, such claims have not been sufficiently pled and thus are dismissed.

Plaintiff does bring one new claim against MS and Cohen. He alleges that they aided and abetted Brinkley's, Stinn's and Suglia's breach of their fiduciary duty by encouraging them to "recommend[] the extraordinary $1 million fee to [MS], which Friedman's board would not have approved had it known of Crescent's payment of $700,000" for the same transaction. A-doc. # 1 ¶ 249. Apparently, Crescent paid MS $700,000 for the work that MS performed for it on the 2002 transaction, but MS never disclosed this to Friedman's. *Id.* ¶ 94. But Friedman's and Crescent were always separately billed by MS for the services that were performed for each company. *Id.* ¶¶ 110-111. There are no allegations that Friedman's based the amount it paid MS on what Crescent also paid. Therefore the plaintiff has no claim for aiding and abetting a breach of fiduciary duty, since no fiduciary duty has been breached.

The recharacterization of MS's fees and expenses so that Friedman's could capitalize all of them inflated its financial statements. *Id.* ¶ 107. The Court has ruled that improperly capitalizing all of MS's fees to fraudulently inflate Friedman's financial statements could constitute a breach of the duty of loyalty by Brinkley, Stinn and Suglia. *See supra* Part III(G)(6). The facts show that MS and Cohen participated in the recharacterization of these fees by sending in a revised fee analysis (A-doc. # 1 ¶ 102) and agreeing to the retainer increase. *Id.* ¶¶ 110, 111. *See Insight,* 280 Ga.App. at 25 n. 12 (procure includes "the lending of assistance in the actual perpetration of the wrong done by another").

It is reasonable to infer that both MS and Cohen knew Brinkley, Stinn and Suglia were directors and/or officers and therefore owed fiduciary duties to Friedman's. It is also a reasonable inference that MS and Cohen knew that recharacterizing the fees to capitalize them improperly interfered with Friedman's ability to maintain accurate financial statements. *See id.* at 25 n. 13 ("'malicious' or 'maliciously' means any unauthorized interference"). The manipulation of Friedman's financial statements proximately caused damage to Friedman's through goodwill-damaging SEC inquiries and investigations and attempts by Friedman's to restate its financials. A-doc. # 1 ¶ 246. This claim shall go forward against both MS and Cohen.

While the Court has ruled that Stinn and Suglia potentially breached their duty of loyalty through fraudulent misrepresentations in other aspects of Friedman's financial statements, the plaintiff alleges no acts on the part of Cohen or MS that procured those breaches of fiduciary duty. Therefore, those claims are dismissed.

## I. Count IX -- Gross Mismanagement

The plaintiff makes the bald allegation that "Brinkley, Stinn, and Suglia abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Friedman's in a manner consistent with the operations of a publicly held corporation." A-doc. # 1 ¶ 254. On its face, this allegation implicates only the duty of care.

Brinkley and Stinn point to Delaware case law holding that claims for gross negligence are simply a duty-of-care claim. *See In re Lukens Inc. S'holder Litig.*, 757 A.2d 720, 731-32 (Del.Ch. 1999) ("If a complaint merely alleges that the directors were grossly negligent in

performing their duties ... without some factual basis to suspect their motivations, any subsequent finding of liability will, necessarily, depend on finding breaches of the duty of care, not loyalty or good faith"); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del.Ch. 2005) ("Director liability for breaching the duty of care is predicated upon concepts of gross negligence") (quotes and cites omitted). 8 Del.C. § 102(b)(7) allows a corporation to

> eliminat[e] or limit[] the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or knowing violations of law; ... (iv) for any transaction from which the director derived an improper personal benefit.

8 Del.C. § 102(b)(7). This provision "immunizes ... directors for liability for monetary damages as a result of a breach of their duty of care." *McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 (Del.Ch. 2000). That includes gross negligence. *Benihana*, 891 A.2d at 192.

Friedman's had a provision in its articles of incorporation that eliminated the liability of a director for breach of fiduciary duties to the fullest extent permitted by Delaware law. Doc. # 31 at 25. Because plaintiff's allegations sound in gross negligence and that is a duty of care claim, *Benihana*, 891 A.2d at 192, Brinkley and Stinn assert that this claim must be dismissed as barred by the Friedman's exculpation provision.

*Continuing Creditors' Committee of Star Telecommunications Inc. v. Edgecomb*, 385 F.Supp.2d 449, 463 (D.Del. 2004) (exculpatory provisions under § 102(b)(7) bar duty of care claims brought by creditors).

Plaintiff responds that this claim is for breach of the duties of loyalty and good faith and therefore is not barred by the exculpatory provision. Doc. # 56-2 at 8. But he fails in his response to point to what facts show that this claim involves the duties of loyalty and good faith. He also fails to cite any facts (in either the Complaint (A-doc. # 1) or his response to the motions to dismiss (doc. ## 56 and 56-2)) supporting his claim for gross mismanagement.

Instead, plaintiff simply incorporates all 210 paragraphs of the Complaint preceding the Counts and rests upon a conclusory allegation that Brinkley and Stinn grossly mismanaged the assets and business of Friedman's. A-doc. # 1 ¶¶ 253, 254. This is a clearly insufficient (shotgun) pleading. Again, the Court will not do the plaintiff's work and develop theories of liability for him.

Furthermore, the language used in the plaintiff's allegation only implicates a duty of care -- "Brinkley, Stinn, and Suglia abandoned and abdicated their responsibilities and fiduciary *duties* with regard to prudently managing the assets and business of Friedman's in a manner consistent with the operations of a publicly held corporation." *Id.* ¶ 254 (emphasis added). This sounds completely in negligence and therefore is barred by the aforementioned exculpatory provision. Plaintiff's claims for gross mismanagement against Brinkley and Stinn thus are dismissed.

## J. Count X -- Corporate Waste

Plaintiff's claims for corporate waste against Brinkley, Stinn and Suglia include:

(a) causing and inducing Friedman's to provide substantial financial support to Crescent in the form of, *inter alia*, (i) the $85 million unsecured investment in August 2002; (ii) making large portions of its own borrowing base available to Crescent; and (iii) subsidizing Crescent's operations under the Services Agreement;

(b) paying huge sums of money to [MS] for services that provided little or no benefit to Friedman's;

(c) paying themselves large incentive-based compensation and forgiving large portions of loans that Friedman's had extended them based on financial results that were inflated and misstated....

A-doc. # 1 ¶ 257.

A claim for corporate waste "is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). To withstand a motion to dismiss on a corporate waste claim, the plaintiff "must show that the transactions were effected on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange." *In re Limited Inc.*, 2002 WL 537692 at * 8 (Del.Ch. 3/27/02) (unpublished) (quotes and cites omitted). Accordingly, a corporate waste claim will fail "if there is any substantial consideration received by the corporation, and ... there is a good faith judgment that in the circumstances the transaction is worthwhile." *White v. Panic*, 783 A.2d 543, 554 (Del. 2001) (quotes and cites omitted). "This is so even if the transaction

appears, with hindsight, to be unreasonably risky to a reviewing court. As [the Delaware Supreme Court has] observed, courts are ill-fitted to attempt to weigh the adequacy of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk." *Id.* (quotes and cites omitted). These statements of law show that the burden for stating a claim for corporate waste is fairly high.

The Trustee's claims for corporate waste with regard to compensation paid to Brinkley and Stinn must be dismissed. The Complaint states that Brinkley received almost $3.2 million over a five year period from Friedman's (1999-2003). A-doc. # 1 ¶ 12. Stinn received a little more than $5.34 million over that same period. *Id.* ¶ 18. Brinkley and Stinn were both directors and Stinn was also the CEO of Friedman's. *Id.* ¶¶ 8, 14. The Trustee does not even suggest that these men should have worked for free, much less what constitutes a "waste-level" salary for their services.

Again, courts are ill-equipped to question the adequacy of consideration. *White*, 783 A.2d at 554. For that matter, the compensation numbers over a five year period do not seem shocking given the publicized amounts paid to corporate directors elsewhere. In short, the Trustee has not supported his corporate waste allegations here, so these claims are dismissed.

As for the payments made to MS, the plaintiff's "waste" claims also are dismissed. The Complaint shows that in 1996 and 1999 MS acted as an investment banker and/or advisor to Friedman's with respect to investments in Crescent. A-doc. # 1 ¶¶ 39, 44. Additionally, MS and Friedman's first entered into their contract in 1994, and that contract was renewed by Friedman's board every year thereafter for more than ten years. This included adjusting the

payment structure to pay an annual flat fee of $1.44 million beginning in 2001. *Id.* ¶¶ 96-98. While the plaintiff does not state what MS provided in the form of services during that ten year period (except for work on transactions in 1996, 1999 and the 2002 refinancing of Crescent), MS certainly must have been providing services for Friedman's board to have continued to renew Friedman's contract with MS. There also does not appear to be anything irregular about a publicly-traded company retaining the services of an investment banking and financial advisory service. *Id.* ¶ 2.

What the plaintiff must be relying upon for this claim is Suglia's statement that he did not know what MS was doing to earn its fees. *Id.* ¶ 105. But this is not enough to meet the burden of a corporate waste claim. The Complaint fails to show that Friedman's was not receiving anything for the amount of money it was paying MS, and doing so under a contract continually renewed by Friedman's board. Therefore, this claim must be dismissed, too.

Also dismissable is the Trustee's corporate-waste claim regarding the subsidization of Crescent's operations under the 2000 Services Agreement. Under this agreement, Friedman's would provide Crescent with "a broad range of investment services relating to accounting, cash management, sales, audit, accounts payable, loss prevention planning and miscellaneous management services" and integrate Crescent and Friedman's technology systems. *Id.* ¶¶ 45, 46. The Complaint then states that, for the management services, Crescent was to pay Friedman's $7500 per store annually on the first 150 stores in operation, $6500 annually for the next 50 stores in operation, and $5500 for the last 50 stores in operation. *Id.* ¶ 45. The technology integration agreement established that Crescent would be "responsible for all costs

and expenses," but it did not provide a price for the work in the contract. *Id.* ¶ 46.

The fact that Friedman's received payment from Crescent for the management services requires dismissal of this corporate waste claim. Once again, this Court is ill-equipped to determine the adequacy of that compensation. *White*, 783 A.2d at 554. With respect to the technology integration agreement, the Trustee fails to allege that Friedman's did not receive any consideration for the agreement. Just because there was not a specific price in the agreement does not mean that Friedman's received nothing in return, especially when the contract states that Crescent is responsible for the costs. Additionally, the integration of Friedman's and Crescent's technology systems makes perfect sense considering plaintiff's own recognition that Friedman's planned on acquiring Crescent at some point. Doc. # 56 at 16 n. 3. Therefore, the Trustee's claims for corporate waste based upon the 2000 Services Agreements must be dismissed.

The plaintiff's final allegations of corporate waste involve allowing Crescent access to a large portion of Friedman's borrowing base and the $85 million unsecured investment in Crescent in 2002. Up to $80 million of Friedman's borrowing base was available for the benefit of Crescent at the end of 3/02. A-doc. # 1 ¶ 71. But neither the Complaint nor the plaintiff's reply to the motions to dismiss (doc. ## 56 and 56-2) make any showing of how Crescent's access to Friedman's borrowing base reserve constituted corporate waste. For that matter, the plaintiff's reply does not even mention this claim and the Complaint simply states a legal conclusion that such access constituted corporate waste. A-doc. # 1 ¶ 257. Such conclusory allegations without supporting facts cannot survive a motion to dismiss.

*Twombly*, 127 S.Ct. at 1974.

The corporate waste claim based on the $85 million investment by Friedman's in Crescent essentially hinges on the fact that when Crescent declared bankruptcy in 2004, Friedman's lost the entire unsecured investment. A-doc. # 1 ¶ 87. Prior to making the $85 million investment, Friedman's was the guarantor of Crescent's $112.5 million credit line with Bank of America. *Id.* ¶ 42. Under the agreement, if Crescent defaulted on its loan with Bank of America, Friedman's would be required to pay off Crescent's debt but then would "step into the shoes" of the secured lenders and have a secured position in front of all other creditors. *Id.*

According to the plaintiff, Friedman's would then have been able to foreclose on all of Crescent's assets through bankruptcy proceedings which would have covered most of the $109 million debt owed under the credit line. Doc. # 56-2 at 9. But instead Friedman's directors approved the $85 million *unsecured* investment in Crescent (which was lost in the Crescent bankruptcy proceedings) and extinguished its guarantee of the Crescent credit line, thereby losing its position as a secured creditor. A-doc. # 1 ¶ 202. The Trustee insists that no responsible, unconflicted director would have made the $85 million unsecured investment in Crescent and swap positions from a secured creditor to an unsecured one. Doc. # 56-2 at 9. Thus, he concludes, this constitutes corporate waste.

But, Brinkley and Stinn point out, by making the $85 million investment in Crescent, Friedman's avoided having to pay $109 million to Bank of America and "all of the attendant costs, delays and effort involved in the event that Friedman's would have incurred at that time to step into the shoes of Crescent's banks

and collect on the loan, and becom[e] embroiled in a likely bankruptcy proceeding." Doc. # 31 at 31; *see also* doc. # 39 at 18. Therefore, they assert that the $85 million investment did have a valid purpose, so the corporate waste claim must be dismissed. *Brehm*, 746 A.2d at 263. Additionally, Friedman's did receive consideration in the form of $50 million in Crescent preferred stock and $35 million in Crescent subordinated notes. A-doc. # 1 ¶ 87. Friedman's was set to receive payments from Crescent on both of those investments, including a $3.2 million dividend from the preferred stock in 9/03. *Id.* ¶¶ 131, 132.

Of course, Crescent never really made those payments because when they came due Crescent could not afford them.[29] *Id.* But the important fact is that at the time the transaction occurred, Friedman's was scheduled to receive payments from Crescent on its investment as consideration, and Friedman's avoided having to accelerate Crescent's debt and all of the costs associated with foreclosing on Crescent's assets. The investment was risky considering Crescent operated at a loss every fiscal year from at least 1995-2001 (*id.* ¶¶ 39-41, 49) and it ultimately paid Friedman's nothing because Crescent could not afford the payments on the stock and subordinated notes. *Id.* ¶¶ 131, 132. But even if the Court believes, with hindsight, that the transaction was unreasonably risky, that is not sufficient to constitute corporate waste because, again, courts are ill-equipped to "judge appropriate degrees of business risk." *White*, 783 A.2d at 554.

Brinkley and Stinn also point out that Friedman's special committee of independent directors appointed for this transaction *approved* the $85 million investment first. A-doc. # 1 ¶ 28. These defendants thus argue that, since the independent directors were not sued in this Complaint *and* they approved the transaction, that shows that persons of sound ordinary business judgment concluded that such represented a fair exchange. *Limited*, 2002 WL 537692 at * 8.

The plaintiff replies that the independent directors were acting in good faith, but Brinkley and Stinn were not. Doc. # 56-2 at 9. Plaintiff fails to expand on this argument, but the Court takes it to mean that the independent directors were not informed of all of the facts and that Brinkley and Stinn kept those facts from them.

The Court earlier concluded that Stinn may have fraudulently omitted certain facts about Crescent's financial situation from the independent directors under a duty of loyalty claim. *See supra* Part III(G)(3). But that same reasoning does not translate to a corporate waste claim. *See Limited*, 2002 WL 537692 at * 8 ("Although the challenged transactions may be questioned because of doubts about the loyalty of the directors approving them, it does not necessarily follow that they constitute corporate waste").

Friedman's independent directors did not know all of the material facts about Crescent's financial condition, but they knew to a certain extent that Crescent was in bad shape. Leading up to the transaction, the independent directors specifically asked E&Y for a downside analysis if Crescent defaulted on its new loan from the transaction. A-doc. # 1 ¶ 76. If the independent directors are asking for an analysis of what happens if Crescent defaults on its loan, then

---

[29] It is true that Crescent did ultimately pay the $3.2 million dividend in 9/03, but only with the understanding that Friedman's would reinvest that $3.2 million back into Crescent because Crescent could not afford to pay the dividend. Therefore, Crescent never really paid Friedman's on its investments. A-doc. # 1 ¶ 132.

certainly they understood that Crescent's financial position was precarious enough that it could default. And when the independent directors asked about the potential for a merger with Crescent, they were told that Crescent had failed to meet its obligations repeatedly to the bank -- that it was so strapped for cash that it did not even have merchandise. *Id.* ¶ 83. They also knew that Crescent could not get substitute financing without support from Friedman's. *Id.* ¶ 63. So the independent members were aware there was a fair amount of risk involved with the $85 million investment in Crescent.

Knowing there was such a risk, the independent directors asked for a fairness opinion on the proposed transaction (*id.* ¶ 75), and the previously mentioned downside analysis from E&Y. *Id.* ¶ 76. Wedbush Morgan prepared a report finding the transaction to be fair. *Id.* ¶ 75. E&Y's downside analysis was prepared in collaboration with A&B's Mark McElreath and it found that if Crescent defaulted, Friedman's could pay off Crescent's debt owed to the banks and then step into the shoes of the bank and foreclose on all of Crescent's assets and the stock of the Crescent operating company. *Id.* ¶ 78.

The Trustee argues that Wedbush Morgan's fairness opinion could not be relied upon because they were not independent in that they were a co-underwriter of Friedman's 1/02, $35 million stock offering. This assumed the collectibility of the $109 million Crescent obligation and Friedman's intent to provide further financial support to Crescent. *Id.* ¶ 75. If they had found the $85 million investment unfair, it would have contradicted their position as a co-underwriter on the 2002 stock offering. *Id.* The downside analysis, as the Trustee argues, was completely wrong because Friedman's had no guarantee that it could step

into the shoes of the bank if Crescent defaulted, and E&Y and McElreath knew that to be the case at that time. *Id.* ¶ 78.

Plaintiff responds that if the independent directors had known these facts, then they would not have voted to approve the transaction, and therefore their vote should not be considered in the corporate waste analysis proffered here.

But the plaintiff fails to plead what Brinkley or Stinn did to procure the conflicted fairness opinion from Wedbush Morgan, or the erroneous downside analysis from E&Y in collaboration with Mark McElreath. In fact, it was McElreath that suggested using Wedbush Morgan for the fairness opinion (*id.* ¶ 75) and the independent directors must have considered Wedbush Morgan's conflicts because one independent director took notes at a 7/31/02 meeting stating that Wedbush was sufficiently independent. *Id.* ¶ 82. The erroneous downside analysis suggests no involvement by Brinkley or Stinn or any knowledge on their part that it was false. Plaintiff's appropriate recourse would be against the individuals that prepared these erroneous materials upon which the independent members relied, and not Brinkley and Stinn, who did not participate in these acts.

Therefore, plaintiff's claim for corporate waste against Brinkley and Stinn must be dismissed because there is an identified corporate purpose behind the investment (avoiding the acceleration of Crescent's debt and the costs of attempting to collect through bankruptcy), Friedman's received "consideration"[30] for the investment, and

---

[30] The Court has put consideration in quotes because, in actuality, Friedman's received nothing from this investment after the deal was made. But at the time, and

Crescent's independent directors approved the transaction with knowledge that, to a certain degree, Crescent was in a precarious financial condition yet Friedman's was still a secured creditor.

It may be that Friedman's would have been better off, as it turned out, to have simply let Crescent default on its credit line, and then foreclose on all of its assets instead of making the $85 million loan. But simply because the plaintiff has identified a reasonable alternative to the action taken is not enough to constitute corporate waste since the business judgment rule protects such hindsight determinations by a court. *See Limited,* 2002 WL 537692 at * 9 ("That the Complaint identifies viable alternatives to the Board's decision here is not enough -- it is precisely this kind of judicial after-the-fact evaluation that the business judgment rule seeks to prevent"). Therefore, the plaintiff has failed to plead a claim for corporate waste; it thus is dismissed.

### K. Count XI – A&B's Malpractice

#### 1. *The Claims*

A&B served as Friedman's outside counsel, was very involved with Friedman's investment in Crescent, and conducted an investigation into potential wrongdoing at Friedman's in light of the Capital Factors litigation and the SEC's investigations of that wrongdoing. A-doc. # 1 ¶¶ 260, 261. Plaintiff claims A&B committed malpractice in several ways.

First, according to the Trustee, A&B failed to disclose material information in its possession to Friedman's independent directors concerning

matters relating to Crescent, more specifically the $85 million investment in Crescent. *Id.* ¶ 261. On top of that, A&B allegedly committed malpractice by structuring transactions and agreements that benefitted Crescent to Friedman's detriment. *Id.*

Next, A&B failed to inform the independent board members that Friedman's was paying unearned and excessive fees to MS and Brinkley. *Id.* A&B supposedly also should have informed the independent board members of MS's, Cohen's, Brinkley's and Suglia's wrongful conduct and breaches of fiduciary duty. *Id.*

Last, the Trustee points to A&B's role in conducting an "unimpaired" investigation into the wrongdoing at Friedman's when in fact A&B, due to its conflict of interest, was simply not independent enough to act as Friedman's counsel. *Id.* Worse, says plaintiff, A&B failed to obtain appropriate consent to its conflicted representation of Friedman's -- it failed to adequately disclose the risks that its previous representations would hinder it from truly conducting an independent investigation. *Id.*

Further malpractice was committed allegedly when A&B negotiated Brinkley and Stinn's termination agreements at the same time that it was conducting its "Capital Factors" and "SEC" investigation. *Id.* The Trustee says that A&B did not conduct the adequate, impartial and vigorous investigation that it was hired to do. *Id.*

#### 2. *A&B's Threshold Defenses*

##### (a) <u>Timeliness</u>

Before discussing the underlying claims for malpractice, the Court must resolve the merits

---

as far as the independent directors knew, Friedman's expected to receive something in exchange.

of A&B's threshold defenses. First A&B argues that, to the extent the Complaint raises any malpractice claims for pre-1/12/01 acts or omissions, Georgia's four-year statute of limitations for legal malpractice applies. Doc. # 35 at 53. Because the Court does not find any allegation for legal malpractice prior to that date, this defense is moot.[31]

### (b) <u>Assignability</u>

Next, A&B argues that the plaintiff's legal malpractice claims must be dismissed because under Georgia law legal malpractice claims are non-assignable. Doc. # 35 at 43. A&B concedes that no Georgia court has actually decided this, but reminds that liabilities arising out of contracts "or engagements for personal services, requiring skill, science, or peculiar qualifications" are not assignable in Georgia. *Decatur N. Assocs., Ltd. v. Builders Glass, Inc.*, 180 Ga.App. 862, 865 (1986). Thus, since the attorney-client relationship involves personal duties and fiduciary duties, A&B asserts that the legal malpractice claims raised here should not be assignable. Doc. # 35 at 44.

Other states have addressed the issue and emphasized public policy concerns underlying the non-assignability of legal malpractice claims.

A&B summarizes some of these concerns as

> (1) the need to preserve the unique and personal nature of the attorney-client relationship; (2) the incompatibility of the assignment and the lawyer's duty of loyalty; (3) the danger that assignment would spawn increased and unwarranted malpractice actions; and (4) the danger that assignment would discourage lawyers from representing poor, underinsured, or judgment-proof defendants.

*Id.* at 44-45; *see Gurski v. Rosenblum & Filan, LLC*, 885 A.2d 163, 168-70 (Conn. 2005). But A&B fails to consider the bankruptcy context that surrounds this case.

The court in *Parret v. National Century Financial Enter.* stated that, even though state law prohibited the assignment of legal malpractice claims, they are property of the debtor's estate under federal bankruptcy law, so the trustee could properly bring those claims on behalf of the debtor's estate. 2006 WL 783361, * 2-5 (S.D.Oh. 2006). *Parret* recognized, and this Court agrees, that the public policy concerns underlying the non-assignability of legal malpractice claims is not present when a bankruptcy trustee assigned by the courts is bringing the claim:

> [A] transfer by and pursuant to the Bankruptcy Code does not implicate any of the general policy concerns discussed by the cases prohibiting the assignment of legal malpractice claims. The Bankruptcy Code transfer is not a marketplace transaction. The debtors in possession did not sell the claims to an economic bidder. Rather, under the Code, a legal entity was created to stand in the shoes of the debtors in possession to be the representative of

---

[31] A&B raised this assertion in case the plaintiff brought a claim for malpractice concerning the 2000 Services Agreement between Friedman's and Crescent. But the plaintiff does not mention the 2000 Services Agreement in Count XI of the Complaint. A-doc. # 1. Nor is it mentioned in plaintiff's legal malpractice arguments in its reply to the motions to dismiss. Doc. # 56. Therefore, the Court assumes the plaintiff does not claim legal malpractice for the 2000 Services Agreement. But even if the plaintiff did bring such a claim, it would be dismissed for failure to allege any facts showing legal malpractice on the part of A&B. A&B at that time acted at the request of the client, and there is nothing to indicate it breached any duty or acted negligently.

the bankruptcy estates. This is not a merchandizing of legal malpractice claims. This is not an effort to replace a judgment-proof, uninsured defendant with a solvent defendant. To the contrary, this is a situation designed to permit an insolvent client to pursue legal malpractice claims.

*Id.* at * 4.

In fact, the cases A&B cites undermine A&B's position here. In both *In re J.E. Marion, Inc.*, 199 B.R. 635 (Bankr.S.D.Tx. 1996) and *Baum v. Duckor, Spradling & Metzger*, 84 Cal.Rptr.2d 703 (Ct.App. 1999), cases which A&B says are directly on point (doc. # 60 at 28 n. 20), the court-appointed trustee actually *could* properly bring the legal malpractice claims because they were part of the debtor's estate. *J.E. Marion, Inc.* 199 B.R. at 637; *Baum*, 84 Cal.Rptr.2d at 711. What those cases held was that the trustee could not then assign those legal malpractice claims to a third party not related to the bankruptcy. *J.E. Marion, Inc.*, 199 B.R. at 635; *Baum*, 84 Cal.Rptr.2d at 713-14.

That has not happened here. The Trustee is the court-appointed trustee who is bringing the legal malpractice claims against A&B on behalf of the debtor's estate. See A-doc. # 1 ¶ 1. Therefore, the Court agrees with *Parret* and holds that legal malpractice claims may properly be assigned to a court-appointed trustee for the debtor's estate.

### (c) Res Judicata

A&B's next defense asserts that the plaintiff's legal malpractice claims should be dismissed because they were not expressly reserved in Friedman's plan of reorganization and are thus now barred by res judicata. Doc. # 35 at 48;

*D&K Life Inusrance Company of New York*, 112 F.3d 257, 259-60 (7th Cir. 1997).

Where a claim could have been brought before the confirmation of a bankruptcy plan, it is normally precluded in subsequent litigation unless it was *expressly* reserved in the bankruptcy plan. *D & K*, 112 F.3d at 259-60. "The identification must not only be express, but also the claim must be specific. A blanket reservation that seeks to reserve all causes of action reserves nothing." *Id.* at 261. The disagreement before the Court is whether or not the reservation in Friedman's reorganization plan is specific enough to preserve this legal malpractice claim.

The reorganization plan's reservation of trust claims attempts to preserve the following:

[A]ny and all Causes of Action against any Person, including, but not limited to, any officer, director, direct or indirect shareholder, lender, attorney, *law firm*, auditor, accounting firm, accountant or other Person, in any way arising from, in connection with, or relating to the subject matters of the investigation conducted by the Joint Review Committee with respect to any acts, conduct or omissions (i) by the officers and directors occurring on or prior to May 5, 2004, and (ii) occurring at any time with respect to any other Person, including, without limitation, in each case, those matters more particularly discussed in Section VI.G of the Disclosure Statement.

Doc. # 35-2 at 15 (exh. 2 attached to A&B's motion to dismiss) (emphasis added). A&B argues that this is simply a blanket reservation that fails to preserve any claims. Doc. # 35 at 51. The plaintiff points out that the reservation

expressly reserves all claims against Friedman's "attorney [and] law firm" arising out of the investigation conducted by the Joint Review Committee. Doc. # 35-2 at 54.

This alone is not sufficient, but the reservation also refers to section VI.G of the Disclosure Statement, and that contains more detail about the claims the reorganization plan reserves to the trust. There is found a discussion of the investments in Crescent, especially the $85 million investment, along with discussions of the accounting misstatements and irregularities at Friedman's. Doc. # 35-3 at 53 (exh. C attached to A&B's motion to dismiss) ("[F]ormer legal professionals may be liable for damages caused by Friedman's significant transfers of cash to Crescent in the time period covered by the Joint Review Investigation").

Furthermore, the Disclosure Statement specifically declares the potential for "professional negligence and malpractice" actions against those that provided "legal ... services to Friedman's." *Id.* While A&B is not specifically mentioned, this reservation of claims is a great deal more specific than the ones A&B cites as blanket reservations. *See Browning v. Levy*, 283 F.3d 761, 774-75 (6th Cir. 2002) ("Company shall retain and may enforce any claims, rights, and causes of action that the Debtor or its bankruptcy estate may hold against any person or entity...."); *D&K Properties*, 112 F.3d at 259 ("Disbursing Agent ... shall enforce all causes of action existing in favor of the Debtor and Debtor in Possession"); *Harstad v. First Am. Bank*, 39 F.3d 898, 902 (8th Cir. 1994) (no provision in reorganization plan).

The Court concludes that the reservation of claims provision in Friedman's confirmed reorganization plan is sufficiently specific with respect to the legal malpractice claims to serve the important purpose of notifying interested parties of potentially valuable claims against third parties. *See Harstad*, 39 F.3d at 903. Therefore, plaintiff's legal malpractice claims against A&B are not barred by res judicata.

### 3. *The $85 Million Investment*

The Trustee argues that A&B breached its fiduciary duties to Friedman's, and committed legal malpractice, by failing to inform Friedman's independent directors of material facts it knew concerning the financial condition of Crescent. It also provided erroneous legal advice concerning the security of Friedman's investment. A-doc. # 1 ¶ 261.

A legal malpractice claim requires proof of (1) the employment of a lawyer; (2) failure of the lawyer to exercise ordinary care, skill and diligence; and (3) damages proximately caused by that failure. *Tante v. Herring*, 264 Ga. 694, 694 (1994). There is no question that A&B was hired by Friedman's to be its outside general counsel, so an attorney-client relationship existed. A-doc. # 1 ¶ 21.

The main point of contention is the duty that A&B owed to Friedman's during its representation. A&B insists that the plaintiff asks this Court to impose a duty on lawyers to provide business and financial advice to its client, a duty which a lawyer simply does not have. Doc. # 35 at 31-34. The Trustee responds that A&B mischaracterizes his argument. The disclosure of material facts concerning Crescent, he emphasizes, was within the scope of A&B's representation as Friedman's counsel so that the independent directors could make an informed decision. Doc. # 56-2 at 38.

"It is axiomatic that the element of breach of duty in a legal malpractice case -- the failure to

exercise ordinary care, skill, and diligence -- must relate directly to the duty of the attorney, that is, the duty to perform the task for which he was employed." *Tante*, 264 Ga. at 694. A&B cites cases for the general proposition that lawyers are not responsible for giving business advice and there is no duty to perform functions that are inherently non-legal. *See In re Greater Southeast Community Hosp. Corp. I*, 353 B.R. 324, 358 (Bankr.D.D.C. 2006); *Kansas Public Employees Retirement System v. Kutak Rock*, 44 P.3d 407, 413 (Kan. 2002). But labeling the information plaintiff argues should have been disclosed as "business advice" is a misrepresentation. Again, the Trustee argues that certain *material facts* (as opposed to advice) regarding Crescent known by A&B should have been disclosed, and an erroneous legal conclusion should have been corrected by A&B.

*That* is hardly business advice. Furthermore, such a blanket assertion of law in the area of duties owed by an attorney is misleading, because the specific duties owed normally turns on the agreement between attorney and client. For example, the finding of no breach of duty by the attorneys in *Kutak Rock* depended in large part on a specific engagement agreement between the client and counsel which did not call for financial analysis and reporting. 44 P.3d at 415. "Although some attorneys do have such skills and experience, *without a specific undertaking*, a duty should not be imposed for functions that are inherently nonlegal." 3 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 25:3 (2007 ed.) (emphasis added). Therefore, the question really is, what was the scope of duties that Friedman's employed A&B to perform?

Because the Court does not have the engagement agreement between Friedman's and A&B to reference, an examination of the services that A&B did provide is necessary to determine the scope of its representation. The Complaint outlines extensive involvement by A&B, through its employee Mark McElreath, in the $85 million investment by Friedman's in Crescent. A&B took a lead role in negotiating with banks about potential refinancing options. A-doc. # 1 ¶ 69. It also was well aware of the defaults by Crescent on its $112.5 million credit line with Bank of America and the subsequent extremely restrictive amendments imposed by that bank in exchange for a waiver of that default. *Id.* ¶¶ 53, 54. A&B counseled Friedman's CEO and CFO on the dangers of Crescent's financial condition and what the consequences would be for Friedman's if Crescent could not abide by these new restrictive covenants -- *i.e.*, a going concern opinion on Crescent and a call on Friedman's $112.5 million guaranty. *Id.* ¶ 56.

As the plaintiff's expert opines, certain McElreath emails "show[] that he was clearly involved in counseling Friedman's concerning the implications for it arising from Crescent's financial problems." A-doc. # 1, exh. 2 at 28. When E&Y was having difficulty valuing Crescent at over $109 million to match the liability of Friedman's, it contacted McElreath. *Id.* ¶ 59. The Complaint alleges A&B devised the footnote in Friedman's 10-K that explained the use of the "investment value" methodology to find the value of Crescent. *Id.* ¶ 62 n. 1. Most importantly, A&B recommended the creation of a special committee to deal with the conflicts of self-dealing involved in the $85 million investment. *Id.* ¶ 66.

A&B also recommended the hiring of a Delaware law firm to represent the Special Committee. *Id.* The outside counsel was never hired though, and A&B instead acted as counsel to the committee. *Id.* Therefore, it is apparent

that in its representation of Friedman's, A&B was highly involved in all matters related to Crescent, and it served as a liaison between banks/accountants and Friedman's CEO and CFO. It also counseled Stinn and Suglia on the ramifications of Crescent's financial situation as it pertained to Friedman's.

A&B then expanded its scope of representation and its duties when it recommended the Special Committee and acted as counsel to it. The Court finds informative on this point the expert opinions in Professor Fox's affidavit attached to the Complaint. A-doc. # 1, exh. 2. As Fox states, when presented with a self-dealing transaction Delaware law requires special steps to be taken such that the integrity of a board's decision will not be questioned. *Id.* at 26-27. The decision must be approved by a majority of disinterested and independent directors who know "the material facts ... as to the contract or transaction." 8 Del.C. § 144(a)(1).

A&B certainly knew the special attention Delaware law paid to self-dealing transactions -- because it suggested the creation of a special committee and the hiring of a Delaware law firm to represent it in approving or disapproving the investment in Crescent. A-doc. # 1 ¶ 66. But again, McElreath is the only counsel documented as present at the Special Committee meetings and board meetings related to the Crescent investment. *Id.* ¶¶ 74, 81. A&B had a duty as counsel to the Committee to ensure compliance with the requirements of Delaware law regarding a self-dealing transaction. Part of that requirement is that the committee must know all material facts concerning the transaction. 8 Del.C. § 144(a)(1). A&B had a duty to disclose all material facts that were in its possession concerning the actions the Special Committee was asked to undertake. *Spector v.*

*Mermelstein*, 361 F.Supp. 30, 39 (S.D.N.Y. 1972) ("A client is entitled to all the information helpful to his cause within his attorney's command"), *aff'd.* 485 F.2d 474 (2d. Cir. 1973).

Yet, as stated earlier, the Complaint alleges that A&B knew but failed to disclose to Friedman's Special Committee:

> (1) that Bank of America had imposed such stringent new requirements on Crescent in December 2001 that they raised serious concerns as to whether Crescent could comply with them and remain solvent (A-doc. # 1 ¶¶ 54-56); (2) that Bank of America had told Stinn and Suglia that it did not wish to continue lending to Crescent (*id.* ¶¶ 50-53); (3) that potential bank lenders had raised fraudulent conveyance concerns about the Individual Defendants' (Brinkley, Stinn, Suglia, Cohen) plans to have Friedman's provide a $75 million junior unsecured investment in Crescent (*id.* ¶ 52); and (4) that Friedman's auditors had only been able to come up with a $109 million value for Crescent using an investment value methodology rather than a fair market value methodology, and that Crescent had narrowly avoided a "going concern" opinion (*id.* ¶¶ 58-63).

Doc. # 56-2 at 28 (paraphrased). These are all material facts that would have been very important in the Special Committee's decision to make an $85 million investment in a company, especially any close brushes with insolvency. *Spector*, 361 F.Supp. at 40 ("Material facts are those which, if known to the client, might well have caused him, acting as a reasonable man, to alter his proposed course of conduct").

Additionally, it is alleged that the Special Committee asked E&Y to provide a downside analysis regarding the investment, *i.e.*, what happens if Crescent defaults on its new $50 million credit line established as part of the Friedman's investment. A-doc. # 1 ¶ 76. E&Y consulted A&B's McElreath to "understand the issues regarding any security, priority of claims and what alternatives Friedman's would have in a default scenario." E&Y's analysis that it then delivered to the Special Committee contained the legal conclusion that if Crescent defaulted, Friedman's could pay off the debt to Bank of America and "step into the shoes" of the lender. That would enable Friedman's "to foreclose on substantially all assets of Crescent and the stock of Crescent operating co. (held by Crescent parent co.) which are pledged as security under the bank facility." *Id.* ¶ 78.

The Trustee argues that this legal conclusion was erroneous and it depended upon "faulty legal advice from A&B."[32] Doc. # 56-2 at 29. Also, A&B allegedly never corrected this legal error by telling the Special Committee that in the event of a Crescent default and ultimate bankruptcy, Friedman's most likely would lose its entire unsecured $85 million investment as actually occurred. A-doc. # 1 ¶¶ 79, 81.

This was important, the Trustee reminds, because prior to Friedman's $85 million *unsecured* investment, Friedman's had a *secured* position as a guarantor of Crescent's credit line, and by paying off Crescent's debt it would have had priority over all other creditors and could have foreclosed on substantially all of Crescent's assets. *Id.* ¶ 64. A&B never discussed with the independent board members the change in

security of Friedman's position (from secured to unsecured) as a consequence of the proposed $85 million investment. This is not financial advice, but rather a legal issue upon which A&B was consulted by E&Y as counsel for Friedman's. Yet, A&B failed to discuss that matter with the Special Committee. It would be difficult for A&B to argue that such a duty was not within the scope of its representation, considering its previous discussions with Friedman's CEO and CFO concerning Crescent's financial situation and the ramifications for Friedman's both legally and financially. *Id.* ¶ 56.

In that regard, the plaintiff's expert affidavit states, "Independent directors needing to make decisions of this type typically rely at least in part on the advice of experienced transactional corporate lawyers, who can help interpret, in light of the current financial condition of an obligor, the future implications, for example in the event of the bankruptcy of the obligor, of the terms of different possible financial restructuring arrangements." A-doc. # 1, exh. 2 at 28. Certainly as the Special Committee's counsel, A&B had a duty to correct any false legal conclusions upon which the independent members were relying.

This case is roughly analogous to the *Spector* case, where the court found an attorney liable for malpractice for failing to inform his client of the dire financial situation of the company in which his client was going to invest. *Spector*, 361 F.Supp. at 40. There the attorney learned that the company had always been operating at a loss, all of its income went to paying off mortgages, and it was deeply in debt. *Id.* at 31-32. The attorney never informed his client of this information and instead performed a transaction for the client to invest in the company. *Id.* at 32.

---

[32] The Court expresses no opinion as to the accuracy of this assertion. Whether or not A&B actually gave erroneous legal advice is a matter for later proceedings.

Subsequently, when the client lost everything, he sued the attorney for malpractice and claimed counsel breached his duties to the client by failing to inform the client of the knowledge he possessed regarding the financial situation of the company in which he invested. *Id.* at 38. The *Spector* court found the attorney liable for malpractice because he withheld this information from the client and the client stated he would never have gone through with the transaction had he been advised of such information. *Id.* at 40. The court stated:

> If an attorney negligently or willfully withholds from his client information material to the client's decision to pursue a given course of action, or to abstain therefrom, then the attorney is liable for the client's losses suffered as a result of action taken without benefit of the undisclosed material facts.

*Id.* at 39-40.

In the same light, the plaintiff has alleged that if the Special Committee had been informed of the dire financial condition of Crescent as known to A&B and the consequential loss of Friedman's secured position by making the $85 million investment, it never would have gone through with it. A-doc. # 1 ¶ 64; *see also Spector*, 361 F.Supp. at 40 ("It is enough to say that a reasonable man, advised by his attorney that a corporation to which he was contemplating a substantial loan was without sufficient income to repay and otherwise in precarious financial condition, probably would not have made the loan").

Consequently, the plaintiff has sufficiently alleged (1) material facts which A&B did not disclose and an erroneous legal conclusion that A&B did not correct; (2) a duty on the part of

A&B to disclose such facts and correct the legal error; and (3) damages proximately caused to the plaintiff by A&B's malpractice -- the Special Committee would not have approved the transaction.

A&B's final defense is that the *in pari delicto* doctrine bars the plaintiff's action because it was Friedman's controlling shareholder and several directors that committed the underlying wrongdoing at Friedman's and failed to inform the independent directors adequately. Doc. # 35 at 20-21. "The doctrine of *in pari delicto* is an equitable doctrine that states a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006).

The Complaint alleges in Counts I through X that it was Phillip Cohen, Friedman's controlling shareholder, who was orchestrating all of the wrongdoing at Friedman's, along with Bradley Stinn (CEO and director), Victor Suglia (CFO), and Sterling Brinkley (director). A-doc. # 1 ¶¶ 211-258. Normally the acts and knowledge of a corporation's officers and directors are imputed to the corporation because officers and directors are agents of the corporation. *Miller v. Lomax*, 266 Ga.App. 93, 100 (2004). Since the plaintiff, as trustee, stands in Friedman's shoes, A&B argues that *in pari delicto* must bar his claims because Friedman's thus participated in the wrongdoing.

The Trustee responds that there is an exception to this imputation rule -- when the officer or director is acting adversely to the corporation. Doc. # 56-2 at 48. For this "adverse interest exception" to apply, "a corporate officer's interest [must] be entirely adverse ... (*i.e.*, his actions must neither be

intended to benefit the corporation nor actually cause short- or long-term benefit to the corporation)." *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998).

A&B argues that the adverse interest exception is inapplicable to the present situation because Friedman's received a benefit from Cohen's and the directors' wrongdoing. Doc. # 35 at 14. More specifically, the 2002 transaction allowed Friedman's to remove the $109 million Crescent debt from its books and proclaim to Wall Street that it had strengthened its balance sheet with debt reduction of $69 million. A-doc. # 1 ¶¶ 65, 89. And Friedman's, A&B also points out, received $50 million in preferred Crescent stock plus $35 million in subordinated notes in exchange for the $85 million investment. *Id.* ¶ 87. Since Friedman's received benefits from the $85 million investment in Crescent, A&B reasons, the adverse interest exception does not apply.

In response, the Trustee cites *Beck*. There the Eleventh Circuit held that, even when the director's wrongful actions created short term benefits, where the trustee alleged that but for the company's accountant's negligence the transaction never would have occurred, the adverse interest exception still applies. *Beck*, 144 F.3d at 736. There the misconduct of the directors and the malpractice of the accountants provided the appearance that the company was healthy after the acquisition. *Id.* at 735. The court ruled that, where the trustee had not conceded that the company was better off in the short or long term because of the wrongful actions of the directors and the accountants, then applying the adverse interest exception is proper. *Id.* at 737.

Here the Complaint outlines a similar situation. The Trustee alleges that the interested directors and Cohen were promoting the $85 million investment in Crescent only to further their own interests in Crescent, not the interests of Friedman's. A-doc. #1 ¶ 36. Furthermore, absent A&B's negligence and malpractice Friedman's would never have approved the investment. *Id.* ¶ 85. Such alleged malpractice includes (a) the failure to disclose information A&B learned, in its position as Friedman's attorney, about Crescent's precarious financial condition; then (b) erroneously telling Friedman's independent directors that Friedman's would retain a secured position as a result of its $85 million investment. *Id.* The truth is that the "benefits" that A&B claims Friedman's received only provided the *appearance* of a healthy investment, and this only hid the true effects of the transaction.

In fact, Friedman's never received anything for its investment. Crescent never paid the dividends Friedman's was owed, and since the investment left Friedman's unsecured, it lost its entire $85 million investment when Crescent declared bankruptcy in 2004. *Id.* ¶¶ 132-133, 202. The Trustee has not conceded that Friedman's received any real benefit from the wrongdoing of its directors. And, because it is alleged that the transaction would never have occurred but for A&B's malpractice, the adverse interest exception applies. Thus, the Trustee's claims are not barred by *in pari delicto*.

To summarize the *in pari delicto* doctrine up to this point, it prevents a plaintiff from recovering when it was the plaintiff's own agents (in this case, directors and officers) who participated in the wrongdoing. *PSA, Inc.*, 437 F.3d at 1152. However, the adverse interest exception applies, and allows the plaintiff to recover, when the plaintiff's agents acted entirely adverse to the plaintiff and the plaintiff did not receive any benefits (long or short term)

nor conceded it was better off from the wrongdoing. *Beck*, 144 F.3d at 735-37.

A&B insists, however, that the adverse interest exception does not apply when "the persons dominating and controlling the corporation orchestrated the fraudulent conduct...." *Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 165 (2d Cir. 2003). This is called the "sole actor rule, which negates the adverse interest exception when the principal and agent are one and the same." *Id.* Therefore, the sole actor rule is an exception to the adverse interest exception, which means the *in pari delicto* doctrine winds up being applied and thus prevents recovery by the plaintiff.

The Court concludes that this is not an appropriate case for the sole actor rule to apply. Most of the A&B-cited cases invoking that rule involve situations where the sole shareholder controlled and dominated the corporation, and any innocent decision makers were powerless to stop the activity on their own. *See Color Tile*, 322 F.3d at 165 (finding no innocent decision makers because managers knew purchase price and debt were excessive when approving transaction); *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992) (no directors could have stopped transaction, only third parties could have potentially stopped sole shareholder); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 101 (2d Cir. 2003) (independent directors "impotent to do anything"); *In re Dublin Securities, Inc.*, 133 F.3d 377, 380 (6th Cir. 1997) (officers and directors "so dominated and controlled the corporation that the corporation had no separate mind, will, or existence of its own"). Perhaps the most informative case relied upon by A&B is *In re CBI Holding Co., Inc.*, 311 B.R. 350 (S.D.N.Y. 2004). That case, while refusing to recognize an innocent-insider exception when the sole actor rule applies, concludes that the adverse interest "exception applies if: (1) the culpable agent totally abandons his principal's interests; and (2) the culpable agent(s) are not the sole shareholder(s) (in which case, the agent and the principal are one)." *Id.* at 372. The court goes on to explain when the sole actor rule should apply:

> When the innocent insiders lack authority to stop the fraud, the "sole actor" exception to the "adverse interest" exception applies, and imputation is thus proper, because all relevant shareholders and decisionmakers were involved in the fraud. However, when the innocent insiders possessed authority to stop the fraud, the "sole actor rule" does not apply, because the culpable agents who had totally abandoned the interests of the principal, and were thus acting outside of the scope of their agency, were not identical to the principal.

*Id.* at 373. Therefore, *In re CBI Holding Co.* recognizes that the sole actor rule, which is an exception to the adverse interest exception, does not apply when innocent insiders possessed authority to stop the wrongdoing of the other directors or shareholder.

Here, Friedman's created a special committee of independent directors, innocent of any wrongdoing, that was "charged with the power and duty to review any proposal by management regarding the strategic investment in Crescent, and after such review to approve or disapprove such investment in their *sole discretion*." A-doc. # 1 ¶ 67 (emphasis added). This Special Committee therefore had the authority to decide whether or not Friedman's would make the $85 million investment in Crescent. In other words, it possessed the authority to prevent this

transaction and therefore the sole actor rule should not apply, which means that the adverse interest exception to the *in pari delicto* doctrine *should* apply.

Note that *in pari delicto* is an equitable doctrine that "is highly sensitive to the facts and readily adapted to achieve equitable results." *In re Fuzion Technologies Group, Inc.*, 332 B.R. 225, 233 (Bankr.S.D.Fl. 2005). It "is based on concern for the public welfare. When application of the defense would not be in the public interest, the courts will permit recovery by the plaintiff...." *Id.*

Here not only did Friedman's have a special committee of independent directors who had not engaged in any wrongdoing and could have stopped this transaction, but A&B acted as counsel to that committee. A-doc. # 1 ¶¶ 66, 74, 75, 81. *In pari delicto* seems especially inapplicable, then, where:

(a) A&B had the duty to counsel this Special Committee, formed to avoid improper voting by conflicting directors; yet

(b) A&B abdicated its responsibilities to that committee (and thus to Friedman's); and

(c) it is pleaded that, had A&B upheld its duty, the Special Committee likely would have acted differently.

The Court therefore rejects A&B's *in pari delicto* defense.

### 4. *Payments to MS and Brinkley*

A&B argues, and the Court agrees, that decisions setting the compensation for Brinkley and the retainer for MS were pure business decisions on the part of Friedman's. Doc. # 35 at 35. The plaintiff makes no argument to refute this assertion or to show that setting compensation levels or retainer amounts was within A&B's duties. Therefore, this claim is dismissed.

### 5. *A&B's Investigation and Disclosure of Conflicts*

On 9/29/03 A&B attorney John Latham received a call from an assistant U.S. attorney for the Eastern District of New York informing him that it was conducting an investigation of Friedman's concerning the Capital Factors complaint. A-doc. # 1 ¶ 136. That complaint essentially alleged that Friedman's intentionally misrepresented the amount of money it owed to a company called Cosmopolitan. This caused Capital Factors, a receivables factoring company that purchased the accounts receivable of Cosmopolitan, to lend Cosmopolitan more money -- much to its chagrin. *Id.* ¶¶ 125-126.

The Capital Factors complaint also alleged that Friedman's made improper payments to Cosmopolitan that should have been made to Capital Factors per the factoring agreement. *Id.* ¶ 126. Later on 9/29/03, Latham had a conference call with Friedman's Audit Committee in which all agreed that Friedman's should cooperate with the Government's investigation. The Committee also resolved to conduct its own "independent investigation." *Id.* ¶ 137. The Committee, out of Latham's presence, discussed the need to preserve its independence during this investigation. It then decided to retain Latham to assist and represent the Committee and Friedman's in the investigation. *Id.* Latham was going to be working with Dennis Shanagher (*id.*), who was hired as in-house general counsel of Friedman's

and Crescent in late 2002. *Id.* ¶ 29. In order to ensure the independence of the investigation, the Committee determined that A&B's McElreath would not participate in the investigation, since he had represented Friedman's during the period in question. *Id.* ¶ 137.

Lastly, the Audit Committee found it necessary to expand the investigation to include Crescent, since Crescent was a subject of the Government's investigation as well. *Id.* Subsequently, all resolutions of the Audit Committee were passed by the Friedman's Board via unanimous written consent, except the Board expanded the scope of the investigation again to include "any other matters that should come to [the Audit Committee's] attention in the course" of the investigation. *Id.* ¶ 139.

Very quickly Latham's investigation grew beyond the Capital Factors complaint. "Other matters [were] being raised by the SEC and Justice Department," and the investigation identified "potential financial and control issues." It also uncovered accounting problems including the Allowance for Doubtful Accounts at Friedman's. *Id.* ¶¶ 147-153. By 10/16/03, Stinn and Suglia had been advised by A&B to retain separate counsel to represent their interests in the investigation -- due to the "issues raised by the SEC and Justice Department." *Id.* ¶ 155.

On 10/20/03, A&B attorneys (including Latham) told the Committee that issues had arisen in Friedman's credit department. They also advised that the 11/11/03 earnings announcement would have to be delayed for an evaluation of Friedman's liability to Capital Factors and adjustments to its allowances for doubtful accounts. *Id.* ¶¶ 156, 158. By late October/early November, A&B attorneys -- including Latham -- investigated related party

transactions between Friedman's and Crescent. At this time, they discovered the $600,000 payments to Stinn and Brinkley from Crescent as compensation for securing the 2002 $85 million investment by Friedman's. *Id.* ¶¶ 161-162.

On 11/3/03, Latham received a subpoena directed to Friedman's from the SEC seeking, *inter alia*, minutes from every meeting of both Friedman's Board and Audit Committee, fiscal-year end financial statements, documents concerning payments by Crescent to any officer or director of Friedman's, documents identifying all business transactions between Friedman's and Crescent, and documents concerning loans made by Crescent to officers or directors. *Id.* ¶ 168. The SEC also sought documents relating to Capital Factors, the basis for Friedman's allowance for doubtful accounts for fiscal years 2000-03, Friedman's credit operations and credit extension policy, and Friedman's accounting treatment of merchandise or product discounts. *Id.* ¶ 169.

Plaintiff claims that A&B committed malpractice by agreeing to represent Friedman's and its Audit Committee when A&B's conflicts were then too substantial to conduct a loyal and adequate investigation. *Id.* ¶¶ 182-183. Also, the Trustee contends, even if A&B could have accepted the engagement with the informed consent of Friedman's, A&B committed legal malpractice by failing to adequately disclose to Friedman's Audit Committee its conflicts from prior representations and the risks associated with such a conflicted representation. *Id.* ¶ 261. Due to A&B's inadequate disclosure, plaintiff alleges, the Audit Committee was unable to provide an informed consent waiver to the hiring of a conflicted-A&B as counsel. *Id.* A&B also allegedly committed malpractice by failing to inform Friedman's Audit Committee

of further conflicts that arose as the investigation expanded after its initial hiring. *Id.* ¶ 182. Plaintiff states that A&B failed to conduct an "adequate, impartial and vigorous investigation" because of its conflicts. Consequently, Friedman's had to retain counsel to basically redo the investigation and complete it. *Id.* ¶ 263.

In Georgia, "[a] mere potential of inadequate representation that is caused by a split of loyalties is a harm that the conflict of interest rules were designed to protect." *Paul v. Smith, Gambrell & Russell*, 267 Ga.App. 107, 111 (2004). A conflict of interest may be waived, but "such waiver must be knowingly made after full disclosure of all facts." *Id.* While the Georgia Rules of Professional Conduct do not establish civil liability for professional misconduct, "pertinent Bar Rules are relevant to the standard of care in a legal malpractice action." *Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.*, 265 Ga. 374, 376 (1995).

"In order to relate to the standard of care in a particular case ... a Bar Rule must be intended to protect a person in the plaintiff's position or be addressed to the particular harm suffered by the plaintiff." *Id.* at 377. Because the Court finds that GA.R.PROF.CONDUCT 1.7 -- dealing with conflicts of interest -- was designed to protect individuals from conflicted representations without informed consent, it will be considered for determining the standard of care that A&B should have exercised here. Under that rule,

(a) A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to another client, a former client, or a third person will materially and adversely affect the representation of the client, except as permitted in (b).

(b) If client consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected or former client consents, preferably in writing, to the representation after:

(1) consultation with the lawyer,

(2) having received in writing reasonable and adequate information about the material risks of the representation, and

(3) having been given the opportunity to consult with independent counsel.

(c) Client consent is not permissible if the representation:

(1) is prohibited by law or these rules;

(2) includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding; or

(3) involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients.

GA.R.PROF.CONDUCT 1.7.

The fact that A&B had conflicts of interest is not contested here. A&B was Friedman's outside general counsel from at least 1996 until May of 2004 when its representation was terminated by the company. A-doc. # 1 ¶¶ 21, 187. During that time, A&B, primarily represented by Mark McElreath, performed

extensive services for Friedman's including: work on various financing transactions between Friedman's and Crescent in 1996, 1998, and 1999, acting as counsel to Friedman's Special Committee for the 2002 $85 million investment in Crescent (*id.* ¶ 21), creation of the 2000 Services Agreement between Friedman's and Crescent (*id.* ¶ 45), assistance with stock offerings for Friedman's (*id.* ¶¶ 55-57), preparation and/or review of securities filings for the SEC and responses to SEC inquiries regarding such filings (*id.* ¶¶ 62 n. 1, 92), and previously representing Friedman's director and CEO Stinn individually (*id.* ¶ 140).

Plaintiff claims that these conflicts precluded A&B from being able to conduct an adequate investigation on behalf of Friedman's from the start. *Id.* ¶¶ 182-183. But normally when dealing with sophisticated clients with inside legal counsel, judicial decisions "rarely hold that a conflict is nonconsentable." REST. 3D OF LAW GOVERNING LAWYERS § 122 cmt. g(iv) (2007). Friedman's and its Audit Committee are sophisticated clients accustomed to employing attorneys. Plus, they had inside legal counsel, Shanagher, advising on this matter. *Id.* ¶ 137.

Furthermore, at the time that A&B was retained, the investigation only included the Capital Factors matter, and nothing in the Complaint indicates that A&B had been involved with Capital Factors in the past. Therefore, it was possible for A&B initially to represent Friedman's and the Audit Committee despite its conflicts, so long as A&B properly disclosed all of those conflicts to Friedman's and obtained an informed consent waiver. *See* GA.R.PROF.CONDUCT 1.7(b).

A&B claims that its letter of 10/24/03 disclosed all actual and potential conflicts and Friedman's made an informed decision to

continue with the representation, thereby constituting a waiver. Doc. # 35 at 35-39. This letter was sent to Mark Pickup, the Audit Committee chairman, and Shanagher, Friedman's in-house general counsel.[33] A-doc. # 1, exh. 1 ¶ 37 (Affidavit of Cunningham). At the time this letter was sent, as discussed above, A&B's investigation included a lot more than just the Capital Factors issues. There were financial and control issues, accounting problems, and credit troubles. *Id.* ¶¶ 147-153, 156. A&B's letter included the following disclosures:

> (1) A&B was not independent from Friedman's due to previously provided legal services; (2) due to the expansion of SEC and Department of Justice inquiries, A&B would have to investigate securities filings that it prepared in the past; (3) the investigation would include matters pertaining to Crescent; (4) issues regarding A&B's lack of independence could arise if the integrity of Brad Stinn is questioned because A&B previously provided limited legal services to him in the past and Stinn was the primary contact at Friedman's for A&B attorney McElreath.

*Id.* ¶ 140 (paraphrased). Also included in this letter was A&B's professional opinion that these conflicts would not impair its judgment or affect the legal advice provided. *Id.* A&B stated that neither the SEC or Department of Justice had alleged any wrongdoing by Stinn at that time, but if anything arose A&B would recommend bringing in independent counsel to advise the

---

[33] While the plaintiff states that the letter was only sent to Mark Pickup (A-doc. # 1 ¶ 140), this is clearly refuted by the affidavit of his own expert, Professor Clark D. Cunningham. A-doc. # 1, exh. 1 ¶ 37.

Audit Committee on the specific issue. *Id.*

Most importantly, A&B said, "[i]f at any time we believe the interest of [A&B] and the Audit Committee differ, we will promptly advise you of our concern." *Id.*

Plaintiff's allegations that A&B committed malpractice because it could not perform an independent investigation based on its conflicts fails based on A&B's disclosure that it was not independent and Friedman's Audit Committee then continued to employ it.

Plaintiff next points out that A&B's disclosures were inadequate because it did not include the material risks of the representation; nor did it advise the Audit Committee or offer it the opportunity to consult independent counsel as required by GA.R.PROF.CONDUCT 1.7(b)(2) and (3). *Id.* ¶ 146. But A&B responds that the Audit Committee had in-house legal counsel to advise it, thereby obviating the need to provide details about the risks of representation. *See* REST. 3D OF LAW GOVERNING LAWYERS § 122 cmt. (c)(i) (2007) ("A client independently represented ... by inside legal counsel ... will need less information about the consequences of a conflict....").

The presence of inside counsel also obviously afforded the Audit Committee the opportunity to consult with independent counsel, and A&B points out that Georgia Rules only require that the client have the "opportunity to consult with independent counsel," and not that a conflicted lawyer must advise the client of that in writing. Doc. # 35 at 36-37 (citing Roy M. Sobelson, *Legal Ethics*, 56 MERCER L. REV. 315, 325 (2004) (Georgia "does not go as far as most states, which require that 'the client be advised in writing of the desirability of seeking ... advice of independent legal counsel'") (quoting MODEL R.PROF.CONDUCT 1.8(a)(2))).

It is apparent from A&B's letter that, while it disclosed its conflicts of interest and lack of independence, it identified none of the risks involved with it representing the Audit Committee. A-doc. # 1 ¶ 140. However, it is reasonable for A&B to rely in this situation on the fact that it was dealing with sophisticated clients accustomed to employing lawyers, and the client had in-house legal counsel to opine on the advisability of hiring conflicted attorneys. Accordingly, A&B's initial disclosure through the 10/24/03 letter was sufficient to constitute a knowing waiver by Friedman's when it continued with the representation.

Nevertheless, the Court finds that the plaintiff has sufficiently pled a claim for legal malpractice against A&B for failure to obtain Friedman's informed consent to continue its representation as the investigation broadened and A&B's conflicts became more severe. "If a material change occurs in the reasonable expectations that formed the basis of a client's informed consent, the new conditions must be brought to the attention of the client and new informed consent obtained." REST. 3D OF LAW GOVERNING LAWYERS § 122 cmt. (d) (2007). A&B's own letter conveyed that if conditions changed concerning its own interests or the integrity of Stinn, it would address the Audit Committee on such matters. A-doc. # 1 ¶ 140. For that matter, even without such a commitment in the letter, it was part of A&B's duty of loyalty to Friedman's to inform it of material changes in the representation that might create new conflicts.

Here, by October 16th A&B had advised Stinn to retain separate counsel to represent his own interests in the investigation. *Id.* ¶ 155. It could be inferred that A&B's advice to retain

separate counsel means that Stinn's integrity had been called into question at that point. But A&B, according to its letter eight days later, states that neither the SEC or Department of Justice had alleged any wrongdoing at that time. *Id.* ¶ 140. Regardless, by early November A&B was aware of the fact that Stinn received $600,000 in compensation from Crescent for securing the $85 million loan from Friedman's. *Id.* ¶ 163. This is a material fact that calls Stinn's integrity into question. Yet there is no indication that A&B subsequently disclosed to the Audit Committee what this meant as far as A&B's ability to continue its representation and the risks involved with it, even though this was an area of particular concern identified by A&B in its engagement letter. *Id.* ¶ 140.

Additionally, by mid-November Stinn was named in several class action lawsuits and derivative suits, and in late November A&B was advising the Audit Committee on and negotiating the terms of Stinn's termination, both of which create a reasonable inference that questions Stinn's integrity. *Id.* ¶¶ 174, 178, 180. Again, there is no indication A&B discussed these conflicts and obtained informed consent to proceed.

On 11/3/03, A&B, on behalf of Friedman's, received a subpoena from the SEC seeking documents concerning all business transactions between Friedman's and Crescent. *Id.* ¶ 168. This expanded the scope of the investigation to include all of the transactions from 10/1/99 through 11/3/03. This included the 2000 Services Agreement, the 2002 $85 million investment by Friedman's in Crescent, and Crescent's 9/03 dividend payment to Friedman's and subsequent reinvestment by Friedman's into Crescent in the form of subordinated debt. *Id.* ¶¶ 45, 85, 132. These are all large transactions that A&B was intimately involved with and

structured. A&B orchestrated the Services Agreement. *Id.* ¶¶ 45-47. A&B facilitated the 2002 transaction and served as counsel to the Special Committee set up to review the investment. *Id.* ¶ 66. When Crescent could not pay the dividends it was required to pay Friedman's stemming from the 2002 investment, it was A&B that devised the solution for Crescent to pay and Friedman's immediately reinvest. *Id.* ¶ 132.

A&B's investigation broadened such that it was expected to perform an unimpaired and loyal investigation for Friedman's of the work that it performed on these transactions. Plaintiff's expert affidavit states, "[t]here was a significant risk that [A&B's] own financial and reputational interests could materially and adversely affect its representation of Friedman's from [10/03] through [4/04] in conducting the investigation ... because of [A&B's] direct involvement in transactions that were the subject of that investigation." A-doc. # 1, exh. 2 ¶ 51. This is a clear conflict of interest that emerged after the 10/24/03 engagement letter, yet it was never addressed with the Audit Committee.

Lastly, A&B's letter stated that it had excluded McElreath and his team from the investigation to preserve the "unimpaired" nature of it. *Id.* ¶ 140. This was an understanding the Audit Committee and Latham had reached in the 9/29/03 meeting. *Id.* ¶ 137.

According to the Complaint, however, A&B failed to exclude McElreath from participating. McElreath was present at an Audit Committee meeting on 10/1/03, and he "provided his recommendations with regard to disclosure of the recent developments associated with the Justice Department." *Id.* ¶ 149. On 10/30/03, McElreath had prepared a list of existing

relationships between Friedman's and Crescent for the Audit Committee in relation to the investigation. *Id.* ¶ 171. In early November, McElreath's emails show him investigating Brinkley's and Stinn's equity interests in Crescent and the amount of fees and expenses billed by MS. *Id.* ¶ 164.

And at an 11/26/03 Friedman's Board meeting, McElreath was present as Latham discussed the investigation. McElreath then was designated to formulate an agreement with Crescent providing Friedman's greater access to Crescent's financial and operations information. *Id.* ¶ 177. Finally, McElreath, along with Latham, was "intimately involved in advising the Audit Committee on, and negotiating the terms of" Brinkley and Stinn's termination agreements. *Id.* ¶ 180. The Complaint thus concludes that A&B completely failed to safeguard the integrity of the investigation, as it agreed to do, by excluding McElreath from it.

Plaintiff has adequately pled that A&B deviated from the ordinary care, skill and diligence of an attorney by failing to disclose the new conflicts created by the expansion of the scope of the investigation, and failing to exclude McElreath from the investigation as it pledged to do. Plaintiff has alleged that A&B ultimately failed to perform an adequate, unimpaired investigation which damaged the plaintiff by having to obtain new counsel to redo the investigation. Therefore, A&B's motion to dismiss this claim is denied.

## L. Count XII – Breach of Fiduciary Duty

Plaintiff's breach of fiduciary duty claim simply reasserts, word for word, all of his allegations constituting a legal malpractice claim in Part III(K) *supra.* A-doc. # 1 ¶ 268. A&B declares that this breach of fiduciary duty claim is duplicative of plaintiff's legal malpractice claim and consequently must be dismissed under Georgia law. Doc. # 35 at 40.

Where the breach of fiduciary duty claims are "mere duplications of the legal malpractice claim which itself is based on the establishment of a fiduciary, attorney-client relationship that is breached," the fiduciary duty claims should be dismissed. *Griffin v. Fowler*, 260 Ga.App. 443, 446 (2003); *McMann v. Mockler*, 233 Ga.App. 279, 281 (1998). "[A] claim for fiduciary breach, which is based on the same facts and seeks the same relief as the negligence claim, is redundant and should be dismissed." 2 MALLEN & SMITH, LEGAL MALPRACTICE § 14:2 (2007 ed.).

Here, the plaintiff's claim for breach of fiduciary duty is an exact mirror image of his legal malpractice claim. *Compare* A-doc. # 1 ¶ 261 and ¶ 268. In fact, it is evident that the allegations were simply cut and pasted since both claims use the same faulty lettering of its allegations in the paragraphs ("(a), (b), (c), (d), (i), (j), (k)"). *Id.* As discussed *supra,* Part III(K), A&B's failure to disclose material adverse information about Crescent and failure to disclose conflicts relate to inadequate services provided as part of the employment relationship. These allegations and A&B's fiduciary duties are all contained in the legal malpractice claim. Plaintiff's fiduciary duty claims, reiterated here, "call into question the degree of professional skill exercised, and therefore are duplications of the legal malpractice claim." *Oehlerich v. Llewellyn*, 285 Ga.App. 738, 741 (2007) (quotes omitted).

The plaintiff first states that the cases cited by A&B were all decided on summary judgment after discovery occurred, not a motion to dismiss. Doc. # 56-2 at 45 n. 41. Plaintiff

argues that making such a determination at this stage is premature. *Id.* The Court believes the plaintiff would be correct if there was some variation in the pleadings between the claims -- *i.e.*, A&B failed to disclose certain information because it was acting in its own interests or for someone else's interests besides Friedman's. But there is no variation between the two claims.

While the plaintiff correctly points out that it has a right to plead alternative claims, *Traub v. Washington*, 264 Ga.App. 541, 544 (2003), that does not overcome Georgia law that when a breach of fiduciary duty claim is duplicative of a legal malpractice claim, it shall be dismissed. *Oehlerich*, 285 Ga.App. at 741; *Griffin*, 260 Ga.App. at 446; *McMann*, 233 Ga.App. at 281.

The cases plaintiff cites that allow both legal malpractice claims and fiduciary duty claims are inapplicable to the present case because they involve breaches of fiduciary duty not arising directly from the professional services rendered. *See Tante v. Herring*, 264 Ga. 694, 695 (1994) (fiduciary duty claim based on misuse of confidential information obtained during representation to convince client to have affair with counsel); *Traub*, 264 Ga.App. at 544 (attorney used confidential information gained during representation to the detriment of plaintiff after relationship ended); *Both v. Frantz*, 278 Ga.App. 556, 559 (2006) (where attorneys claimed no attorney-client relationship existed, breach of fiduciary duty claim not duplicative because plaintiff alleged attorneys owed fiduciary duties to maintain confidences and avoid conflicts of interest after relationship ended); *Holmes v. Drucker*, 201 Ga.App. 687, 688 (1991) (allowing breach of fiduciary duty claim where attorney attempted to conceal the legal malpractice claim).

In all of the cases cited, the courts found that

the claims were not duplicative (*i.e.*, not based on the same factual allegations) so both legal malpractice claims and breach of fiduciary duty claims could be brought. Here there are no factual distinctions between the two claims, and the fiduciary duty claims question the degree of professional skill exercised. Therefore they are duplicative. The Court thus dismisses the Trustee's breach of fiduciary duty claims.

## M. Count XIII -- Preferential Transfers

Plaintiff alleges that Friedman's made payments to A&B totaling at least $697,469 within 90 days before filing the bankruptcy petition in this case and when Friedman's was insolvent. A-doc. # 1 ¶ 272. 11 U.S.C. § 547(b) allows the trustee to avoid such a transfer assuming other specific requirements are met.

A&B argues that this claim is barred by the doctrine of *res judicata* because no such claim was brought prior to the confirmation of the bankruptcy plan, and there was no specific reservation of preferential transfer claims in the reservation statement of the plan. Where a claim could have been brought before the confirmation of a bankruptcy plan, it is normally precluded in subsequent litigation unless it was *expressly* reserved in the bankruptcy plan. *D&K* 112 F.3d at 259-60. Again, the "identification must not only be express, but also the claim must be specific. A blanket reservation that seeks to reserve all causes of action reserves nothing." *Id.* at 261.

The Court found earlier that plaintiff's legal malpractice claims were specifically reserved by the bankruptcy plan such that *res judicata* did not apply. *See supra* Part III(K)(2)(c). However, nowhere in the reservation statement or in section VI.G of the Disclosure Statement is there any preservation of claims for

preferential transfers or avoidance actions against A&B. *See* Doc. # 35-2 at 15 (exh. 2 attached to A&B's motion to dismiss).

The reservation statement does preserve "any Cause of Action under Chapter 5 of the Bankruptcy Code" that arises from, connects with, or relates to the subject matters of the investigation conducted by the Joint Review Committee. *Id.* The Trustee's preferential transfer claims are within Chapter 5 of the Bankruptcy Code. 11 U.S.C. § 547(b). But a blanket reservation of "any and all claims" is not sufficiently specific to include the preferential transfer claims. *See D&K*, 112 F.3d at 261.

Furthermore, in section VI.G of the Disclosure Statement, Friedman's discusses the potential for "certain bankruptcy-related causes of action" against "officers, directors, and controlling shareholders." Doc. # 35-3 at 53 (exh. C attached to A&B's motion to dismiss). But there is no similar mention of bankruptcy causes of action regarding claims against Friedman's *lawyers*. *Id.* Friedman's has not properly reserved these claims.

In order for *res judicata* to apply, four conditions must be met:

(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent litigation which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Id.* at 259-60. There is no argument that the first and fourth conditions are satisfied. But the plaintiff makes an argument that the second and third requirements cannot be met because (1) A&B was not a party to the prior proceedings since it expunged any interest in the bankruptcy estate and (2) somehow this claim could not have been litigated in the previous action. Doc. # 56-2 at 56.

The plaintiff's arguments have no merit. It is well settled that "a bankruptcy court's order confirming a plan of reorganization is given the same effect as any district court's final judgment on the merits." *In re Justice Oaks II*, 898 F.2d 1544, 1550 (11th Cir. 1990). Under the bankruptcy code, a "party in interest" to the bankruptcy proceedings includes a "creditor." *See* 11 U.S.C. § 1109(b). While A&B expunged any interest in the bankruptcy estate it had as a creditor, that did not occur until well after the bankruptcy plan was confirmed. Friedman's bankruptcy plan was confirmed on 11/23/05, *In re Friedman's, Inc.*, Case No. 05-40129, doc. # 1338 (Bankr.S.D.Ga. 11/23/05), and A&B expunged its interests in the bankruptcy estate on 3/21/07. *Id.* at doc. # 1338. Accordingly, A&B was a party in interest to the bankruptcy proceeding because it was a creditor at the time the bankruptcy plan was confirmed.

Plaintiff's argument that this claim could not have been litigated in the prior proceeding is easily dismissed. Under 28 U.S.C. § 157(b)(2)(F) "proceedings to determine, avoid, or recover preferences" is a core proceeding that a bankruptcy judge may adjudicate. Therefore this core proceeding could have been adjudicated in the prior proceeding but was not.

All four of the res judicata elements have been met here, and there was no express reservation of preference claims in the bankruptcy plan. Consequently, A&B's motion to dismiss the Trustee's avoidance claim against it is granted.

**N. Count XIV -- Fraudulent Conveyance**

The Trustee's claims against A&B for fraudulent conveyance must be dismissed for the same reasons stated *supra* Part III(M). The reservation statement fails to preserve claims for fraudulent conveyance against A&B and therefore are barred by *res judicata*.

Plaintiff also attempts to make a fraudulent conveyance claim against MS, Cohen and Brinkley. He alleges that Friedman's paid MS and, indirectly, Cohen and Brinkley approximately $4.14 million in 2002 and 2003. A-doc. # 1 ¶ 279. He further alleges that Friedman's did not receive reasonably equivalent value for these transfers and Friedman's was insolvent at the time of them. *Id.* ¶¶ 280-281. Therefore, he asks that these transfers be voided pursuant to 11 U.S.C. § 548(a)(1), which states:

> The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 1 year[34] before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
>> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>>> (ii)(I) was insolvent on the date that such transfer was

made or such obligation was incurred, or became insolvent as a result of such transfer or obligation....

*Id.* (footnote added).

Because plaintiff only refers to payments made in 2002 and 2003, more than one year prior to the instant bankruptcy petition's 1/14/05 filing date, these claims must be dismissed.

## O. Count XV – Fraudulent Conveyance Under Georgia Law

The Court previously held that the Trustee's federal-law based, fraudulent conveyance claims must be dismissed on *res judicata* grounds. *See supra* Part III(M) and (N). Again, the confirmed plan's reservation statement fails to preserve claims for fraudulent conveyance against A&B and therefore all such claims are barred by *res judicata*.

Plaintiff reasserts his fraudulent conveyance allegations here against MS, Cohen and Brinkley under *Georgia* law. None of these defendants raise the issue of *res judicata*, so the Court will proceed to their other defenses.

11 U.S.C. § 544(b)(1) states,

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). Applicable law, as the plaintiff claims without objections, would be

---

[34] The current version of 11 U.S.C. § 548(a)(1) allows avoidance of transfers made within 2 years of the filing of the petition. However, that amendment occurred on 4/20/05 and only applied to cases filed after that date which is after the filing date of the instant petition (1/14/05). Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L.No. 109-8, § 1501(b)(1), 119 Stat. 23, 216 (2005). Section 548(a)(1) prior to that amendment only allowed transfers within 1 year of the petition to be voided.

Georgia law. Under Georgia's Uniform Fraudulent Transfers Act (UFTA),

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

O.C.G.A. § 18-2-75(a).

Plaintiff claims that, as of 8/27/02 Friedman's was insolvent, *i.e.*, "the Company's debts were greater than all of the Company's assets, at a fair valuation, and/or the Company was not generally paying its debts as they were due." A-doc. # 1 ¶ 288. Friedman's, while it was insolvent, allegedly paid MS, Cohen (as an alter ego) and Brinkley approximately $4.14 million for which Friedman's did not receive reasonably equivalent value. *Id.* ¶¶ 286-287. Accordingly, the Trustee concludes, such payments should be voided under O.C.G.A. § 18-2-75(a). Defendants respond that this claim has not been sufficiently pled.

First, the plaintiff's claim against Cohen is based on an alter ego theory which this Court already rejected as insufficiently pled. *See supra* Part III(a)(2). Accordingly, this claim is dismissed as to Cohen.

The remaining defendants argue that the plaintiff may bring this claim under O.C.G.A. § 18-2-75(a), but he must establish standing under 11 U.S.C. § 544(b) first. Doc. # 31 at 10. According to the defendants, plaintiff has failed

to identify the name of a specific unsecured creditor still existing with an allowable claim which is necessary to establish standing. 11 U.S.C. § 544(b).

"Code § 544(b) grants to the trustee avoidance powers possessed by certain actual creditors of the estate, as opposed to hypothetical creditors." NORTON BANKRUPTCY LAW AND PRACTICE 2D § 54:6 (October 2007). "[T]he existence and substantive rights generated by the status are dependent on the rights of actual creditors possessing claims that are allowable in bankruptcy." *Id.* In this particular claim, the plaintiff must allege the existence of an unsecured creditor "whose claim arose before the transfer was made...." O.C.G.A. § 18-2-75(a).

But the further question is whether or not the Complaint has to identify the name of a specific creditor, or may simply allege the existence of such a creditor which can then be proved at a later date. Courts have split on this issue. Many have found that simply alleging such a creditor exists suffices at this stage to satisfy the liberal pleading requirements under F.R.Civ.P. 8(a). *See In re Lexington Healthcare Group, Inc.*, 339 B.R. 570, 576 (Bankr.D.Del. 2006) (no need to name specific creditor); *In re APF*, 274 B.R. 634, 639 (Bankr.D.Del. 2001) (same), *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 673-74 (D.R.I.1998) (naming creditor unnecessary because plaintiff "not required to prove his case at this point; his allegation that such a creditor exists suffices"). As one case stated:

> When analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name, although the trustee must ultimately prove such a creditor

exists.

*APF,* 274 B.R. at 639.

The defendants point to *In re Sverica Acquisition Corp.,* which held that it is "crucial ... that Defendants have proper notice of the identity of the alleged creditor in order that they might confirm or deny the validity of that entity's claim." 179 B.R. 457, 465 (Bankr.E.D.Pa. 1995). They emphasize that requiring the name of a creditor is especially important here, where the alleged transfers occurred eighteen to twenty-four months prior to the filing of the bankruptcy petition. Doc. # 31 at 13. Based on this fact, they allege it is likely that no such creditors still exist because they were all paid off during that time. *Id.*

Yet, that same argument was made and rejected in *Lexington,* 339 B.R. at 776. The court there agreed with the majority of decisions and determined that notice pleading did not require the specific identification of a creditor at this stage. *Id.*

The Court agrees with the majority of decisions and holds that at this stage it is not necessary for the plaintiff to specifically name creditors. But he will have to prove their existence to ultimately recover. It is sufficient at this point to simply plead the existence of such creditors. Note, though, that F.R.CIV.P. 11(b)(3) requires attorneys to certify, based upon their reasonable inquiries, that any representations made to the Court have or will have evidentiary support. The potential for Rule 11 sanctions for bald allegations with no evidentiary support should be sufficient to ensure that the Trustee here makes this claim in good faith.

Even though the Court finds that the plaintiff need not identify the names of specific creditors,

the plaintiff's claim is still not sufficient because the Complaint does not allege that there are *any* such creditors. At the very least, the plaintiff must make this allegation and without it the claim cannot go forward as pleaded.

The defendants' second argument is that the plaintiff has failed to identify specific transfers to put them on sufficient notice of the plaintiff's claims. Cases have held that a fraudulent transfer claim is sufficiently pled when it identifies the date and amount of the transfer and the transferor and transferee. *Lexington,* 339 B.R. at 575 (must identify transfer by date and amount and the transferor and transferee); *In re DVI, Inc.,* 326 B.R. 301, 308 (Bankr.D.Del. 2006) (complaint sufficiently pled where it identifies date and amounts of transfers); *In re Enron Corp.,* 2006 WL 2400369, at * 8 (Bankr.S.D.N.Y. 5/11/2006) (sufficiently pled when complaint identifies date of transfer and amount of transfer); *APF Co.,* 274 B.R. at 639 (complaint inadequate when it provides no information about the transfers).

The Court agrees that the Complaint is also deficient in this regard. Plaintiff simply lumps together unidentified payments made to MS, Cohen and Brinkley totaling approximately $4.14 million in 2002 and 2003. A-doc. # 1 ¶ 286. But there are no specifics given -- no dates, no amounts, and no specification on what transfers were made to whom. *Id.*

The Court rejects the Trustee's argument that such specifics can be obtained during discovery. Doc. # 56-2 at 24. The plaintiff must have Friedman's records which show the transfers. The Court finds it hard to believe that the plaintiff can produce a figure of $4.14 million of fraudulent transfers yet does not have any means of providing specifics as to the dates and amounts of each of those transfers. If the

plaintiff cannot, it begs the question of how did the plaintiff make such an allegation to begin with? As pleaded, the plaintiff's fraudulent conveyance claims cannot proceed.

### P. F.R.Civ.P. 4(m)

Defendant Victor Suglia has made no appearance in this case, and nothing in the record shows that he was properly served within 120 days of the filing of the complaint as required by F.R.Civ.P. 4(m).[35] Consequently, the plaintiff has 15 days from the date this Order is served to show why this Court should not dismiss the plaintiff's claims, without prejudice, against Suglia.

## IV. CONCLUSION

As stated *supra* Part III(F), the plaintiff submitted a shotgun complaint, incorporating all 210 paragraphs of facts into each count. "The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (*i.e.*, all but the first) contain irrelevant factual allegations and legal conclusions. Consequently, in ruling on the sufficiency of a claim, the trial court must sift out the irrelevancies, a task that can be quite onerous." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293,

1295 (2002). This form of pleading is condemned in the 11th Circuit. *U.S. ex rel. Atkins*, 470 F.3d at 1354 n. 6. But "[w]hen faced with a shotgun pleading, the trial court, whether or not requested to do so by the party's adversary, ought to require the party to file a repleader." *Id.*

Not all of the instant Complaint may be said to constitute a shotgunned product. Consequently, the Court has waded through the Complaint and reached a conclusion on all of the plaintiff's claims. The defendants' motions to dismiss (doc. ## 31, 35, 36, 38, 41) are therefore ***GRANTED*** **in part** and ***DENIED*** **in part**.

This <u>  10  </u> day of January, 2008.

*[signature]*

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[35] In pertinent part Rule 4(m) provides:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.